Daniel "Sparky" Abraham (SBN 299193)
**JUBILEE LEGAL**
300 E. Esplanade Dr., 9th Floor
Oxnard, CA 93036
(805) 946-0386
sparky@jubilee.legal

Andrea J. Matthews (M.A. Bar No. 694538)*
Anna L. Deffebach (D.C. Bar No. 241346)*
Johanna M. Hickman (D.C. Bar No. 981770)*
Kristen Miller (D.C. Bar No. 229627)*
Steven Y. Bressler (D.C. Bar No. 482492)*
Elena Goldstein (D.C. Bar. No. 90034087)*
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
(202) 304-3457 (Matthews)
amatthews@democracyforward.org
adeffebach@democracyforward.org
hhickman@democracyforward.org
consultantkmiller@democracyforward.org
sbressler@democracyforward.org
egoldstein@democracyforward.org

**Pro hac vice motion forthcoming*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| INCLUSIVE ACTION FOR THE CITY and CAMEO NETWORK,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE TREASURY; SCOTT BESSENT, in his official capacity; COMMUNITY DEVELOPMENT FINANCIAL INSTITUTIONS FUND; ALEXANDRIA SMITH, in her official capacity; OFFICE OF MANAGEMENT AND BUDGET; and RUSSELL VOUGHT, in his official capacity,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1. Nearly one quarter of American households do not have bank accounts or must rely on costly payday lenders and check-cashing outlets to meet basic financial needs. In those communities, a corner-store owner who needs $2,000 to replace a freezer, or a street vendor who needs $500 to buy inventory, often cannot simply turn to a bank for a loan. The lack of ready access to capital investments for underserved small businesses forces these entrepreneurs to choose between foregoing the funding they need and resorting to high-cost lenders who might impose finance charges that approach or exceed 100%.

2. Community Development Financial Institutions (CDFIs) exist to close that gap. They are mission-driven lenders that make the loans conventional banks will not make, on terms borrowers can actually repay, in places other capital does not reach.

3. Congress created the CDFI Fund in 1994 to better capitalize those lenders, and has appropriated money to it every year since. Over three decades, the Fund has awarded more than $8 billion in monetary awards, allocated $81 billion in tax credits, and guaranteed nearly $3 billion in bonds. It has built the capacity of more than 1,400 certified CDFIs operating in all fifty States, the District of Columbia, Guam, and Puerto Rico.

4. Despite strong bipartisan congressional support, the Trump-Vance Administration has set out to shut the Fund down. In May 2025, the President's proposed budget asked Congress to eliminate the Fund's award programs outright. The White House issued a fact sheet explaining the Presidential budget's proposed elimination of the CDFI Fund, calling the program "woke" and accusing it of "abus[ing] funds to advance a partisan agenda" that included "critical race theory," "racial justice," "gender extremism," and "climate radicalism." And in October 2025, during the government shutdown, the Trump-Vance Administration sent termination notices to every employee of the Fund, asserting that the basis of the terminations was "to implement the abolishment" of the CDFI Fund.

5. Congress refused to implement the President's budget. It rejected the proposed cuts, appropriated the same $324 million budget that it appropriated in fiscal year 2025 for fiscal year 2026, and barred the use of any appropriated funds to "increase, eliminate, or reduce funding for a program, project, or activity as proposed in the President's budget request" unless Congress itself enacts that change. Congress also

passed legislation requiring the reinstatement of the CDFI Fund employees by November 17, 2025, along with others across the government, and the Fund reinstated the staff needed to run its programs.

6. Defendants are now accomplishing by delay what they could not accomplish by legislation or mass firing. Notwithstanding Congress's unambiguous directives, Defendants have withheld virtually all of the money Congress appropriated for the CDFI programs, including funds that will expire within weeks.

7. The contrast with prior policy and practice is stark. In 2024, OMB made the Fund's $289 million in program money available within weeks, and Treasury was able to award and disburse it to CDFIs. But in 2025, OMB only immediately released $35 million Congress provided for the Fund's own administration (including staff salaries) and withheld the $289 million Congress provided for the Fund's award programs. OMB withheld that money from the Treasury Department, through an OMB process called "apportionment" of appropriations, until April 8, 2026 — more than a year late, and shortly before OMB Director Vought was scheduled to testify before Congress.

8. Even after OMB finally acted, no further progress has been made. As of this filing, Treasury has not made a single award of fiscal year 2025 funds.

9. The result is that every dollar Congress appropriated for fiscal year 2025 awards is at risk of expiring unspent on September 30, while the money Congress appropriated for the years that follow sits frozen in OMB accounts where the Fund cannot reach it.

10. Defendants have never explained any of this. They have identified no statute authorizing them to withhold the money. And they have said nothing at all about what the delay means for CDFIs that applied for those funds, or for the communities those CDFIs serve.

11. The challenged delays in apportioning and awarding the funds, if left unchecked, will cause direct, immediate, significant, and irreparable harm to CDFIs and the communities they serve.

12. Defendants' conduct is unlawful several times over. Their refusal to obligate money Congress directed them to spend is arbitrary and capricious: Defendants have offered no reasoned explanation, have ignored the reliance interests of the CDFIs that applied, and have weighed a consideration Congress forbade them to weigh — alignment with a budget that Congress rejected. It is contrary to law, because the appropriations acts require this money to be obligated in the amounts, for the purposes, and by the

dates Congress set. It is also agency action unlawfully withheld and unreasonably delayed. It cannot be squared with the Appropriations Clause or the Take Care Clause, which commit the power of the purse to Congress and leave the Executive the duty to spend what Congress has appropriated. And it is harming people and communities across the country that depend upon and benefit from CDFIs.

**PARTIES**

13. Plaintiff Inclusive Action for the City (Inclusive Action) is a not-for-profit corporation located in Los Angeles, California, and a federally certified CDFI whose mission is to champion working people, invest in entrepreneurs, and change systems to build an economy that works for all of us. It serves underinvested communities and builds thriving local economies by improving access to capital and advancing policy through collaborative research and community-driven advocacy. Inclusive Action has received seven awards from the CDFI Fund. As it had successfully for many years prior, Inclusive Action applied for a fiscal year 2025 Financial Assistance award seventeen months ago and continues to await a decision from the CDFI Fund. And Inclusive Action would apply for fiscal year 2026 funds if Defendants open that round. Inclusive Action is a member of Plaintiff CAMEO Network.

14. Plaintiff California Association for Micro Enterprise Opportunity Network (CAMEO Network or CAMEO) is a San Francisco, California based association made up of over 400 organizations, agencies, and individuals dedicated to furthering business development across the nation with small and micro-business financing such as loans and credit, technical assistance, and business management training—including 57 CDFIs. CAMEO Network runs a CDFI Incubator, National Academy, Shared Services Center, and Impact Fund, through which it offers training, consulting, lending capital, and back-office services to help emerging and established CDFIs and technical assistance providers build critical operating capacity. It also provides public education on the economic impacts of micro-business through public awareness and advocacy at the local, state and federal levels to support the growth of micro-business, start-ups, and entrepreneurs. CAMEO Network's members include Inclusive Action.

15. Defendant the United States Department of the Treasury (Treasury) is an executive department of the United States federal government, headquartered in Washington, D.C.

16. Defendant Scott Bessent is the Secretary of the Treasury. He is sued in his official capacity.

17. Defendant Community Development Financial Institutions Fund (CDFI Fund) is a component of the Department of the Treasury.

18. Alexandria Smith is the Acting Director of the CDFI Fund, the highest-ranking officer of the CDFI Fund. She is sued in her official capacity.

19. The Office of Management and Budget (OMB) is an executive department of the United States federal government, headquartered in Washington, D.C.

20. Russell Vought is the Director of OMB. He is sued in his official capacity.

## JURISDICTION AND VENUE

21. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331, because this action arises under the Constitution and laws of the United States, and under 28 U.S.C. § 1361 over Plaintiffs' claim for mandamus relief.

22. This Court may grant declaratory, injunctive, and other relief pursuant to 28 U.S.C. §§ 2201-2202, 5 U.S.C. §§ 702, 705, 706, and the Court's inherent authority to enjoin federal officials from acting unlawfully.

23. Venue is proper in this District under 28 U.S.C. § 1391(e)(1). Defendants are agencies of the United States and officers of the United States sued in their official capacities; Plaintiff CAMEO Network resides in this District, with its principal place of business in San Francisco, California.

## LEGAL BACKGROUND

### The Community Development Financial Institutions Fund

24. CDFIs are mission-driven financial institutions that create economic opportunity, promote quality affordable housing, and provide essential community services to rural and urban low-income people and communities across the nation that lack adequate access to affordable financial products and financial services.

25. Congress established the federal CDFI Fund in the Riegle Community Development and Regulatory Improvement Act of 1994 (P.L. 103-325), codified at 12 U.S.C. § 4701 *et seq.*, to expand economic opportunity for underserved people and communities by improving the supply of capital,

credit, private investment, and development services in economically distressed areas.[1] Although the Fund is organized within Treasury's Office of Domestic Finance, Congress provides the Fund with its own budget authority through annual appropriations. The CDFI Fund is headed by a director appointed by the Secretary of the Treasury. Congress has appropriated funding for the CDFI Fund each year since the Fund's creation.

26. As Congress explained when it created the CDFI Fund, its purpose is to "promote economic revitalization and community development through investment in and assistance to community development financial institutions, including enhancing the liquidity of community development financial institutions."[2] Accordingly, Congress recognized that providing capital to CDFIs would in turn allow CDFIs to promote economic development in communities that were not adequately served by traditional financial institutions.

27. Congress charged the CDFI Fund with pursuing those objectives by administering 11 programs or functions, including:

a. CDFI Program;
b. The New Markets Tax Credit Program;
c. Bank Enterprise Award Program;
d. Native American CDFI Assistance Program;
e. Housing Production-Financial Assistance;
f. Capital Magnet Fund;
g. CDFI Bond Guarantee Program;
h. Small Dollar Loan Program;
i. CDFI Equitable Recovery Program;
j. CDFI Rapid Response Program;

---

[1] Although the Riegle Act created the Fund as a wholly owned, independent government corporation, a supplemental appropriations bill moved the Fund into the Department of the Treasury in 1996. Balanced Budget Downpayment Act, II, Pub. L. No. 104-134, Title I, § 101(e)[Title III], Apr. 26, 1996, 110 Stat. 1321-294; renumbered Title I. Pub. L. No. 104-140, § 1(a), May 2, 1996, 110 Stat. 1327.

[2] 12 U.S.C. § 4701(b).

k. Certification of CDFIs and Community Development Entities.[3]

28. In order to ensure that its resources are allocated to appropriate institutions, the CDFI Fund is authorized to certify banks, credit unions, nonprofit loan funds, microloan funds, and venture capital funds as designated CDFIs.[4] Depending on the program, a CDFI must be certified, in the process of being certified, or must obtain certification within a certain period of time to be eligible for an award.[5]

29. Obtaining certification allows a CDFI to access the vital support the government's CDFI programming provides. Certification by the government is a rigorous process, requiring CDFIs to routinely provide key metrics on their lending portfolio and practices, information about their customer base, and financial information on the health of the organization.[6]

30. Certification also serves as an indicator of legitimacy for other types of funders, including large financial institutions and foundations. Because the financial assistance offered by the CDFI Fund usually requires that a CDFI find "matching" funds from non-government sources, the CDFI program and its certification are deliberately engineered to couple government support with private or nonprofit investment. In this way, CDFI certification from the government serves both as a formal gateway to government support and a driver of outside investment.

31. To be eligible for CDFI certification, an institution must demonstrate that at least 60% of its activities are directed toward either an Investment Area or a Targeted Population.[7]

***The CDFI Program***

32. The largest program administered by the CDFI Fund is the CDFI Program. The CDFI Program provides awards to CDFIs that focus on serving low-income people, historically underserved demographic populations, and distressed communities through awards of technical assistance (TA) and financial assistance (FA) including in the form of loans, grants, equity investments, deposits, and capital

---

[3] *See* 12 U.S.C. § 4701 et seq.; 26 U.S.C. § 45D; 12 U.S.C. § 4713; 12 U.S.C. §§ 4701-4718; 12 U.S.C. § 4703(a)(1); 12 U.S.C. § 4569; 12 U.S.C. § 4713a; 12 U.S.C. § 4719; Consolidated Appropriations Act, 2021, Title V, Sec. 523, (Pub. L. No. 116-260, 134 Stat. 1182, 2087 (2020);
[4] 12 C.F.R. § 1805.201.
[5] *See, e.g.*, 12 C.F.R. § 1805.200.
[6] 12 C.F.R. § 1805.201.
[7] 12 C.F.R. §§ 1805.200(a)(2), 1805.201(b)(3)(i); U.S. Dep't of the Treasury, CDFI Fund, *Target Market CDFI Certification Webinar*, https://perma.cc/9BJB-S2MA; *see also* 12 U.S.C. § 4702.

reserves.[8] FA awards include an award called the "Base Financial Assistance award" or "Base-FA" as well as supplemental awards that target specific areas such as hunger, persistent poverty, and individuals with disabilities.[9]

33. FA and TA awards are both subject to several restrictions. For example, the Fund requires an applicant to demonstrate that it can match award funds with those from other sources. Additionally, the Fund generally limits any one entity or its affiliates from receiving more than $5 million in awards from the Fund within a three-year period.[10]

34. Additionally, all financial assistance awarded by the CDFI Program must be matched with funds from sources other than the federal government.[11] Matching funds may be in the form of loans, grants, equity investments, deposits, and credit union shares.[12] Financial awards from the CDFI Program are made in the same form as the matching funds—in other words, if an organization obtains matching funds in the form of grants, the CDFI Fund award will likewise take the form of a grant.[13]

35. The CDFI Program made its first awards in 1996. Since its establishment, it has awarded over $3 billion in FA and TA grants.[14]

36. From FY 2010 through FY 2024, CDFI Program FA recipients have used their awards to originate nearly $300 billion in total loans and investments in distressed and economically underserved communities; provide more than $55.8 billion in financing to more than 1.34 million businesses; and support the development of more than 557,000 units of affordable housing.[15]

---

[8] 12 U.S.C. § 4707; 12 C.F.R. § 1805.100 et seq.

[9] These include Healthy Food Financing Initiative-Financial Assistance (HFFI-FA), Persistent Poverty Counties-Financial Assistance (PPC-FA), Disability Funds-Financial Assistance (DF-FA), and Housing Production-Financial Assistance (HP-FA). *See* U.S. Dep't of the Treasury, CDFI Fund, *Community Development Financial Institutions Program, Award Book, FY 2024* at 1, https://perma.cc/4UMU-B6JK.

[10] 12 C.F.R. § 1805.500; *Notice of Funds Availability*, 90 Fed. Reg. at 6052.

[11] 12 U.S.C. § 4707.

[12] 12 C.F.R. § 1805.501.

[13] *Id.*

[14] U.S. Dep't of the Treasury, CDFI Fund, *Community Development Financial Institutions Program, Award Book, FY 2024*, supra note 9 at 1.

[15] *Id.*

37. In fiscal year 2024, the last year for which awards were issued, 578 organizations received $433.6 million dollars in CDFI program awards. These included $257.1 million in Base-FA awards, $43 million in Persistent Poverty County awards, $13 million in Healthy Food Financing awards, and $72.7 million in TA awards. These awards were issued to 257 loan funds, 267 credit unions, 49 banks and bank holding companies, three venture capital funds, and two other institutions. The organizations were headquartered in 45 states, the District of Columbia, Puerto Rico, and the Virgin Islands.[16]

38. Of the fiscal year 2024 CDFI Program awardees, 66 serve rural areas, 113 serve minor urban areas, 17 serve micropolitan areas, and 136 serve major urban areas.[17] Sixty-three organizations are headquartered in Persistent Poverty Counties.[18]

***The CDFI Fund's Other Programs***

39. The CDFI Fund also runs a number of other programs that inject hundreds of million dollars into underserved communities.

40. The CDFI Fund's Small Dollar Loan Program was created by the Dodd-Frank Wall-Street Reform and Consumer Protection Act of 2010. Since the program launched in 2021, the CDFI Fund has provided more than $40.2 million in Small Dollar Loan Program awards to CDFIs. The program supports both loan loss reserve grants, which enable CDFIs to cover the losses on small dollar loans associated with starting a new small dollar loan program or expanding an existing small dollar award program, as well as grants for technical assistance.[19]

41. The CDFI Fund's Bank Enterprise Award Program provides grants to FDIC-insured depository institutions. Award recipients are required to deploy those awards towards qualifying activities, which include increased investments in CDFIs or in their own lending, investing, or service-related activities in the most economically distressed communities.[20] Since the inception of the Bank Enterprise Award

---

[16] *Id*. at 2.
[17] *Id*. at 4.
[18] *Id*. at 5. Persistent Poverty Counties are counties "where 20% or more of the population has lived in poverty over the past 30 years, as measured by the U.S. Census Bureau[.]" *Id*. at n.1.
[19] U.S. Dep't of the Treasury, CDFI Fund, *The Small Dollar Loan Program Award Book FY 2024* at 1, https://perma.cc/M4FS-ATE9.
[20] U.S. Dep't of the Treasury, CDFI Fund, *The Bank Enterprise Award Program Award Book FY 2024*, at 1, https://perma.cc/7AME-FXJN.

program in 1994, the CDFI Fund has awarded grants totaling over $638 million. From 2016 through 2024 alone, Bank Enterprise Award program recipients have increased their lending and direct investments in distressed communities by more than $4.5 billion.[21]

42. The CDFI Fund's Bond Guarantee Program provides CDFIs with guarantees of bonds, injecting new and substantial capital into distressed communities. Since its inception through 2022, more than $2 billion in bonds have been guaranteed through the program.[22]

43. The Native American CDFI Assistance Program provides monetary awards for Financial Assistance and Technical Assistance, as well as training opportunities, to CDFIs that serve Native Communities. The CDFI Fund's Native Initiatives program creates jobs, builds businesses, and fosters economic self-determination in Native Communities nationwide.[23]

44. New Markets Tax Credit Program incentivizes community development and economic growth through tax credits that attract private investment to distressed communities. This tax incentive sparks the revitalization of communities in need.[24]

45. The CDFI Fund's Capital Magnet Fund program awards competitive grants to CDFIs and qualified non-profit housing organizations. These awards can be used to finance affordable housing activities, as well as related economic development activities and community service facilities.[25]

46. The CDFI Fund also administered two programs designed to respond to COVID-19 economic impacts: the CDFI Equitable Recovery Program and the CDFI Rapid Response Program.[26]

47. In total, since its creation, the CDFI Fund has awarded more than $8 billion to CDFIs, community development organizations, and financial institutions through its various programs.[27] Consistent with its

---

[21] *Id.*

[22] U.S. Dep't of the Treasury, CDFI Fund, *CDFI Bond Guarantee Program, A gateway to Capital and Community Revitalization*, at 1, https://perma.cc/ZYN2-UN9M.

[23] *See* U.S. Dep't of Treasury, CDFI Fund, *Native Initiatives*, https://perma.cc/KW6J-VP8Q.

[24] *See* U.S. Dep't of Treasury, CDFI Fund, *New Markets Tax Credit Program*, https://perma.cc/XVZ3-C8WP.

[25] *See* U.S. Dep't of Treasury, CDFI Fund, *Capital Magnet Fund*, https://perma.cc/S4PH-PG2H.

[26] *See* U.S. Dep't of Treasury, CDFI Fund, *CDFI Equitable Recovery Program*, https://perma.cc/2PJD-PTQV; U.S. Dep't of Treasury, CDFI Fund, *CDFI Rapid Response Program*, https://perma.cc/6C3F-H9P8.

[27] *See* U.S. Dep't of Treasury, CDFI Fund, *Empowering Underserved Communities* at 3, available at

objective of boosting CDFIs' ability to inject capital into underserved American communities, Congress has mandated that at least 10% of the funds awarded by the CDFI Fund be used for activities that serve populations living in Persistent Poverty Counties.[28] For the FY 24 funding round, each of the CDFI Fund's programs exceeded that Congressional mandate.[29]

***The CDFI Fund's Award Process***

48. The CDFI Fund announces funding opportunities through a Notice of Funding Availability (NOFA) published in the Federal Register.

49. The NOFA is the instrument that opens a funding round. It announces the total amount of funding available and its allocation among award categories, identifies who is eligible to apply, sets the application deadline, and specifies how applications will be evaluated. The Fund's regulations specify the eligibility and certification timing, the criteria for merit review, the treatment of matching funds, and applicants' reporting obligations.[30]

50. Under the Paperwork Reduction Act (PRA), OMB's Office of Information and Regulatory Affairs (OIRA) has final authority to approve these applications before they are released.[31] Failure to do so prevents CDFI Fund from proceeding with the application process for these programs and can, therefore, ultimately prevent it from making the awards.

51. Without a NOFA, there is no funding round. Prospective applicants cannot apply, the Fund cannot evaluate applications, and no award can be made. Publication of the notice is the necessary first step in converting an appropriation into capital deployed in a community.

---

https://perma.cc/8EYQ-HVEN.

[28] PPCs are counties, including county equivalent areas in Puerto Rico, where 20% or more of the population has lived in poverty over the past 30 years, as measured by the U.S Census Bureau, or any other territory or possession of the United States that has had 20% or more of its population living in poverty over the past 30 years, as measured by the Island Areas Decennial Censuses or equivalent data of the Bureau of the Census. A link to the list of PPCs can be located on the CDFI Fund's website (www.cdfifund.gov).

[29] *See, e.g.*, U.S. Dep't of the Treasury, CDFI Fund, *CDFI Program, Award Book, FY 2024*, supra note 9 at 1; U.S. Dep't of the Treasury, CDFI Fund, *The Bank Enterprise Award Program Award Book FY 2024*, supra note 20 at 1; U.S. Dep't of the Treasury, CDFI Fund, *The Small Dollar Loan Program Award Book FY 2024*, supra note 19 at 1.

[30] *See, e.g.*, 12 C.F.R. §§§ 1805.200, 1805.301(d), 1805.500, 1805.600.

[31] *See* 44 U.S.C. § 3507.

52. Applications for CDFI Fund's programs are governed by statute, regulations, and procedures established by the CDFI Fund.[32]

53. An applicant must generally "establish that the applicant is, or will be, a community development financial institution" and include a comprehensive strategic plan for the organization that contains a business plan; an analysis of the needs of the investment area or targeted population and a strategy for how the applicant will attempt to meet those needs; a plan to coordinate use of assistance from the Fund with existing Federal, State, local, and tribal government assistance programs, and private sector financial services; an explanation of how the proposed activities of the applicant are consistent with existing economic, community, and housing development plans in the relevant area; and a description of how the applicant will coordinate with community organizations and financial institutions, and must include a detailed description of the applicant's plans and likely sources of funds to match the amount of assistance requested from the Fund.[33]

54. Congress defined thirteen statutory factors that the Fund must consider when evaluating applications, alongside considerations "deemed to be appropriate" by the CDFI Fund.[34] Through rulemaking, the CDFI Fund established additional factors that include "evaluat[ion] on a merit basis and in a fair and consistent manner," considering the unique characteristics of the applicant that vary by institution type, asset size, stage of organizational development, markets served, products and services provided, and location.[35]

55. If the Fund selects an applicant, prior to issuing any funding, the parties must enter into an Assistance Agreement — a formal agreement between the Fund and the recipient specifying the terms of the assistance, the recipient's performance goals, and its reporting obligations.[36]

---

[32] 12 U.S.C. § 4704.
[33] *Id.*
[34] *Id.* § 4706.
[35] 12 C.F.R. §§ 1805.700; 1805.701.
[36] 12 U.S.C. § 4707.

**OMB Apportionment**

56. Appropriated funds do not become available for an agency to spend automatically. Before an agency may incur an obligation against an appropriation, the appropriation must be apportioned in a manner that a spending agency can access.[37]

57. The apportionment function is assigned to the President and is exercised by the Director of the Office of Management and Budget.[38]

58. OMB must make apportionments in writing to an executive agency either twenty days prior to the start of the fiscal year for which the appropriations were provided or thirty days after the date of enactment of the appropriations act, whichever is later.[39]

59. An apportionment is legally binding on the agency. No officer or employee of the United States may make or authorize an obligation or expenditure that exceeds an apportionment.[40]A violation must be reported immediately to the President and Congress and transmitted to the Comptroller General.[41]

60. Apportionment is the first step in a fiscal year's budget execution process. Apportionment permits the agency to access the funds, and to include information about the funds in the agency's fund control and financial systems.

61. However, even after OMB apportions funds, the funding may still not be immediately available to an agency to obligate. An apportionment might divide an appropriation by time period; by activity, function, project, or object; or by a combination of the two.[42] For example, OMB might make an apportionment that does not allow funds to be spent until a future fiscal year, which is referred to as a Category C apportionment.

62. When Congress appropriates funds, it may make them available for any period of time—a single year, multiple years, or no specific year. For example, Congress might appropriate funds in the fiscal

---

[37] 31 U.S.C. § 1512.
[38] *Id.* § 1513; *See also* Off. of Mgmt. & Budget, *OMB Circular No. A-11, Preparation, Submission, and Execution of the Budget* §§ 120.1, 120.34, https://perma.cc/H466-36D6.
[39] 31 U.S.C. § 1513(b)(2).
[40] 31 U.S.C. § 1517(a).
[41] *Id.* § 1517(b); *see also id.* § 1341.
[42] *Id.* § 1512(b)(1).

year 2025 budget that it intends to be available throughout fiscal year 2025 and 2026, and do not expire until the end of fiscal year 2026. Or, it might appropriate funds in the fiscal year 2025 budget that have no expiration date at all.

63. When OMB makes Category C apportionments of budgetary resources in multi-year and no-year appropriations into future fiscal years, it blocks an agency from being able to obligate or spend those funds until the fiscal year that OMB has designated through the apportionment unless OMB provides otherwise in a new apportionment or in a binding apportionment footnote. When OMB uses a Category C apportionment to set aside, for use only in a future fiscal year, funds that Congress has deliberately made available across multiple fiscal years (multi-year money) or without fiscal-year limitation (no-year money), it contravenes Congress's express intention.

64. In some cases, a footnote to the apportionment will impose additional conditions on the obligation of funds that must be satisfied to OMB's satisfaction. Footnotes designated with the letter "A" purportedly impose legally binding conditions, subject to the Antideficiency Act, on the agency's use of the apportioned funds.[43]

65. Under the Antideficiency Act, OMB may not hold back appropriations using apportionments unless doing so to establish a "reserve" for a statutorily permissible purpose. OMB may establish a reserve only (A) to provide for contingencies; (B) to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (C) as specifically provided by law.[44] Prior to 1974, the Antideficiency Act had an additional provision allowing broader grounds for establishing reserves, but Congress repealed that provision to "preclude the President from relying on that Act as authority for implementing policy impoundments." *City of New Haven v. United States*, 809 F.2d 900, 906 & n.18 (D.C. Cir. 1987).

66. Congress has thus sharply limited the circumstances in which OMB may lawfully hold appropriated funds back in reserve. Disagreement with the program Congress chose to fund is not among the permitted grounds.

---

[43] *See* Off. of Mgmt. & Budget, *OMB Circular No. A-11, Preparation, Submission, and Execution of the Budget*, supra note 38 §§ 120.1, 120.34.
[44] 31 U.S.C. § 1512(c).

67. In sum, the law requires that Congressionally appropriated funds be spent *unless* specific, narrow circumstances apply. If the apportioning official concludes that a reserved amount "will not be required to carry out the objectives and scope of the appropriation concerned," the official must recommend that the amount be rescinded, through the process the Impoundment Control Act prescribes.[45]

68. Although apportionment is intended to be a ministerial exercise, the practical consequence of the apportionment process is that OMB has, including in its handling of appropriations for the CDFI Fund and its programs, abused it to functionally control when and whether appropriated money can be spent at all. Until OMB apportions an appropriation in a manner that an agency can obligate and spend, the agency to which Congress gave the money is legally forbidden to obligate it.

69. A decision to withhold an apportionment, or apportion funds in a manner that an agency cannot access, is therefore not a bookkeeping matter. It is a decision that the money will not be spent.

70. Prior to this year, OMB's apportionment policy and practice has made funds available for the CDFI Fund's obligation on a timeline that has allowed the CDFI Fund to issue awards and release funds well in advance of end of the fiscal year.

**The Impoundment Control Act**

71. Similarly, the Impoundment Control Act of 1974 (ICA) precludes agencies from "withholding or delaying the obligation or expenditure of" appropriated funds and from taking "any other type of Executive action or inaction which effectively precludes the obligation or expenditure of" appropriated funds.[46] If the Executive Branch wishes to "defer" the expenditure of funds in any of the above manners, it must send a special message to Congress detailing the money to be deferred and the reasons for the deferral.[47]

72. Congress enacted the Impoundment Control Act of 1974, 2 U.S.C. §§ 681–688, after President Nixon repeatedly refused to spend funds Congress had appropriated. The Act specifies the procedures by which the Executive Branch may propose to cancel or to postpone spending that Congress has

---

[45] 31 U.S.C. § 1512(c)(2).
[46] 2 U.S.C. § 682(1).
[47] *Id.* § 684.

directed, and it makes release of the funds the default consequence when those procedures are not followed.[48]

73. The ICA provides the same three grounds for deferral as the Antideficiency Act provides for a reserve. "In other words, deferrals are authorized only in those situations in which reserves are authorized under the Antideficiency Act."[49] The ICA does not permit a deferral for policy reasons.[50]

74. The Impoundment Control Act provides for two types of impoundments: rescissions and delays.[51]

75. Whenever the President determines that all or part of any budget authority "will not be required to carry out the full objectives or scope of programs for which it is provided," or "should be rescinded for fiscal policy or other reasons (including the termination of authorized projects or activities for which budget authority has been provided)," or whenever budget authority provided for a single fiscal year "is to be reserved from obligation for such fiscal year," the President "shall transmit to both Houses of Congress a special message" setting out specified information about the proposed rescission or reservation.[52]

76. Unless Congress completes action on a rescission bill within 45 days, "[a]ny amount of budget authority proposed to be rescinded or . . . reserved . . . shall be made available for obligation."[53]

77. If the Executive proposes only to delay rather than cancel spending, the President must likewise transmit a special message to both Houses of Congress. 2 U.S.C. § 684(a). Deferrals are permissible only to provide for contingencies, to achieve savings made possible by or through changes in requirements or greater efficiency of operations, or as specifically provided by law. *Id.* § 684(b). And a deferral may not extend beyond the end of the fiscal year in which it is proposed. *Id.* § 684(a).

78. The Impoundment Control Act thus leaves the Executive Branch two lawful courses when it does not wish to spend money Congress has appropriated. It may ask Congress to rescind the appropriation,

---

[48] *See* U.S. Gov't Accountability Off., *Impoundment Control Act*, https://perma.cc/MU5Y-GSR8.
[49] U.S. Gov't Accountability Off., *Principles of Federal Appropriations Law* at 2-48 n.56 (4th ed. 2016), https://perma.cc/VLX9-DH5E.
[50] *Id.*; 2 U.S.C. § 684(b).
[51] 2 U.S.C. §§ 683(a), 684(a).
[52] 2 U.S.C. § 683(a).
[53] *Id.* § 683(b); *see also id.* §§ 682(3), 688 (computation of the 45-day period).

and withhold the funds for 45 days while Congress decides. Or it may, under limited circumstances that do not apply here, propose a temporary deferral on one of the narrow grounds Congress specified, to defer spending the funds for a period before the fiscal year ends. What the Executive may not do is withhold appropriated funds indefinitely while saying nothing to Congress at all.

79. Defendants have taken neither lawful course. They have transmitted no special message to Congress as to any of the funds at issue in this action. No rescission bill concerning these funds is pending. Defendants have simply declined to make the money available, without notifying Congress, invoking any statutory authority, or offering any explanation.

## FACTUAL ALLEGATIONS

### Congressional Appropriations for the CDFI Fund

80. In the Consolidated Appropriations Act of 2024, Congress appropriated $289 million to the CDFI Program. It appropriated $324 million in total "[t]o carry out the Riegle Community Development and Regulatory Improvement Act of 1994 (subtitle A of title I of Public Law 103-325), including services authorized by section 3109 of title 5, United States Code." Of that amount, it directs that "not less than $188,000,000 . . . is available until September 30, 2025," for the CDFI Fund's financial assistance and technical assistance programs. Specifically, Congress mandated that not less than $40 million is appropriated for the Bank Enterprise Award Program, $28 million for Native American Financial Assistance, Technical Assistance, and Training, $24 million for the Healthy Food Financing Initiative, and $9 million for the Small Dollar Loan Program. Congress then specified that these funds shall remain available through September 30, 2025.[54]

81. Congress also appropriated $35 million for the CDFI Fund to administer its programs.[55]

82. The fiscal year 2025 budget was passed as a continuing resolution. On March 15, 2025, Congress continued appropriations for fiscal year 2025 at the same levels, under the same conditions, and under

---

[54] *See* Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460, 524 (2024).
[55] *Id.*

the same authority provided in the fiscal year 2024 appropriations acts.[56] These fiscal year 2025 funds are available until September 30, 2026.

83. Congress again appropriated the same amount of funding for the CDFI Fund in 2026. In the Consolidated Appropriations Act of 2026, enacted into law on February 3, 2026, Congress appropriated the identical amounts for fiscal year 2026 and made those funds available until September 30, 2027.[57]

84. Congress included specific language in the Consolidated Appropriations Act of 2026 prohibiting the President or his agents from attempting to unilaterally eliminate programs funded by Congress: "None of the funds made available in this or any other appropriations Act may be used to increase, eliminate, or reduce funding for a program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act, or unless such change is made pursuant to the reprogramming or transfer provisions of this or any other appropriations Act."[58]

**The Trump-Vance Administration's Hostility towards the CDFI Fund**

85. Although the CDFI Fund enjoys strong bipartisan support, there is fierce opposition to the CDFI Fund within the Trump-Vance Administration.

86. In May 2025, the President's fiscal year 2026 Budget Request recommended eliminating CDFI Fund discretionary awards and preserving only enough funding to support oversight and closeout of past awards, maintaining the CDFI certification process, and running the New Market Tax Credit and Bond Guarantee Programs.[59]

87. In conjunction with the announcement of the President's Budget, the White House issued a "fact sheet" titled "Cuts to Woke Programs." That fact sheet explained the desire to eliminate the CDFI Fund on the grounds that the CDFI awards were "abused to advance a partisan agenda" including building "a

---

[56] Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, 139 Stat. 9 (2025).

[57] Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, 140 Stat. 173, 442 (2026).

[58] Pub. L. No. 119-75, § 739, 140 Stat. 502.

[59] *See* Ltr. from Russell Vought, Dir. of Off. Mgmt. & Budget, to Sen. Susan Collins, Chair, U.S. Senate, Comm. on Appropriations at 35 (May 2, 2025), https://perma.cc/ZQD4-PS4S ("the Budget recommends eliminating CDFI Fund discretionary awards").

more equitable, resilient economy." The fact sheet also decried the CDFI Fund and its award recipients as promoting "critical race theory," "advanc[ing] racial justice," "forwarding gender extremism," and "irresponsibly dedicating funds to climate radicalism."[60]

88. In early October 2025, during a lapse in congressional appropriations to many federal agencies (but generally not the CDFI Fund), virtually all CDFI employees received reduction-in-force (RIF) notices stating that their positions were being abolished and that the purpose of the RIF was "to implement the abolishment of the Community Development Financial Institutions [sic] (CDFI) which is based on the Department of the Treasury determination that its programs, projects, and activities do not align with the President's priorities."[61]

89. When Congress passed a continuing resolution that November, it required the reinstatement of the CDFI Fund employees by November 17, 2025, along with other civil servants across the government.

90. In April 2026, the Office of Management and Budget transmitted to Congress the President's fiscal year 2027 budget, which once again recommended eliminating CDFI Fund discretionary awards.[62] The White House's accompanying "Cuts to Woke Programs" Fact Sheet asserted that "[t]he elimination of this fund would also disincentivize critical race theory[,]" and "prevent taxpayer dollars from forwarding gender extremism" and "climate radicalism[.]"[63] On April 15, 2026, Russell Vought testified before Congress that he believes that many CDFIs "continue to be woke."[64]

91. In April 2026, Secretary Bessent testified to Congress that he supported the Administration's proposed cuts to the CDFI Fund in the fiscal year 2027 budget. He testified that the CDFI Program had "lost its way" in pursuit of "a partisan agenda."[65]

---

[60] *See* Press Release, The White House, *Cuts to Woke Programs Fact Sheet* (May 2, 2025) https://perma.cc/X9W4-5N7P.

[61] *See* Katherine Hapggood, *White House eliminates entire Community Development Financial Institutions Fund staff*, PoliticoPro, (Oct. 10, 2025 at 6:33 PM EDT), https://perma.cc/YFJ4-LRHL.

[62] Off. of Mgmt. & Budget, *Budget of the U.S. Government, Fiscal Year 2027* at 53-54, https://perma.cc/978R-KGHQ.

[63] Press Release, The White House, supra note 60 at 1.

[64] *The President's Fiscal Year 2027 Budget Request: Hearing Before the H. Budget Comm.* 119th Cong. (2026), at 1:18:16 (YouTube Apr. 15, 2026) https://www.youtube.com/watch?v=Gf-Q2vqxngg&t=1s (statement of Russell Vought, Dir. Off. of Mgmt. & Budget).

[65] Ebrima Santos Sanneh, *Bessent says CDFI Fund 'had lost its way'*, American Banker (Apr. 22, 2026

**The Un-Awarded Fiscal Year 2025 CDFI Appropriations Cycle**

92. This year, without explanation, the CDFI Fund has abandoned the orderly process for announcing awards well in advance of September 30, 2026, the date on which the funds for fiscal year 2025 awards expire. Instead, in a haphazard and untimely manner, the CDFI Fund has repeatedly delayed the application process, while refusing to announce awards withholding funds to CDFIs nationwide.

93. The CDFI Fund initiates the award application process by publishing a Notice of Funds Availability (NOFA), which includes an application for prospective grantees to complete.

94. On January 17, 2025, the CDFI Fund published a NOFA inviting Applications for Financial Assistance (FA) or Technical Assistance (TA) awards under the CDFI Program fiscal year 2025 Funding Round.[66]

95. The deadline for CDFIs to submit applications for funding under the FA or TA programs was March 21, 2025.[67]

96. The CDFI Fund stated (and as of this filing, still states) on its website that it anticipated awards from this funding round, which it expected to total approximately $320 million[68], would be announced in Fall of 2025.

97. The fiscal year 2025 Funding Round federal register notice estimated that it would award funding in the following amounts to the following components of the CDFI Program:

98. Base-FA Category I (Small and/or Emerging CDFI Assistance): $14.8 million

99. Base-FA: Category II/Core: $101.2 million

100. Healthy Food Financing Initiative-Financial Assistance (HFFI-FA): $24 million

101. Persistent Poverty Counties-Financial Assistance (PPC-FA): $21 million

---

at 2:20 PM EDT), https://perma.cc/YT9G-AQWR.

[66] *Community Development Financial Institutions Fund, Notice of Funds Availability*, 90 Fed. Reg. 6051 (Jan. 17, 2025).

[67] *Id*.

[68] The amount available in the NOFA exceeds the amount that Congress appropriated for the CDFI Fund because one of the programs announced in the NOFA, the Housing Production—Financial Assistance Award, is funded through interest and dividend payments and sale proceeds received under the Department of the Treasury's Emergency Capital Investment Program. *See id*. 90 Fed. Reg. at 6053.

102. Disability Funds-Financial Assistance (DF-FA): $20 million

103. Housing Production-Financial Assistance (HP-FA): $100 million[69]

104. Instead of announcing awards in Fall of 2025, on September 25, 2025, six months after the application deadline under the original NOFA, the CDFI Fund published amendments to the NOFA in the Federal Register, and extended the application deadline until October 27, 2025.[70]

105. On October 10, 2025, the Administration terminated every employee at the CDFI Fund. Those employees were reinstated on November 17, and then only pursuant to a statutory command from Congress.

106. On March 6, 2026, the CDFI Fund again revised its application deadline for fiscal year 2025 funding awards to April 10, 2026.[71]

107. Following the April 10, 2026, application deadline, the CDFI Fund has not announced or issued any awards for the fiscal year 2025 Funding Round. The CDFI Fund has not announced when it will take these steps, and it has given applicants no explanation for the delay. To date, award announcements are nearly a year behind the previously announced Fall 2025 award timeline on the CDFI Fund's website.

108. The CDFI Fund has taken no action to announce awards or release the fiscal year 2025 funding to CDFIs. As of today, nearly a year and a half after the fiscal year 2025 application process began, the CDFI Fund has failed to announce any awards or release any funds.

109. These fiscal year 2025 funds expire on September 30, 2026.

110. The CDFI Fund only released the applications for the Bank Enterprise Award Program, for which Congress appropriated $40 million, the Small Dollar Loan Program, for which Congress appropriated $9 million, and the Bond Guarantee Program, for which the Secretary may guarantee bonds up to an aggregate total of $500 million, on June 30, 2026.[72] Those applications opened just ninety-two days before the appropriations funding them expire, and closed in July of 2026.

---

[69] 90 Fed. Reg. at 6052.

[70] *Amendment of Notice of Funds Availability for Community Development Financial Institutions Program; Revised Application Submission Deadline*, 90 Fed. Reg. 46303 (Sept. 25, 2025).

[71] *See Amendment of Notice of Funds Availability for Community Development Financial Institutions Program; Revised Application Submission Deadline*, 91 Fed. Reg. 11595 (Mar. 10, 2026).

[72] *See Funding Opportunities: Small Dollar Loan Program: FY 2026 Funding Round*, 91 Fed. Reg.

111. Although Congress appropriated $324 million for the CDFI Fund and its associated programs in 2025, OMB initially apportioned only the $35 million Congress allocated for administration of the Fund. But at the same time that OMB apportioned the $35 million, it refused to apportion remaining $289 million that Congress appropriated for the CDFI Fund's programs. Instead, for months, it left those funds sitting in an account where the CDFI Fund could not access them or award them to CDFIs for distribution.

112. On April 8, 2026, shortly before OMB Director Russell Vought was scheduled to testify before Congress, OMB apportioned the $289 million in CDFI Program funds that it had previously refused to apportion. This apportionment took place over a year after the passage of the 2025 Continuing Resolution on March 15, 2025.

113. Even though the Antideficiency Act requires OMB to apportion appropriations to agencies not later than "30 days after the date of enactment of the law by which the appropriation is made available." 31 U.S.C. § 1513(b)(2)(B), OMB failed to apportion the CDFI Fund's fiscal year 2025 within 30 days of the passage of the 2025 Continuing Resolution Act.[73]

114. OMB's non-apportionment policy also violates the Antideficiency Act's provisions limiting when OMB may not apportion the full amounts appropriated, so as to establish a "reserve."[74]

115. However, in the months since OMB finally apportioned the fiscal year 2025 funds, Treasury has not obligated the funds. No awards have been made and those funds have not been distributed to awardees, despite the fact that they will expire on September 30, 2026.

116. OMB is required by law to post its apportionments to a publicly available database.[75] The database is available at https://apportionment-public.max.gov/, and a nonprofit organization has

39666 (June 30, 2026); *Funding Opportunities: Bank Enterprise Award Program (BEA) Program: FY 2026 Funding Round*, 91 Fed. Reg. 39682 (June 30, 2026); *Funding Opportunities: Bond Guarantee Program, FY 2026; Notice of Guarantee Availability*, 91 Fed. Reg. 39697 (June 30, 2026).

[73] 31 U.S.C. § 1513(b)(2)(B).

[74] *Id.* § 1512(c).

[75] *See* Pub. L. No. 117-103, div. E, tit. II, § 204(b)-(c), 136 Stat. 49, 256-57 (2022); Pub. L. No. 117-328, div. E, tit. II., § 204, 136 Stat. 4459, 4667 (2022).

compiled the apportionments posted to that website in a more user-friendly searchable database at OpenOMB.org.

117. The April 8, 2026 apportionment is reflected in the OpenOMB.org database.[76]

118. When OMB apportioned the $289 million on April 8, 2026, it included a footnote to the apportionment. OMB considers that footnote to the apportioned amount, which begins with the letter A, to have legal effect, including under the Antideficiency Act.[77]

119. Specifically, the "A" footnote to the apportionment provides that Treasury must "provide notification to OMB three days in advance of public announcement or obligation of award amounts." The rationale for the footnote, provided by OMB, is that OMB requests additional information on programmatic spending for some or all of the apportioned funds.

120. OMB has, through its footnote to the appropriations, imposed an additional hurdle to Treasury's ability to obligate the funds, which may provide OMB another avenue by which to unlawfully delay, restrict, or withhold funding from award recipients.

**The Impounded Fiscal Year 2026 CDFI Appropriations**

121. OMB has prevented Treasury and the CDFI Fund from obligating other Congressionally appropriated funds, preventing the CDFI Fund and applicants from accessing or distributing these funds. These include another $324 million for fiscal year 2026 appropriations, which Congress intended to be available to the CDFI Fund and its programs.

122. OMB has refused to apportion the CDFI Fund's fiscal year 2026 funds within 30 days of the passage of the 2026 Appropriations Act in violation of the Antideficiency Act.[78] OMB's withholding violates the Antideficiency Act's provisions limiting when OMB may not apportion for agency use the full amounts appropriated, so as to establish a "reserve."[79]

---

[76] OpenOMB, *TAFS: 020-1881 2025/2026 - Community Development Financial Institution Fund Program Account*, https://perma.cc/VT4X-C29Y.
[77] Off. of Mgmt. & Budget, *OMB Circular No. A-11, Preparation, Submission, and Execution of the Budget*, supra note 38.
[78] 31 U.S.C. § 1513(b)(2)(B).
[79] *Id.* § 1512(c).

123. OMB has unlawfully impounded these funds, rendering them inaccessible to the CDFI Fund, despite the fact that Congress appropriated these funds to be spent on the CDFI Fund and its programs.

124. These funds have been unlawfully impounded by OMB. Unless apportioned and obligated, they will expire in September 2027.

125. OMB has also refused to apportion, in a manner that Treasury can access, funds that Congress appropriated to the CDFI Fund without restriction on what fiscal year those funds are spent ("no-year funds").[80] Those funds have been apportioned through a Category C apportionment, rendering them inaccessible to Treasury.

126. Defendants have not transmitted to Congress any special message proposing the rescission or deferral of these funds, and no rescission bill as to these funds is pending before Congress.

127. Defendants have offered no explanation, in the Federal Register or anywhere else, for the unreasonable delay in announcing awards on applications whose funding will expire within the next 45 days. Nor have Defendants offered any explanation for OMB's refusal to apportion the fiscal year 2026 funds so that Treasury can spend them or for apportioning the no-year funds into Category C where they are inaccessible to Treasury. Nor have Defendants offered any explanation in failing to announce a NOFA for fiscal year 2026 funds, which expire in just over a year.

**Impact on Plaintiffs**

128. Defendants' unexplained departure from their prior policy of disbursing funds to CDFIs before those funds expire, withholding fiscal year 2025 funds, and impounding the funds for fiscal years 2026 and beyond, has caused substantial disruption to CDFIs and the communities they serve.

***A. Inclusive Action for the City***

129. Inclusive Action was founded more than a decade ago to advocate for working people in Los Angeles County, California. Today, Inclusive Action is a CDFI serving micro- and small business owners.

---

[80] *See* OpenOMB, *TAFS: 020-1881/X – Community Development Financial Institution Fund Program Account*, https://perma.cc/N62T-JV7J (showing OMB has apportioned CDFI Fund's no-year funds to an account that cannot be accessed until fiscal year 2027).

130. Inclusive Action's mission is to champion working people, invest in entrepreneurs, and change systems to build an economy that works for all of us. It aims to provide underserved entrepreneurs with the capital they need to grow their business, enter and remain in the formal economy, and expand and stabilize their operations so that they can create local jobs and serve their communities. Some of Inclusive Action's small business customers are enterprises that need injections of capital in order to transition from cottage industry to the formal economy.

131. The entrepreneurs served by Inclusive Action are often trapped in debt cycles and unable to build wealth. Inclusive Action's lending exists to serve borrowers the mainstream credit market will not, including entrepreneurs whose preexisting assets, geographic location, credit history, legal or work history, or immigration or citizenship status fall outside the parameters conventional lenders serve. Their communities are targeted by predatory payday lenders, and they have extremely limited access to banks and traditional financial products. For those entrepreneurs, the realistic alternative to a CDFI loan is not a bank loan. It is a predatory loan at an exorbitant interest rate, subject to abusive collection practices—or no loan at all.

132. The capital Inclusive Action deploys has concrete, traceable effects on small businesses and the jobs they create. Its loans allow neighborhood restaurants to buy kitchen equipment; street vendors to obtain the permits they need to enter the formal economy; and local businesses to keep paying employees through unexpected closures caused by natural disasters, construction, and other interruptions. For example, Inclusive Action loans are helping businesses that lost their entire physical footprint in the 2025 Eaton fire to reopen.

133. Since its founding, Inclusive Action has reached more than 9,400 small businesses with loans or grants, deployed more than $5 million in capital to small business owners through loans and more than $6 million in grants, and provided more than 6,700 hours of free business coaching to its customers and to members of the communities it serves.

134. Prior to the fiscal year 2025 award cycle, Inclusive Action received seven awards from the CDFI Fund, including Technical Assistance, Financial Assistance, Equitable Recovery Program, and Rapid

Response Program awards. Each award has had a material impact on Inclusive Action's institutional stability and its capacity to extend low-cost credit to Los Angeles-area entrepreneurs.

135. The financial assistance Inclusive Action gets from Treasury's CDFI Fund directly furthers Inclusive Action's mission by increasing its loan fund by 10% annually, allowing it to serve more of its community and manage its institutional growth sustainably. Those awards help Inclusive Action keep its loans affordable at a time when the cost of capital has gone up in recent years as interest rates have increased—which is what permits Inclusive Action to extend low-interest loans to borrowers who would otherwise be driven to payday lenders and similar products. CDFI Fund awards have also funded Inclusive Action's cushion against loan losses and have supplied the loan capital for its consumer and small-business lending products. In addition, the CDFI Fund awards help fund Inclusive Action's operational and staffing costs.

136. For the CDFI Program's fiscal year 2025 cycle, the Notice of Funding Availability opened on January 16, 2025; applications were due March 21, 2025; and the government stated that it expected to announce awards by Fall 2025. Inclusive Action timely submitted its application for the 2025 Financial Assistance funding round by that deadline.

137. On September 24, 2025, Inclusive Action received a notification from the CDFI Fund that the organization had advanced to Step 4 of the Financial Assistance evaluation process. Step 4 of the evaluation process is the last remaining step before award amounts are determined and announced.[81] That notification also advised that, "to reflect the current Administration's priorities," the CDFI Fund was providing applicants that had advanced to Step 4 of the process the opportunity to reopen and update their applications to align with those priorities.

138. Following the CDFI Fund staff's termination by the Administration in October 2025, and their reinstatement by Congress in November 2025, that deadline to reopen and update applications was later extended to April 10, 2026, and Inclusive Action resubmitted by that deadline.

139. Since April 2026, Inclusive Action has heard nothing from the CDFI Fund—no status information and no award decision.

---

[81] *See Notice of Funds Availability*, 90 Fed. Reg. at 6069-70.

140. Inclusive Action's 2025 application has now been pending roughly seventeen months, more than double the time any prior Inclusive Action application to the CDFI Fund has taken to reach a decision. In past award cycles, Inclusive Action has not waited longer than approximately seven months from submission of its application to be notified of the CDFI Fund's award decision.

141. Nothing about the 2025 cycle resembles the CDFI Fund's prior practice, and Defendants have offered Inclusive Action no explanation for the delay.

142. This delay has harmed Inclusive Action. The 2025 Financial Assistance award Inclusive Action sought represents approximately one fourth of the remaining capital it needs to meet its current lending goals for 2026. That money could support around 34 small businesses that depend on CDFIs for access to capital.

143. Every month the application sits undecided is a month in which Inclusive Action cannot commit that capital, cannot plan its loan book against it, and cannot extend credit it would otherwise extend. The uncertainty also makes it more difficult for Inclusive Action to raise funds from non-governmental sources, as those sources look to the CDFI Fund's support of the CDFI industry and Inclusive Action specifically as indicators of stability and safe investment.

144. Defendants' conduct has already damaged Inclusive Action's ability to raise money from alternative, non-governmental, sources. Because CDFI Fund awards increase Inclusive Action's institutional stability and capacity, they make Inclusive Action a more attractive investment for major financial institutions, philanthropies, and private lenders. Defendants' unpredictable treatment of the CDFI Fund's awards is harming Inclusive Action because it chills investors who view the CDFI industry as potentially unstable, given the uncertainty of federal funding. This has harmed Inclusive Action's ability to secure investment from non-federal sources, such as private lenders and philanthropic organizations.

145. The CDFI Fund's delay and failure to announce awards for the fiscal year 2025 funding round also harms Inclusive Action's ability to fairly compete for funding from the CDFI Fund. The inability to compete for fiscal year 2025 funds will harm Inclusive Action's ability to carry out its mission of serving small businesses and entrepreneurs. And the loss of the ability to meaningfully compete for CDFI Fund

money, even for the 2025 cycle alone, increases the perceived risk that Inclusive Action presents to private investors, impairing its ability to attract outside investment. Accordingly, Inclusive Action is harmed by the denial of the opportunity to compete for a pool of funds for which they are able and willing to compete.

146. If the CDFI Fund does not announce Financial Assistance awards before the funding for those awards expires on September 30, 2026, Inclusive Action will permanently lose the opportunity to fairly compete for fiscal year 2025 awards because the funds Inclusive Action applied for in March 2025 will become permanently unavailable. And as a result, Inclusive Action's clients will never see a penny of the fiscal year 2025 award funding that Congress appropriated. Without a fiscal year 2025 award, Inclusive Action will be able serve fewer small businesses and entrepreneurs because it will need to scale back its lending program for the calendar year 2027, missing its targets for the number of small businesses Inclusive Action has planned to serve with loans and grants. Inclusive Action will also have to scale back its technical assistance educational offerings, including the free business coaching it provides to clients and members of the community—services that are critical to minimizing its clients' default rates and promoting their business success.[82] And Inclusive Action may need to reduce staffing, which would have a sustained impact on its operations.

147. These harms will be acutely felt by the small business owners that Inclusive Action serves. The entrepreneurs who needed a permit, a piece of kitchen equipment, or a payroll bridge will be forced to go without or turn to a predatory lender instead of working with Inclusive Action's mission-based lending program. And when Inclusive Action cancels or curtails its educational programming, entrepreneurs will go without vital financial education they need to help their businesses in real time—a harm that cannot be remedied by a later payment even if funding is obligated in future fiscal years.

[82] Indeed, promoting its clients' business success supports Inclusive Action's stability and viability, as successful clients are more likely to timely repay their loans. Conversely, being forced to curtail its educational offerings may increase Inclusive Action's own institutional risk and harm its mission by increasing its clients' risk of delinquency or default.

### *B. CAMEO Network and its Members*

148. The California Association for Micro Enterprise Opportunity began in the early 1990s when four women from across California joined together to create business development programs to serve low-income women entrepreneurs. Three decades later, CAMEO Network is now an organization of more than 400 members nationwide dedicated to furthering business development across the nation with small and micro-business financing such as loans and credit, technical assistance, and business management training. CAMEO Network's members include small businesses, the organizations and institutions that serve them, policymakers, public agencies, and other non-traditional community-based partners that serve entrepreneurs as stakeholders in entrepreneurial ecosystems. Its members include 57 Community Development Financial Institutions (CDFIs). One of those CDFI members is Inclusive Action for the City in Los Angeles, California.

149. CAMEO Network's dues-paying members are located throughout California, and in Nevada, Arizona, Colorado, Michigan, Alabama, South Carolina, Florida, Virginia, Pennsylvania, and Maryland. Annually, CAMEO members serve about 200,000 very small businesses with training and access to capital.

150. CAMEO's members, including Inclusive Action and others, include CDFIs who have been harmed by the CDFI Fund's delay and withholding of not only fiscal year 2025 award funds, but also of the instability and chaos caused by Defendants' actions. CAMEO counts among its membership CDFIs that have applied for the CDFI Program Financial Assistance and Technical Assistance, the Small Dollar Loan Program, the Bank Enterprise Award Program, and the Bond Guarantee Program—all of which have failed to announce awards for fiscal year 2025 funds.

151. CAMEO's main purpose is in promoting and protecting the interests of its members, who are being harmed by Defendants' conduct. CAMEO's members are harmed by the inability to fairly compete for fiscal year 2025 funding awards. They are harmed by the uncertainty plaguing the CDFI industry and disrupting and disincentivizing private investment. And they will be harmed by permanently losing access to these funding opportunities.

152. CAMEO members, including Inclusive Action and others, have applied for fiscal year 2025 CDFI Fund awards, but have still not received notification that awards have been issued and have yet to see any money flow from the CDFI Fund. Those members have been irreparably harmed by the uncertainty Defendants' withholding of the funds has already created and the effective denial of their ability to fairly compete for the fiscal year 2025 awards, and will be further irreparably harmed if the fiscal year 2025 funds become permanently unavailable.

153. CAMEO members, including Inclusive Action and others, also have been harmed by the delayed announcement of the fiscal year 2026 funding cycle, and OMB's failure to apportion fiscal year 2026 funds and no-year funds to accounts that the CDFI Fund can use to support the important work that CAMEO's members do.

154. CAMEO also offers training, consulting, access to capital, and affordable back-office services to help emerging and established CDFIs and technical assistance providers that provide business coaching to entrepreneurs. CAMEO's programs help advise its members on applying for funding from the CDFI Fund. A significant portion of CAMEO's work involves counseling their members through these training programs and resources.

155. CAMEO created and operates the National CDFI Academy, which provides ongoing education and skill development to microlenders' staff and board members. This educational programming helps identify and provide microlending best practices and technical assistance courses for business coaching organizations.

156. In addition to providing financial and technical resources to its members, CAMEO Network builds community among small business stakeholders, bringing members together to elevate best practices, develop relationships, and share information and support.

157. Faced with the uncertainty and instability that has characterized OMB's and Treasury's treatment of the CDFI Fund since 2025, CAMEO's members have turned to CAMEO to help them decipher what is happening in the CDFI Fund's programs that affect them. The uncertainty at the federal level has taken a toll on CDFIs and, for some, has wreaked havoc on their financial stability and ability to operate.

158. CAMEO has diverted significant resources to trying to figure out exactly what is happening with the CDFI Fund, the status of Notices of Funding Availability tied to each CDFI program, and how the applications submitted by member CDFIs will be handled, in order to counsel their members effectively.

159. For example, CAMEO has spent significant resources with respect to both its staff and paid consultants to track what is going on with the funds Congress appropriated for the CDFI Fund to distribute to receiving CDFIs, and, given the lack of transparency about the administration of the CDFI Fund, any information that can be gleaned from private conversations between government officials and CDFI industry stakeholders.

160. In order to make sense of the government's actions with respect to the CDFI Fund, CAMEO has had to change the scope of work it contracted a paid consultant to execute, shifting the consultant's time away from facilitating congressional relationship building in order to educate legislators on the needs of small businesses and the financial institutions that serve them. In place of that work, CAMEO's consultant spends their time tracking what little information is publicly available about the administration's handling of the CDFI Fund and working sources to understand what is happening to the government's CDFI programs.

161. In order to ensure it is tracking and responding to its members' needs, CAMEO has also conducted numerous leadership polls of its membership and provided regular updates specific to the evolving status of the CDFI Fund.

162. CAMEO has also had to divert staff and leadership time to responding to the ripple effects of the government's unstable administration of its CDFI programs on non-governmental financial supporters of CDFIs. The federal government's unstable handling of the CDFI Fund has generated concern and anxiety among non-governmental CDFI funders, many of whom are seeking clarity and seriously considering limiting or ending their investments in the industry.

163. If the fiscal year 2025 CDFI Fund award money expires before Treasury obligates the funds to CDFIs, some of CAMEO's CDFI members will likely scale back their participation and utilization of CAMEO's membership programming. For example, if no fiscal year 2025 funding flows to CDFIs,

CAMEO expects that some of its CDFI members would fail to renew their membership dues or choose to pay for fewer National CDFI Academy course offerings. CAMEO has already seen double-digit declines in both the number of organizations and the number of attendees in one of its signature membership events for 2026 as compared to previous years when CDFI Fund money flowed without obstruction.

### *C. The Communities Plaintiffs Serve*

164. CDFIs serve communities that the conventional banking system has largely passed over. Viable businesses, run by capable people, need capital and investment to succeed and thrive. But many of these entrepreneurs get turned down by traditional financial institutions because they lack collateral, a long credit history, or family wealth to put up as a down payment—not because their business does not work or is unworthy of investment.

165. The work of CDFIs reaches rural towns without a bank branch for miles, urban neighborhoods scarred by decades of redlining, tribal lands, immigrant communities, and small business owners whose creditworthiness and entrepreneurial spirit cannot be captured by an automated underwriting score.

166. CDFIs finance affordable housing, childcare centers, health clinics, grocery stores, and the small enterprises that anchor local economies and employ neighbors. Just as importantly, they pair capital with relationships — technical assistance, financial coaching, and patient underwriting that reflects genuine knowledge of the borrower and the place where the borrower operates. That combination allows CDFIs to take on risk that conventional lenders will not, and to build lasting wealth and resilience in communities where the absence of accessible capital has been a persistent barrier to opportunity.

167. For a small business owner in one of these places, the practical choice is rarely between a CDFI loan and a bank loan. It is between a CDFI loan and a predatory lender—often demanding interest rates in the triple digits. Those products do not fund growth; they consume it, and they frequently push an otherwise viable business into a cycle of refinancing that ends in closure.

168. If the CDFI Fund continues to delay, withhold, and impound funding for the CDFI Fund's crucial programs, those harms will be felt not just by the CDFIs, but also by the communities they serve

and the small businesses and entrepreneurs who will increasingly be forced to seek capital from much higher risk sources — or forego their dream of starting or growing a business at all.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the APA 706(2) — Arbitrary and Capricious
***Against all Defendants***

169. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

170. A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

171. Defendants' actions, in first proposing elimination of the CDFI Fund's discretionary award program entirely in the President's budget; terminating all CDFI Fund staff (who were only reinstated pursuant to a subsequent congressional mandate); delaying the apportionment of the fiscal year 2025 CDFI Funds until less than six months before those funds are set to expire; failing to obligate or spend the fiscal year 2025 CDFI Funds; refusing to apportion the fiscal year 2026 programmatic funds; and apportioning the no-year CDFI funds into Category C such that Treasury cannot access them; evince Defendants' refusal and intent to refuse to spend the money that Congress appropriated for the CDFI Fund and its programs.

172. Defendants are now attempting to accomplish by unlawful means what they could not accomplish by lawful channels: the dismantling and defunding of the CDFI Fund and its discretionary award programs. Accordingly, Defendants have adopted a policy to withhold, delay, impound, and otherwise not obligate or spend for the purposes set by Congress the amounts appropriated for the CDFI Fund's programs ("the Impoundment Policy") before those appropriations expire on September 30, 2026 (for fiscal year 2025 funds) and September 30, 2027 (for fiscal year 2026 funds).

173. Defendants' adoption of the Impoundment Policy is final agency action because it (1) marks the consummation of the agencies' decisionmaking process and (2) affects "rights or obligations" or creates "legal consequences[.]" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). And because Defendants' new policy constitutes "final agency action for which there is no other adequate remedy in a court," it is subject to judicial review under the APA. 5 U.S.C. § 704.

174. Defendants are implementing their Impoundment Policy through a series of actions, including: OMB's delayed or withheld apportionment of the CDFI Fund's appropriations, apportioning funds tin ways that Treasury cannot access (by abusing "Category C" apportionments); Treasury's refusal to obligate those funds it is able to access; Treasury's delay in publishing notices of funding availability for several CDFI Fund programs, which are a necessary condition for the CDFI Fund to solicit applications for, and then make, awards; and the purported review authority OMB has sought to impose on the fiscal year 2025 funds through its use of the "A" footnote, which adds an additional step before Treasury may make awards from the CDFI Fund even after OMB apportioned that money to an account Treasury can access.

175. Each of these decisions also constitutes final agency action.

176. The effect of Defendants' Impoundment Policy is final because the appropriations will expire, either in September 2026 (for fiscal year 2025 funds) or in September 2027 (for fiscal year 2026 funds). Once the appropriations expire without having been spent, the money is permanently unavailable and cannot be recovered, whether by Defendants or by entities that should have received the funds through awards.

177. A decision is arbitrary and capricious where Defendants "failed to consider an important aspect of the problem, offered an explanation for [their] decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Assoc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Defendants' decision is arbitrary and capricious for each of the following independently sufficient reasons:

178. First, Defendants considered factors that Congress did not permit them to consider. For example, Congress's mandatory appropriation of CDFI Fund money does not permit Defendants to consider whether they can refuse to spend the money that Congress directed be spent through the CDFI Fund because they believe the CDFI Program is "woke" or otherwise inconsistent with the Administration's policy goals. Defendants also are not permitted to consider whether obligating the CDFI Fund moneys aligns with the President's proposed budget where that budget was not enacted into law by Congress.

179. Second, Defendants have failed to reasonably explain their decision, including under what authority Defendants believe they can refuse to spend Congress's appropriation after Congress explicitly rejected the President's proposal to eliminate the CDFI Program.

180. Third, Defendants failed to consider the serious reliance interests implicated by the CDFI Programs, including the interests of CDFIs themselves as well as the people, organizations, and communities that depend on those funds for loans, mortgages, financial services, educational programming, and other important functions.

181. Fourth, Defendants have failed to consider multiple important aspects of the problem. For example, there is no evidence that Defendants considered the detrimental impact of not obligating funds, including the lack of access to capital and other financial services to small businesses and low-income rural and urban communities across the country. There is also no evidence that Defendants considered the increased reliance on predatory lenders that will result if CDFIs are unable to supply financial services and loans to entrepreneurs, homeowners, and others in underserved populations.

182. Fifth, there is no evidence that Defendants considered reasonable alternatives to impounding, withholding, or otherwise refusing to spend congressionally mandated funding for the CDFI Fund.

183. For each of these reasons, Defendants' conduct is arbitrary and capricious in violation of the APA.

**COUNT II**
**Violation of the APA 706(2) — Contrary to Law and In Excess of Statutory Authority**
***Against all Defendants***

184. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

185. A reviewing court must "hold unlawful and set aside agency action" that is "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C).

186. Pursuant to their Impoundment Policy, Defendants have so far withheld, delayed, or otherwise failed to spend for the purposes set by Congress the amounts appropriated for the CDFI Fund for fiscal year 2025, which are set to expire on September 30, 2026, as well as fiscal year 2026 funds and no-year funds. Defendants' actions are contrary to law or in excess of statutory authority for three independent

reasons: they contravene Congress's commands in the 2024 Appropriations Act, the 2025 Continuing Resolution, and the 2026 Appropriations Act; they contravene the 2026 Appropriations Act's specific prohibition on the executive branch seeking to unilaterally eliminate programs established and funded by Congress; and OMB's actions violate the Antideficiency Act.

187. *First*, other than through the processes laid out in the ICA, which Defendants have not followed here, Defendants do not have authority to impound funds. Defendants' policy violates the 2024 Appropriations Act, the 2025 Continuing Resolution, and the 2026 Appropriations Act, because those laws require Defendants to apportion and obligate money appropriated to the CDFI Fund in the amounts specified, by the dates specified, and for the purposes specified.

188. *Second*, Defendants' failure to apportion and obligate the CDFI Fund money also violates the 2026 Appropriations Act for an independent reason. Congress included specific language in that Act prohibiting the President and his agents from attempting to unilaterally eliminate programs established and funded by Congress: "None of the funds made available in this or any other appropriations Act may be used to increase, eliminate, or reduce funding for a program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act, or unless such change is made pursuant to the reprogramming or transfer provisions of this or any other appropriations Act."[83] Defendants' actions amount to an attempt to unilaterally implement the President's budgetary goal of dismantling and defunding the CDFI Fund, or at a minimum, reduce its funding. Either way, Defendants' actions under the Impoundment Policy with respect to the funds Congress appropriated under the 2024 Appropriations Act, the 2025 Continuing Resolution, and the 2026 Appropriations Act contravene the 2026 Appropriations Act by attempting to advance the President's budgetary goals through unilateral means.

189. *Third*, pursuant to the Impoundment Policy, Defendant OMB has also refused to apportion, by the deadlines set by Congress and for the purposes set by Congress, amounts that Congress appropriated to fund the CDFI Fund and its programs for fiscal years 2026, and OMB has apportioned no-year funds in a Category C apportionment that Treasury cannot access, much less obligate or spend.

[83] Pub. L. No. 119-75, § 739, 140 Stat. 502.

190. The Antideficiency Act requires OMB to make apportionments in writing to an executive agency either twenty days prior to the start of the fiscal year for which the appropriations were provided or thirty days after the date of enactment of the appropriations act, whichever is later. 31 U.S.C. § 1513(b)(2). Congress appropriated funds for the CDFI Fund to spend in fiscal year 2026 on February 3, 2026. Under the Antideficiency Act, OMB was required to apportion those funds by March 5, 2026. More than five months after that deadline, OMB has yet to apportion those funds to an account that Treasury can access.

191. For all of these reasons, Defendants' conduct is contrary to law in violation of the APA.

**COUNT III**

**Violation of the APA 5 U.S.C. § 706(1) — Agency Action Unlawfully Withheld or Unreasonably Delayed**

***Against all Defendants***

192. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

193. A reviewing court must "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

194. The CDFI Fund stated that it would announce fiscal year 2025 awards in the fall of 2025. Those awards have still not been announced, nearly a year later than promised. And as a result, the fiscal year 2025 funds appropriated for those awards have not been obligated or spent. The funds will expire within weeks absent judicial intervention.

195. The 2024 Appropriations Act, and the 2025 Continuing Resolution, require Defendants to obligate fiscal year 2025 appropriated CDFI Fund money before the funds expire on September 30, 2026. The 2024 Appropriations Act and the 2025 Continuing Resolution thus impose a non-discretionary duty on OMB to apportion, and Treasury to obligate and spend, appropriated CDFI Fund money in the amounts specified, and for the purposes specified, prior to the expiration of those funds.

196. In addition, the Antideficiency Act requires OMB to make apportionments in writing to an executive agency either thirty days prior to the start of the fiscal year for which the appropriations were provided or thirty days after the date of enactment of the appropriations act, whichever is later. 31 U.S.C. § 1513(b).

197. Defendants have not complied with their duties. Instead, Defendants have withheld and delayed appropriated monies from the CDFI Fund and its programs, prevented obligation of, and failed to obligate, those appropriated monies to assist people, small businesses, and communities as Congress intended.

198. OMB unlawfully withheld and delayed apportioning the CDFI Fund's fiscal year 2025 discretionary award money until April 8, 2026—over a year after Congress passed the 2025 Continuing Resolution on March 15, 2025, and long after the statutory deadline imposed by the Antideficiency Act.

199. OMB's imposition of a requirement that the CDFI Fund notify OMB three days in advance of obligating award amounts adds an additional step, affording OMB further, unauthorized control over expenditure of funds and further opportunity to delay or prevent Treasury's obligation of the funds before the end of the fiscal year.

200. And OMB continues not to apportion fiscal year 2026 programmatic funds, despite that appropriation having been made on February 3, 2026. Under the Antideficiency Act, OMB was required to apportion those funds by March 5, 2026.

201. Defendants' actions have thus amounted to a withholding of the funds and have caused an unreasonable delay in obligating the fiscal year 2025 funds that Congress appropriated before the funds expire on September 30, 2026. Further, OMB has refused to apportion the fiscal year 2026 programmatic funds the Antideficiency Act mandated that OMB apportion more than five months ago.

202. The September 30, 2026 expiration of the fiscal year 2025 funds is fast approaching, and the CDFI Fund has not taken action to ensure that the funding for these crucial programs will flow in time. The effect of continued inaction is irreparable because the appropriation will lapse permanently and the funds will never be recovered.

203. Defendants have unreasonably withheld and unreasonably delayed apportioning, obligating, and spending appropriated CDFI Fund funds as directed by Congress in violation of the APA.

## COUNT IV
## Violation of Separation of Powers and Take Care Clause
*Against all Defendants*

204. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

205. The Constitution exclusively grants the power of the purse to Congress. *See* U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause); U.S. Const. art. I, § 8, cl. 1 (Spending Clause). The President lacks authority to enact, amend, or repeal statutes, *Clinton v. City of New York*, 524 U.S. 417, 438 (1998), and, as the head of the Executive Branch, must "take care that the laws be faithfully executed." U.S. Const. art. II, § 3.

206. Consistent with these separation of powers principles, the Executive Branch has no unilateral authority to modify or disregard congressional appropriations.

207. By flouting Congress's statutory directives to spend appropriated CDFI Fund money, Defendants have acted contrary to separation of powers principles and the Take Care Clause.

**COUNT V**
***Ultra Vires* Action (In the Alternative)**
***Against all Defendants***

208. The paragraphs above are incorporated and reasserted as if fully set forth here.

209. *Ultra vires* review is appropriate "when an agency has taken action entirely in excess of its delegated powers and contrary to a specific prohibition in a statute." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (citations and internal quotation marks omitted).

210. Defendants' impoundment of CDFI Fund funds is contrary to specific prohibitions in the 2024 Appropriations Act, the 2025 Continuing Resolution, and the 2026 Appropriations Act's statutory mandates that the CDFI Fund obligate no less than the amounts specified by Congress, by the dates specified, and for the purposes specified.

211. The 2024 Appropriations Act provides that "*not less than*" $188 million "is available" for Financial Assistance and Technical Assistance awards, along with specific amounts for the other CDFI Fund programs. Pub. L. 118-47, 138 Stat. 460 (emphasis added).

212. The 2025 Continuing Resolution held those amounts steady,[84] and under the same conditions as the 2024 appropriation,[85] prohibiting the executive branch from making available through the CDFI

[84] Pub. L. No. 119-3, § 1101(a)(5), 139 Stat. 8.
[85] *Id*. at § 1105.

Fund any amount less than the funding levels that Congress specified, by the dates specified, and for the purposes specified.

213. The 2026 Appropriations Act held the CDFI Fund spending level steady once again,[86] and prohibited OMB and Treasury from using any of the "funds made available in this or any other appropriations Act" to "increase, eliminate, or reduce funding for a program, project, or activity as proposed in the President's budget request for fiscal year until such proposed change is subsequently enacted in an appropriation Act[,]".[87]

214. Defendants' actions in delaying, withholding, refusing to obligate, and impounding the CDFI Fund funds have violated these specific prohibitions, and are entirely in excess for their delegated powers.

215. If relief is not available on Plaintiff's APA and constitutional claims, the Court should declare unlawful and enjoin Defendants' *ultra vires* actions.

**COUNT VI**
**Mandamus Relief (In the Alternative)**
***Against all Defendants***

216. The paragraphs above are incorporated and reasserted as if fully set forth here.

217. Mandamus relief is appropriate where "(1) the plaintiff's claim is clear and certain; (2) the [defendant's] duty is ministerial and so plainly prescribed as to be free from doubt; and (3) no other adequate remedy is available." *R.T. Vanderbilt Co. v. Babbitt*, 113 F.3d 1061, 1065 n. 5 (9th Cir.1997).

218. By delaying, withholding, refusing to obligate, and impounding money appropriated by Congress to the CDFI Fund, Defendants have violated their clear legal duty to obligate CDFI Fund funds in the amounts specified, by the dates specified, and for the purposes specified in the 2024 Appropriations Act, the 2025 Continuing Resolution, and the 2026 Appropriations Act.

219. If relief is not available under Plaintiffs' APA, constitutional, and *ultra vires* claims, the Court should grant mandamus relief.

---

[86] Pub. L. No. 119-75, 140 Stat. 173.
[87] Pub. L. No. 119-75, § 739, 140 Stat. 502.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

a. Declare that Defendants' Impoundment Policy, and their resulting failure to apportion, obligate, and award the funds Congress appropriated to the CDFI Fund for fiscal years 2025, 2026, and no-year funds is contrary to law, exceeds statutory authority, arbitrary and capricious, and constitutes agency action unlawfully withheld and unreasonably delayed;

b. Preliminarily and permanently enjoin Defendants from withholding those funds, and order Defendants to take all steps necessary to apportion, obligate, and award them in the amounts, for the purposes, and by the dates Congress specified — including by obligating awards in the fiscal year 2025 funding round before September 30, 2026, and by opening the fiscal year 2026 funding round forthwith and making funding awards in due course;

c. Stay the effective date of Defendants' challenged actions, including the Impoundment Policy, under 5 U.S.C. § 705, or, in the alternative, postpone the expiration of the affected appropriations to the extent permitted by 5 U.S.C. § 705, 31 U.S.C. § 1502(b), and this Court's equitable authority pending this Court's review;

d. Retain jurisdiction to monitor Defendants' compliance, and require Defendants to file periodic status reports identifying the funds apportioned, obligated, and awarded;

e. Award Plaintiffs their costs, reasonable attorneys' fees, and other disbursements deemed appropriate; and

f. Grant such other relief as the Court deems necessary, just, and proper.

Date: August 14, 2026

Respectfully submitted,

*<u>/s/ Daniel "Sparky" Abraham</u>*
Daniel "Sparky" Abraham (SBN 299193)
**JUBILEE LEGAL**
300 E. Esplanade Dr., 9th Floor
Oxnard, CA 93036
(805) 946-0386
sparky@jubilee.legal

*<u>/s/ Andrea Matthews</u>*
Andrea J. Matthews (M.A. Bar No. 694538)*
Anna L. Deffebach (D.C. Bar No. 241346)*
Johanna M. Hickman (D.C. Bar No. 981770)*
Kristen Miller (D.C. Bar No. 229627)*
Steven Y. Bressler (D.C. Bar No. 482492)*
Elena Goldstein (D.C. Bar. No. 90034087)*

**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
(202) 304-3457 (Matthews)
amatthews@democracyforward.org
adeffebach@democracyforward.org
hhickman@democracyforward.org
consultantkmiller@democracyforward.org
sbressler@democracyforward.org
egoldstein@democracyforward.org

*Counsel for Plaintiffs*

* Motion to appear *pro hac vice* forthcoming