Daniel "Sparky" Abraham (SBN 299193)
**JUBILEE LEGAL**
300 E. Esplanade Dr., 9th Floor
Oxnard, CA 93036
(805) 946-0386
sparky@jubilee.legal

Andrea J. Matthews (M.A. Bar No. 694538)*
Anna L. Deffebach (D.C. Bar No. 241346)*
Johanna M. Hickman (D.C. Bar No. 981770)*
Kristen Miller (D.C. Bar No. 229627)*
Steven Y. Bressler (D.C. Bar No. 482492)*
Elena Goldstein (D.C. Bar. No. 90034087)*
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
(202) 304-3457 (Matthews)
amatthews@democracyforward.org
adeffebach@democracyforward.org
hhickman@democracyforward.org
consultantkmiller@democracyforward.org
sbressler@democracyforward.org
egoldstein@democracyforward.org

*Counsel for Plaintiffs*
**Pro hac vice motion forthcoming*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| INCLUSIVE ACTION FOR THE CITY, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>OFFICE OF MANAGEMENT AND BUDGET, *et al.*,<br><br>Defendants. | Case No. 3:26-cv-08433<br><br>**PLAINTIFFS MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND § 705 STAY**<br><br>Judge: The Honorable Edward M. Chen<br>Ctrm: 5 – 17th Floor<br>Date: September 24, 2026<br>Time: 1:30pm |

## TABLE OF CONTENTS


INTRODUCTION ..... 1

BACKGROUND ..... 2

I. The CDFI Fund ..... 2

II. The Trump-Vance Administration's Hostility Towards the CDFI Fund ..... 5

III. The Administration's Refusal to Apportion and Obligate Money for CDFI Fund Awards ..... 6

IV. Defendants' conduct has harmed, and will continue to harm, Plaintiffs ..... 8

LEGAL STANDARD ..... 8

ARGUMENT ..... 9

I. Plaintiffs are likely to succeed on the merits of their claims. ..... 9

A. Defendants' refusal to obligate funds violates APA § 706(2) (Counts I, II) ..... 9

i. The Impoundment Policy is final agency action reviewable under the APA. ..... 9

ii. The Impoundment Policy is contrary to law. ..... 11

iii. The Impoundment Policy is arbitrary and capricious. ..... 13

B. Defendants' refusal to obligate funds constitutes unreasonably delayed and unlawfully withheld agency action in violation of APA § 706(1) (Count III) ..... 15

C. The Impoundment Policy violates the Separation of Powers doctrine and Take Care Clause (Count IV) ..... 18

D. Defendants' Actions are *Ultra Vires* (Count V) ..... 20

II. Plaintiffs Have Standing and Will Suffer Irreparable Harm if the Funds Expire. ..... 21

III. The Remaining Factors Favor Plaintiffs. ..... 24

IV. This Court should stay the Impoundment Policy and enjoin Defendants to obligate the FY 2025 funds or, in the alternative, preserve the status quo by tolling the expiration of FY 2025 funds pending the resolution of the merits of this case ..... 24

CONCLUSION ..... 25

# TABLE OF AUTHORITIES

**Cases**

*AIDS Vaccine Advocacy Coal. v. Dep't of State ("AVAC I")*, 770 F.Supp.3d 121 (D.D.C. 2025)........20

*AIDS Vaccine Advocacy Coal. v. Dep't of State ("AVAC II")*, 803 F.Supp.3d 164 (D.D.C. Sep. 3, 2025)........10, 11, 12

*Al Otro Lado v. EOIR*, 138 F.4th 1102 (9th Cir. 2025)........15, 16, 17, 18

*All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011)........9

*Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015)........20

*Bennett v. Spear*, 520 U.S. 154 (1997)........9

*Biden v. Sierra Club*, 142 S. Ct. 46 (2021)........20

*California v. Azar*, 911 F.3d 558 (9th Cir. 2018)........23

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416 (2024)........11, 12

*City & Cnty. of S.F. v. Trump*, 816 F.Supp.3d 1017 (N.D. Cal. 2026........10

*City & Cnty. of S.F. v. Trump*, 897 F.3d 1225 (9th Cir. 2018)........19, 20

*City of Houston v. HUD*, 24 F.3d 1421 (D.C. Cir. 1994)........21, 23, 25

*Cmty. Legal Servs. in E. Palo Alto v. HHS.*, 137 F.4th 932 (9th Cir. 2025)........23

*Cnty. of Santa Clara v. Trump*, 250 F.Supp.3d 497 (N.D. Cal. 2017)........21, 22

*Ctr. for Biological Diversity v. Haaland*, 58 F.4th 412 (9th Cir. 2023)........9

*Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339 (D.C. Cir. 2012)........11

*Dep't of State v. Aids Vaccine Advoc. Coal.*, 146 S. Ct. 19 (2025)........10

*Encino Motorcars v. Navarro*, 579 U.S. 211 (2016)........13

*Goodluck v. Biden*, 104 F.4th 920 (D.C. Cir. 2024)........25

*Illinois v. Vought*, 820 F.Supp.3d 727 (N.D. Ill. 2026)........10

*Immigr. Defs. Law Ctr. v. Noem*, 145 F.4th 972 (9th Cir. 2025)........9

*In re Aiken Cnty.*, 725 F.3d 255 (D.C. Cir. 2013)........11, 14, 19

*Indep. Min. Co. v. Babbitt*, 105 F.3d 502 (9th Cir. 1997)........18

*Kendall v. United States*, 37 U.S. 524 (1838)........19

*Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682 (1949) ........ 20
*La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355 (1986) ........ 20
*L.A. Press Club v. Noem*, 820 F.Supp.3d 1034 (C.D. Cal. 2026) ........ 9
*Martin Luther King, Jr. Cnty. v. Turner*, 785 F.Supp.3d 863 (W.D. Wash. 2025) ........ 12, 21, 22
*M-J-M-A- v. Hermosillo*, 822 F.Supp.3d 1147 (D. Or. 2026). ........ 9
*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) 13, 15
*Mullin v. Al Otro Lado*, No. 25-5, 2026 WL 1825741 (U.S. June 25, 2026) ........ 16
*Multnomah Cnty. v. Azar*, 340 F.Supp.3d 1046 (D. Or. 2018) ........ 25
*Nat'l Ass'n of Regional Councils v. Costle*, 564 F.2d 583 (D.C. Cir. 1977) ........ 25
*Nat'l Council of Nonprofits v. OMB*, 763 F.Supp.3d 36 (D.D.C 2025) ........ 11
*Nat'l Urb. League v. Ross*, 977 F.3d 770 (9th Cir. 2020) ........ 14
*New York v. Trump*, 769 F.Supp.3d 119 (D.R.I. 2025) ........ 24
*Nken v. Holder*, 556 U.S. 418 (2009) ........ 24
*Norton v. S. Utah Wilderness All. (SUWA)*, 542 U.S. 55 (2004) ........ 15
*Ohio v. EPA*, 603 U.S. 279 (2024) ........ 13
*ONRC Action v. Bureau of Land Mgmt.*, 150 F.3d 1132 (9th Cir. 1998) ........ 15
*Population Inst. v. McPherson*, 797 F.2d 1062 (D.C. Cir. 1986) ........ 21, 25
*Preston v. Heckler*, 734 F.2d 1359 (9th Cir. 1984) ........ 21
*Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013) ........ 24
*Sierra Club v. Trump*, 963 F.3d 874 (9th Cir. 2020) ........ 20
*Teton Historic Aviation Found. v. U.S. Dep't of Def.*, 785 F.3d 719 (D.C. Cir. 2015) ........ 21
*Train v. City of New York*, 420 U.S. 35 (1975) ........ 19
*Velesaca v. Decker*, 458 F.Supp.3d 224 (S.D.N.Y. 2020) ........ 9, 10
*Washington v. Dep't of Ed.*, 161 F.4th 1136 (9th Cir. 2025) ........ 25
*West Virginia v. EPA*, 597 U.S. 697 (2022) ........ 20
*Widakuswara v. Lake*, 779 F.Supp.3d 10 (D.D.C. 2025) ........ 12, 18
*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ........ 9
*Woonasquatucket River Watershed Council, et al. v. Dep't of Ag., et al.*, No. 25-1428, 2026 WL

2279789, (1st Cir. Aug. 7, 2026) .......... 10

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 1 .......... 18
U.S. Const. art. I, § 9, cl. 7 .......... 18

**Statutes**

12 U.S.C. § 4569 .......... 2
12 U.S.C. § 4701 .......... 2, 14, 17, 24
12 U.S.C. § 4706 .......... 4
2 U.S.C. § 4703 .......... 2
12 U.S.C. § 4707 .......... 3
2 U.S.C. § 4713 .......... 2
2 U.S.C. § 4713a .......... 2
2 U.S.C. § 4718 .......... 2
2 U.S.C. § 4719 .......... 2
2 U.S.C. § 623 .......... 12
2 U.S.C. § 683 .......... 12
5 U.S.C. § 705 .......... 9, 24, 25
5 U.S.C. § 706 .......... 11, 13, 15, 18
26 U.S.C. § 45D .......... 2
31 U.S.C. § 1502 .......... 25
31 U.S.C. § 1512 .......... 5
31 U.S.C. § 1513 .......... 5
Consolidated Appropriations Act, 2021, Title V, Sec. 523 (Pub. L. 116-260) .......... 2
Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, div. E, 140 Stat. 173 .......... 4, 12
Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460 .......... 4, 11, 12
Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, §1101(a), 139 Stat. 9 .......... 4, 12

**Regulations**

12 C.F.R. § 1805.100. .......... 3

12 C.F.R. § 1805.201 .......... 2, 3

12 C.F.R. § 1805.600 .......... 3

*Amendment of Notice of Funds Availability for Community Development Financial Institutions Program; Revised Application Submission Deadline*, 90 Fed. Reg. 46303 (Sep. 25, 2025). .......... 7, 16

*Amendment of Notice of Funds Availability for Community Development Financial Institutions Program; Revised Application Submission Deadline*, 91 Fed. Reg. 11595 (Mar. 10, 2026). .......... 7, 16

*Community Development Financial Institutions Fund Notice of Funds Availability*, 90 Fed. Reg. 6051 (Jan. 17, 2025). .......... 7, 16

*Funding Opportunities: Small Dollar Loan Program: FY 2026 Funding Round*, 91 Fed. Reg. 39666 (June 30, 2026) .......... 7

*Funding Opportunities: Bank Enterprise Award Program (BEA) Program: FY 2026 Funding Round*, 91 Fed. Reg. 39682 (June 30, 2026). .......... 7

*Funding Opportunities: Bond Guarantee Program, FY 2026; Notice of Guarantee Availability*, 91 Fed. Reg. 39697 (June 30, 2026) .......... 7

**Other Authorities**

CBS News, *OMB Director Russell Vought testifies before House committee on 2027 budget* at 1:18:16 (Apr. 15, 2016), https://www.youtube.com/watch?v=Gf-Q2vqxngg&t=1s .......... 14

Centers for Disease Control, HHS, *Social Determinants of Health* (Jan. 17, 2024), https://perma.cc/P9HQ-UUH5 .......... 17

Cerin Lindgrensavage, *This is what it looks like when OMB kills your program*, If you can keep it (Apr. 07, 2026), https://perma.cc/HWH6-D8DU .......... 7

Katherine Hapggood, PoliticoPro, *White House eliminates entire Community Development Financial Institutions Fund staff* (Oct. 10, 2025), https://perma.cc/YFJ4-LRHL .......... 14

Letter from Hon. Susan Collins, S. Comm. On Appropriations Chair, to Russell T. Vought, Off. of Mgmt.& Budget Director (May 2, 2025), https://perma.cc/8YX7-RYL2 .......... 5

Off. of Mgmt. & Budget, Exec. Off. of the President, *Budget of the United States Government, Fiscal Year 2027* (2026), https://perma.cc/Q8D2-VDQ9. Bessent says CDFI Fund "'had lost its way', NewsRoom, Westlaw Today (Apr. 22, 2026) https://perma.cc/YT9G-AQWR. .......... 5

*OMB Circular No. A-11, Preparation, Submission, and Execution of the Budget* §§ 120.1, 120.34, https://perma.cc/H466-36D6 .......... 6

OpenOMB, *TAFS: 020-1881 2025/2026 - Community Development Financial Institution Fund Program Account*, https://perma.cc/VT4X-C29Y .......... 6

OpenOMB, *TAFS: 020-1881/2026 - Community Development Financial Institution Fund Program Account* https://perma.cc/53R2-2LLH .......... 7

Office of Disease Prevention and Health Promotion, Dep't of Health & Human Servs., *Poverty Literature Summary* (last visited Aug. 4, 2026), https://perma.cc/6XMB-ZEQ8 .............................. 17

*The President's Fiscal Year 2027 Budget Request: Hearing Before the H. Budget Comm.* 119th Cong. (2026), at 1:18:16 (YouTube Apr. 15, 2026) https://www.youtube.com/watch?v=Gf-Q2vqxngg&t=1s (statement of Russell Vought, Dir. Off. of Mgmt. & Budget).................................. 6

The Federalist No. 28 (Alexander Hamilton) (Clinton Rossiter, ed., 1961)......................................... 19

U.S. Dep't of the Treasury, CDFI Fund, *Programs*, https://perma.cc/UTS9-FLLR... ............................ 3

U.S. Dep't of the Treasury, CDFI Fund, *CDFI Program*, https://perma.cc/NPQ6-K4G4. ................ 7, 16

U.S. Dep't of the Treasury, CDFI Fund, *Community Development Financial Institutions Program, Award Book, FY 2024*, https://perma.cc/4UMU-B6JK. ......................................................... 3

U.S. Gov't Accountability Off., *Impoundment Control Act*, https://perma.cc/MU5Y-GSR8 ................ 11

White House, *Cuts to Woke Programs* (May 2025), https://perma.cc/X9W4-5N7P ......................... 5, 10

White House, *Cuts to Woke Programs* (Apr. 2026), https://perma.cc/6QFG-SCCN.............................. 6

## INTRODUCTION

In a national economy in which nearly one in four American households are unbanked, traditional lenders often overlook entrepreneurs and borrowers whose preexisting assets, geographic location, credit history, legal or work history, or immigration or citizenship status fall outside their conventional lending parameters. Community Development Financial Institutions (CDFIs) are mission-driven lenders that seek to serve the people and communities that traditional sources of capital leave behind, making the loans conventional banks will not make, on terms borrowers can actually repay.

Recognizing that CDFIs are an effective channel for vital investment in underserved communities, Congress sought to support and capitalize CDFIs by creating the CDFI Fund at the Department of the Treasury and charging it with administering a suite of programs that, together, have awarded more than $8 billion in monetary awards, allocated $81 billion in tax credits, and guaranteed nearly $3 billion in bonds, all directed toward underserved communities. Since creating the CDFI Fund in 1994, Congress has appropriated money to it every year since, with strong bipartisan support.

Beginning in 2025, the Trump-Vance Administration abandoned this decades-long track record based on the political belief that CDFIs' work is "woke"—and accordingly, sought to stop the Fund from distributing its awards. The Administration zeroed out the CDFI Fund's award programs in its May 2025 budget request, then terminated nearly all the Fund's employees during the fall 2025 government shutdown. When Congress overrode both efforts by funding the CDFI Fund and its programs at the exact same level as it had the year prior, and requiring reinstatement of the Fund's employees, the Administration turned to a new tactic: Delay the awards until Congress's appropriation expires.

Accordingly, Defendants adopted a policy to withhold, impound, delay, and otherwise not obligate or spend Congress's appropriation for the CDFI Fund's programs (the Impoundment Policy). And though Defendants have never explained or publicly acknowledged their policy, evidence of it abounds: When it initially opened CDFIs' fiscal year (FY) 2025 award applications, the CDFI Fund claimed it anticipated making awards in "fall 2025." Nearly a year after that deadline passed, not a single award has been made. For its part, OMB sequestered the FY 2025 funds in an account Treasury could not even access until April 2026, releasing them only on the eve of OMB Director Russell Vought's

testimony before Congress. Still, four months after it gained access to the funds, Treasury has not disbursed a dollar.

Plaintiff Inclusive Action is among the many CDFIs, including other members of Plaintiff CAMEO Network, whose FY 2025 application has been met with enduring silence—a delay that is already harming Inclusive Action and CDFIs across the economy. The FY 2025 funds expire in a matter of weeks, on September 30, 2026. Plaintiffs therefore have little choice but to seek emergency relief from this Court before the hundreds of millions of dollars Congress appropriated become permanently unavailable and the irreparable harm becomes permanent.

## BACKGROUND

### I. The CDFI Fund

The CDFI Fund was established by the Riegle Community Development and Regulatory Improvement Act of 1994 (P.L. 103-325) ("Riegle Act"), codified at 12 U.S.C. § 4701 *et seq*., to expand economic opportunity for underserved people and communities by improving the supply of capital, credit, private investment, and development services in economically distressed areas. The CDFI Fund is organized within Treasury's Office of Domestic Finance and is headed by a director appointed by the Secretary of the Treasury. The CDFI Fund is responsible for 11 programs or functions, including the CDFI Program, which distributes Financial Assistance awards and Technical Assistance awards to CDFIs nationwide amounting to hundreds of millions of dollars per year.[1]

CDFIs are financial institutions that channel much-needed investment into underserved communities and businesses, thereby creating economic opportunity, promoting quality affordable

---

[1] In addition to the CDFI Program, 12 U.S.C. § 4701 *et seq*., the CDFI Fund administers the New Markets Tax Credit Program, 26 U.S.C. § 45D; the Bank Enterprise Award Program, 12 U.S.C. § 4713; the Native American CDFI Assistance Program, 12 U.S.C. §§ 4701-4718; the Housing Production-Financial Assistance, 12 U.S.C. § 4703(a)(1); the Capital Magnet Fund, 12 U.S.C. § 4569; the CDFI Bond Guarantee Program, 12 U.S.C. § 4713a; the Small Dollar Loan Program, 12 U.S.C. § 4719; and Certification of CDFIs and Community Development Entities, 12 U.S.C. § 4719 & 26 U.S.C. § 45D; 12 C.F.R. § 1805.201. The CDFI Fund also administered two COVID-era programs, CDFI Equitable Recovery Program, Consolidated Appropriations Act, 2021, Title V, Sec. 523 (Pub. L. 116-260); and the CDFI Rapid Response Program, Consolidated Appropriations Act, 2021, Title V, Sec. 523 (Pub. L. 116-260).

housing, and providing essential community services to rural and urban low-income people and communities across the nation. To participate in the CDFI Fund's programs, CDFIs must obtain or take steps to obtain certification from the government. *See, e.g.*, 12 C.F.R. § 1805.201. Certification also serves as an indicator of legitimacy for other types of funders, including traditional large financial institutions and philanthropic foundations.

The CDFI Fund's largest discretionary award program is the CDFI Program. The CDFI Program provides Financial Assistance and Technical Assistance awards to CDFIs that focus on serving low-income individuals, historically underserved demographic populations, and distressed communities through awards in the form of loans, grants, equity investments, deposits, and capital reserves. 12 U.S.C. § 4707; 12 C.F.R. § 1805.100 *et seq*. It has awarded over $3 billion in financial assistance and technical assistance grants since 1996. *See* U.S. Dep't of the Treasury, CDFI Fund, *Community Development Financial Institutions Program, Award Book, FY 2024* at 1, https://perma.cc/4UMU-B6JK. From 2010 through 2024, CDFI Program financial assistance recipients have used their awards to originate nearly $300 billion in total loans and investments in distressed and economically underserved communities; provide over $55.8 billion in financing to more than 1.34 million businesses; and support the development of more than 557,000 units of affordable housing. *Id.*

The CDFI Fund also runs other programs that CDFIs rely on. These include the Small Dollar Loan Program, which supports loan loss reserve grants, which help CDFIs cushion their books against underperforming loans, as well as grants for technical assistance; the New Markets Tax Credit Program, which provides tax credits for investments in low-income communities, such as in manufacturing facilities and healthcare amenities; and the Bond Guarantee Program, which provides CDFIs with bonds guaranteed by the federal government, injecting new and substantial capital into distressed communities.[2]

The CDFI Fund announces funding opportunities through a Notice of Funding Availability (NOFA) published in the Federal Register. 12 C.F.R. § 1805.600. The NOFA announces the total amount of funding available and its allocation among award categories, identifies who is eligible to apply, sets

[2] *See* U.S. Dep't of the Treasury, CDFI Fund, *Programs*, https://perma.cc/UTS9-FLLR..

the application deadline, and specifies how applications will be evaluated. The Fund evaluates applicants based on thirteen statutory factors and others established via rulemaking, as well as geographic diversity. 12 U.S.C. § 4706.

Congress has appropriated money for the CDFI Fund each year since its founding. In the Consolidated Appropriations Act of 2024, Congress appropriated $289 million to the CDFI Program. It appropriated $324 million in total for the CDFI Fund to execute its statutory mandates. Of that amount, it directed that "not less than" $188 million is available for the CDFI Fund's financial assistance and technical assistance programs. Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460, 524. The FY 2025 budget was passed as a continuing resolution. On March 15, 2025, Congress continued appropriations for FY 2025 at the same levels, under the same conditions, and under the same authority provided in the FY 2024 Appropriations Act. Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, §1101(a), 139 Stat. 9, 10-12 (hereinafter "2025 Appropriations Act"). Congress provided that the FY 2025 funds are available until September 30, 2026. *Id*. Accordingly, Congress specified that "not less than" $188 million is available for the CDFI Fund's funding award programs in the fiscal year ending September 30, 2026.

Congress appropriated the same amount for the CDFI Fund, under the same conditions, in 2026. Accordingly, "not less than $188 [million] . . . is available until September 30, 2027" for financial assistance and technical assistance awards. Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, div. E, 140 Stat. 173, 442 (hereinafter "2026 Appropriations Act"). In a sharp rebuke to the Administration's proposed elimination of programs across the federal budget, including the CDFI Fund, the 2026 Appropriations Act prohibits the Administration from unilaterally eliminating programs Congress funded:

> "None of the funds made available in this or any other appropriations Act may be used to increase, eliminate, or reduce funding for a program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act, or unless such change is made pursuant to the reprogramming or transfer provisions of this or any other appropriations Act."

Pub. L. No. 119-75, § 739, 140 Stat. 173, 502.

Appropriated funds do not become available for an agency to spend automatically, however.

Before an agency can spend funds, OMB must apportion the appropriation to an account the agency can access. 31 U.S.C. § 1512. OMB must make apportionments in writing to an executive agency either twenty days prior to the start of the fiscal year for which the appropriations were provided or thirty days after the date of enactment of the appropriations act, whichever is later. *Id.* § 1513(b).

## II. The Trump-Vance Administration's Hostility Towards the CDFI Fund

In May 2025, the President's FY 2026 budget request recommended eliminating CDFI Fund discretionary awards and preserving only enough funds for oversight and closeout of past awards, the CDFI certification process, and running the New Market Tax Credit and Bond Guarantee Programs.[3]

The White House also issued a "fact sheet" titled "Cuts to Woke Programs." It explained the desire to "eliminate[]" the CDFI Fund on the grounds that the CDFI awards were "abused to advance a partisan agenda" including building "a more equitable, resilient economy." The fact sheet also decried the CDFI Fund and its award recipients as promoting "critical race theory," advancing "racial justice," "forwarding gender extremism," and "irresponsibly dedicating funds to climate radicalism."[4]

In early October 2025, during the federal government shutdown, virtually all CDFI employees received reduction-in-force (RIF) notices stating that their positions were being eliminated and that the purpose of the RIF was "to implement the abolishment of the Community Development Financial Institutions [sic] (CDFI) which is based on the Department of the Treasury determination that its programs, projects, and activities do not align with the President's priorities." Congress later mandated the rescission of those RIF notices—along with others across the government—in the November 2025 continuing resolution. Pub. L. No. 119-37, § 120(e), 139 Stat. 495, 500-01 (2025).

But the Administration's hostility to the CDFI Fund has not abated. In April 2026, OMB Director Russell Vought transmitted the President's FY 2027 budget to Congress and again sought to eliminate the Fund's discretionary programs, a move which Secretary Bessent also supported.[5] The White House

---

[3] *See* Letter from Hon. Susan Collins, S. Comm. On Appropriations Chair, to Russell T. Vought, Off. of Mgmt.& Budget Director (May 2, 2025), https://perma.cc/8YX7-RYL2 ("the Budget recommends eliminating CDFI Fund discretionary awards").

[4] Press Release, The White House, *Cuts to Woke Programs Fact Sheet* at 1, (May 2025), https://perma.cc/X9W4-5N7P.

[5] Off. of Mgmt. & Budget, Exec. Off. of the President, *Budget of the United States Government, Fiscal*

published another "Cuts to Woke Programs" Fact Sheet that claimed: "The elimination of this fund would also disincentivize critical race theory" and "prevent taxpayer dollars from forwarding gender extremism" among other political targets.[6] Vought testified to Congress soon after: "We have issues with this program. The President proposed to eliminate this program . . . That's why you see a reduction in our budget. We eliminate the main program[.]"[7]

**III. The Administration's Refusal to Apportion and Obligate Money for CDFI Fund Awards**

Defendants now seek to accomplish by delay what they have not accomplished by legislation by adopting and implementing the Impoundment Policy, under which they are withholding, impounding, delaying, and otherwise refusing to spend the CDFI Fund award funds appropriated by Congress.

Although Congress appropriated $324 million for the CDFI Fund and its associated programs in March of 2025, OMB initially apportioned only the $35 million Congress allocated for administration of the Fund itself (including to cover staff salaries). For months, OMB refused to apportion the remaining $289 million that Congress appropriated for the CDFI Fund's programs to accounts Treasury could access.[8] Then, on April 8, 2026, shortly before OMB Director Russell Vought was scheduled to testify before Congress, OMB apportioned the outstanding $289 million in CDFI Fund program funds that it had previously refused to apportion.[9] When Congress appropriated FY 2026 awards at the same level as the prior two fiscal years, OMB once again refused to apportion the funds for the CDFI Fund's

---

*Year 2027* at 53 (2026), https://perma.cc/Q8D2-VDQ9. Bessent says CDFI Fund "'had lost its way', NewsRoom, Westlaw Today (Apr. 22, 2026) https://perma.cc/YT9G-AQWR.

[6] Press Release, The White House, *Cuts to Woke Programs Fact Sheet* at 1, (Apr. 2026), https://perma.cc/6QFG-SCCN.

[7] *The President's Fiscal Year 2027 Budget Request: Hearing Before the H. Budget Comm.* 119th Cong. (2026), at 1:18:16 (YouTube Apr. 15, 2026) https://www.youtube.com/watch?v=Gf-Q2vqxngg&t=1s (statement of Russell Vought, Dir. Off. of Mgmt. & Budget).

[8] OpenOMB, *TAFS: 020-1881 2025/2026 - Community Development Financial Institution Fund Program Account*, https://perma.cc/VT4X-C29Y.

[9] Even then, it included a footnote to the apportionment. *Id*. OMB considers that footnote, which begins with the letter A, to have legal effect, including under the Antideficiency Act. (Off. of Mgmt. & Budget, *OMB Circular No. A-11, Preparation, Submission, and Execution of the Budget* §§ 120.1, 120.34, https://perma.cc/H466-36D6. Specifically, the "A" footnote to the apportionment provides that Treasury must "provide notification to OMB three days in advance of public announcement or obligation of award amounts." The rationale for the footnote, provided by OMB, is that OMB requests additional information on programmatic spending for some or all of the apportioned funds.

programs.[10] Those funds remain inaccessible by Treasury.

Meanwhile, the CDFI Fund's FY 2025 award process has abandoned any semblance of order or timeliness. Instead, the CDFI Fund has repeatedly delayed the application process, while refusing to announce awards, withholding funds to CDFIs nationwide.

On January 17, 2025, the CDFI Fund published a NOFA inviting Applications for Financial Assistance (FA) or Technical Assistance (TA) awards under the CDFI Program FY 2025 Funding Round.[11] The initial deadline for CDFIs to submit applications was March 21, 2025. The CDFI Fund stated (and as of this filing, still states) on its website that it anticipated awards from this funding round, which it expected to total approximately $320 million, would be announced in Fall of 2025.[12] Instead, on September 25, 2025, the CDFI Fund extended the application deadline to October 27, 2025.[13] On March 6, 2026, the CDFI Fund again revised its application deadline for FY 2025 funding awards to April 10, 2026.[14] On June 30, 2026, the CDFI Fund released NOFAs for the Bank Enterprise Award Program, the Small Dollar Loan Program, and the Bond Guarantee Program.[15] The deadlines for those applications closed in July 2026. The CDFI Fund has not even announced a NOFA for the FY 2026 money, which will expire on September 30, 2027. To date, Treasury has not made a single FY 2025 award.

The money Congress appropriated for the FY 2025 funding round will expire on September 30, 2026. The CDFI Fund has taken no action to announce awards or release the FY 2025 funding to CDFIs.

---

[10] *See* OpenOMB, *TAFS: 020-1881/2026 - Community Development Financial Institution Fund Program Account* https://perma.cc/53R2-2LLH; *see also* Cerin Lindgrensavage, *This is what it looks like when OMB kills your program*, If you can keep it (Apr. 07, 2026), https://perma.cc/HWH6-D8DU.

[11] *Community Development Financial Institutions Fund Notice of Funds Availability*, 90 Fed. Reg. 6051 (Jan. 17, 2025).

[12] CDFI Fund, *CDFI Program*, www.cdfifund.gov (last visited Aug. 6, 2026), https://perma.cc/NPQ6-K4G4. (Stating that the "ANNOUNCEMENT DATE" for awards is "Fall 2025").

[13] *Amendment of Notice of Funds Availability for Community Development Financial Institutions Program; Revised Application Submission Deadline*, 90 Fed. Reg. 46303 (Sep. 25, 2025).

[14] *Amendment of Notice of Funds Availability for Community Development Financial Institutions Program; Revised Application Submission Deadline*, 91 Fed. Reg. 11595 (Mar. 10, 2026).

[15] *See Funding Opportunities: Small Dollar Loan Program: FY 2026 Funding Round*, 91 Fed. Reg. 39666 (June 30, 2026); *Funding Opportunities: Bank Enterprise Award Program (BEA) Program: FY 2026 Funding Round*, 91 Fed. Reg. 39682 (June 30, 2026); *Funding Opportunities: Bond Guarantee Program, FY 2026; Notice of Guarantee Availability*, 91 Fed. Reg. 39697 (June 30, 2026).

Defendants have offered no explanation, in the Federal Register or anywhere else, for the delay in announcing awards on applications whose funding will expire in weeks.

**IV. Defendants' conduct has harmed, and will continue to harm, Plaintiffs**

Inclusive Action's mission is to provide underserved entrepreneurs with the capital they need to get into business, enter the formal economy, and expand and stabilize their operations so that they can create local jobs. Inclusive Action Dec. (IA Dec.) ¶ 6. Inclusive Action has received seven awards from the CDFI Fund in the past. Each has had a material impact on Inclusive Action's institutional stability and its capacity to extend low-cost credit to Los Angeles-area entrepreneurs. *Id.* ¶ 11. Yet, despite timely applying for the CDFI Program 2025 funding cycle, Inclusive Action has heard nothing about award announcements. Inclusive Action's 2025 application has now been pending roughly seventeen months, more than double the time any prior Inclusive Action application to the CDFI Fund has taken to reach a decision, and well beyond the anticipated Fall 2025 award date. *Id.* ¶ 14.

CAMEO Network is an organization of more than 400 members nationwide dedicated to furthering business development across the nation with small and micro-business financing such as loans and credit, technical assistance, and business management training. CAMEO Dec. ¶ 3. Many of CAMEO's members are CDFIs, including Inclusive Action. Many CAMEO members have applied for FY 2025 CDFI Fund awards, but have still not received notification that awards have been issued, and have yet to see any money flow from the CDFI Fund. *Id.* ¶¶ 15-16. If the FY 2025 CDFI Fund award money expires before Treasury obligates the funds to CDFIs, CAMEO's CDFI members will likely be forced to scale back their operations and the activities that are core to their missions, including reducing the capital they provide to small business entrepreneurs who are not served by traditional lenders. *Id.* ¶ 29-30.

## LEGAL STANDARD

A plaintiff seeking "a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council,*

*Inc.*, 555 U.S. 7, 20 (2008).[16] "[T]he factors used to determine whether to issue a § 705 stay under the APA are the same equitable factors used to consider whether to issue a preliminary injunction." *Immigr. Defs. Law Ctr. v. Noem*, 145 F.4th 972, 995 (9th Cir. 2025) (cleaned up).

## ARGUMENT

### I. Plaintiffs are likely to succeed on the merits of their claims.

Plaintiffs have demonstrated a substantial likelihood of success on each of their claims, any one of which would be sufficient to support the relief sought in their Motion.

#### A. Defendants' refusal to obligate funds violates APA § 706(2) (Counts I, II)

##### *i. The Impoundment Policy is final agency action reviewable under the APA.*

The Impoundment Policy is a final agency action reviewable under the APA because it (1) "mark[s] the consummation of the agency's decisionmaking process" and (2) is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). "In determining whether an agency's action is final," the Ninth Circuit "focus[es] on the practical and legal effects of the agency action, not on labels, and finality is interpreted in a pragmatic and flexible manner." *Ctr. for Biological Diversity v. Haaland*, 58 F.4th 412, 417 (9th Cir. 2023). Accordingly, an "unwritten" "decision or a policy can be a final agency action," *L.A. Press Club v. Noem*, 820 F.Supp.3d 1034, 1048 (C.D. Cal. 2026) (collecting cases), and courts may "infer[] from . . . agency conduct that the agency has adopted a general policy, even in the face of agency denials of such policies," *Velesaca v. Decker*, 458 F.Supp.3d 224, 237 n.7 (S.D.N.Y. 2020). "Any ruling to the contrary would allow agencies to avoid review by simply not putting their decisions in writing." *M-J-M-A- v. Hermosillo*, 822 F.Supp.3d 1147, 1178 (D. Or. 2026).

The public record contains "significant evidence" that Defendants have made a final decision to withhold CDFI awards as part of their broader efforts to eliminate the CDFI Fund and its programs. *Id.*

---

[16] Alternatively, under the "serious questions" test, the plaintiff may demonstrate "that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor," so long as the other two *Winter* factors are also met. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011) (cleaned up). This "sliding scale approach," allows "a stronger showing of one element" to "offset a weaker showing of another." *Id.* at 1131, 1134–35. Plaintiffs in this case satisfy either standard.

As noted, the Administration has conveyed its desire to shut the agency down again and again by (1) attempting to zero out the agency's budget for discretionary awards; (2) explicitly stating a desire to "eliminate[]" the CDFI Fund in its "Woke Programs" fact sheet, *supra* at n.6; and (3) attempting to terminate all CDFI employees in order to "abolish[]" the CDFI Fund, *supra* at n.22.

After Congress stymied the budgetary and firing strategies, Defendants moved to a third approach: withholding appropriated award funds until they expire at the end of the fiscal year, This is evident in the fact that, weeks from the expiration of FY 2025 funds, no award money has been announced, obligated, or disbursed to any CDFI. *See* CAMEO Dec. at ¶ 16. OMB has also refused to apportion the FY 2026 program funds. *Supra* at n.10. And if any question remains, the passage of time will soon remove all doubt; once the 2025 funds expire on September 30, the decision to not spend them will be undeniably final. *See, e.g.*, *Woonasquatucket River Watershed Council, et al. v. Dep't of Ag., et al.*, No. 25-1428, 2026 WL 2279789, at *9-10 (1st Cir. Aug. 7, 2026) (agencies' categorical decision to "freeze" funding likely constitutes final agency action). Indeed, other courts have found that agencies have adopted policies based on similar records at the preliminary injunction stage. *See, e.g.*, *Illinois v. Vought*, 820 F.Supp.3d 727, 731 (N.D. Ill. 2026) (finding final agency action in the absence of a written policy based on defendant agencies' "public statements" and actions, such as relevant "data collection[] and [a] notice to Congress"); *Velesaca*, 458 F.Supp.3d at 241-42 (unwritten agency policy likely existed where one could "see plainly" from agency's conduct "that a change [in policy] . . . took place").

The Impoundment Policy also easily clears the second *Bennett* prong. It alters legal obligations by "lead[ing] to a substantial reduction in spending," *AIDS Vaccine Advocacy Coal. v. Dep't of State ("AVAC II")*, 803 F.Supp.3d 164, 180 (D.D.C. Sep. 3, 2025), and alters legal rights by "den[ying]" CDFIs "the opportunity to compete for [the] funds," *id.* at 175.[17] *See also, e.g.*, *Nat'l Council of*

---

[17] Following the D.C. Circuit's denial of the government's motion to stay the district court's preliminary injunction in *AVAC*, the Supreme Court granted that stay on the basis that the President had initiated the rescissions process under the Impoundment Control Act by sending the "special message" to Congress that the Act requires. *Dep't of State v. Aids Vaccine Advoc. Coal.*, 146 S. Ct. 19 (2025). As a result, and in light of "the asserted harms to the Executive's conduct of foreign affairs" at issue in that case, it was the Court's "preliminary view" that interim relief under the Administrative Procedure Act should be stayed. *Id*. Here, the executive branch cannot claim either to have initiated the Impoundment Control Act's rescission process or any harm to its ability to conduct foreign affairs. *See also City & Cnty. of San Francisco v. Trump,* 816 F.Supp.3d 1017, 1035 n.9 (N.D. Cal. 2026).

*Nonprofits v. OMB*, 763 F.Supp.3d 36, 54 (D.D.C 2025) (OMB policy had "legal consequences" where it prohibited the "obligation . . . of all federal financial assistance").

***ii. The Impoundment Policy is contrary to law.***

Plaintiffs are likely to succeed on their claim that the Impoundment Policy is contrary to law or in excess of statutory authority. *See* 5 U.S.C. § 706(2)(B)-(C).

To begin, the policy violates the 2025 and 2026 Appropriations Acts because it "unilaterally decline[s]" to "spend the specific amount of funds that Congress dictated for specific purposes in [those] appropriations laws." *AVAC II*, 803 F.Supp.3d at 182. Defendants' "decision not to [spend the funds] is contrary to law in violation of the APA." *AVAC II*, 803 F.Supp.3d at 184. The 2025 and 2026 Appropriations Acts plainly impose a duty on Defendants. Congress appropriated $324 million to the CDFI Fund and its programs, mandating that specific amounts be spent on a series of programs. For example, as reenacted through the 2025 Appropriations Act, the 2024 Appropriations Act directs that "not less than $188,000,000" is available for the CDFI Fund's financial assistance and technical assistance awards. Pub. L. No. 118-47, 138 Stat. 524; *see also* 138 Stat. 524–25 (directing that similarly specific amounts be spent on various other programs).

These provisions impose a mandatory duty on Defendants to spend the funds. It is a bedrock principle that the Constitution "gives Congress control over the public fisc." *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 420 (2024). Further, that power is "exclusive," with the Appropriations Clause operating as a "restraint on Executive Branch officers." *Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346–47 (D.C. Cir. 2012). Accordingly, it is well-established that the executive "does not have unilateral authority to refuse to spend [appropriated] funds," even when it "has policy reasons . . . for wanting to spend less than the full amount[.]" *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013). *See also AVAC II*, 803 F.Supp.3d at 182–84 (collecting cases to explain the "longstanding, bedrock presumption" that "Congress's appropriations of funds" are "mandatory").

Moreover, like all modern appropriations laws, the 2025 Appropriations Act was enacted against the background of the Impoundment Control Act of 1974, which "operates on the premise that when

Congress appropriates money to the executive branch, the President is required to obligate the funds."[18] That statute precludes agencies from "withholding or delaying the obligation or expenditure of" appropriated funds, 2 U.S.C. § 623(1), and requires the President to obtain congressional approval to rescind appropriated funds, *id.* § 683.[19] Applying these principles, multiple courts have recently held in similar circumstances that agency defendants "have a nondiscretionary duty to comply with the statutory commands in the appropriations acts by obligating the relevant funds." *AVAC II*, 803 F.Supp.3d at 186 (plaintiffs would likely succeed on section 706(2) claim where agencies withheld appropriated funds); *See also*, *e.g.*, *Martin Luther King, Jr. Cnty. v. Turner*, 785 F.Supp.3d 863, 886 (W.D. Wash. 2025); *Widakuswara v. Lake*, 779 F.Supp.3d 10, 36 (D.D.C. 2025) (same). So too here. Defendants are legally required to spend "not less than" the specified amounts on the specific programs identified in the 2025 Appropriations Act. Pub. L. 118-47, 138 Stat. 460 (in fiscal year 2024, providing "not less than" the specified amount is available for awards); Pub. L. 119-4, 139 Stat. 9 Sec. 1101(a)(5), 1105 (appropriating the same amount under the same conditions as the fiscal year 2024 appropriation).

The Impoundment Policy also violates the 2026 Appropriations Act's prohibition on impoundment. In addition to rejecting the President's proposal to zero out the CDFI Fund's discretionary awards, that Act mandated "[n]one of the funds made available in this or any other appropriations Act may be used to . . . eliminate[] or reduce funding for a program . . . as proposed in the President's budget request." Pub. L. No. 119-75, § 739, 140 Stat. 502. Yet the Impoundment Policy does exactly that.[20]

---

[18] *See* U.S. Gov't Accountability Off., *Impoundment Control Act*, https://perma.cc/MU5Y-GSR8.

[19] "To be sure, Congress does at times use language that makes spending permissive, including by explicitly framing the amount appropriated as a discretionary ceiling." *AVAC*, 803 F.Supp.3d at 184. For example, Congress has occasionally "given the Executive leeway to decide how to allocate funds, up to a ceiling," by using language such as "'sums not exceeding' stated amounts for 'broad categories' of purposes." *Cmty. Fin. Servs*., 601 U.S. at 442. However, Congress did not use such discretionary language here. Instead, Congress unambiguously appropriated "$324,000,000" to "carry out the Riegle [Act]" and further created a mandatory floor for spending on specific programs, requiring "*not less than*" the stated amounts be spent on each program. Pub. L. No. 118-47, 138 Stat. at 524-25.

[20] OMB's implementation of the Impoundment Policy also violated the Antideficiency Act by refusing to apportion both fiscal year 2025 and 2026 funds by the deadline imposed by that act. *See* Compl. at ¶¶ 113–114, 122.

***iii. The Impoundment Policy is arbitrary and capricious.***

The Impoundment Policy is also arbitrary and capricious in violation of the APA. 5 U.S.C. § 706(2)(A). An agency action is arbitrary or capricious if it is not "reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024). The APA requires an agency to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quote omitted). To meet this standard, the agency's explanation and decisionmaking cannot rely "on factors which Congress has not intended it to consider." *Id.* Further, when an agency changes its policy, it "must at least display awareness that it is changing position," "show that there are good reasons for the new policy," and consider any "serious reliance interests" engendered by the prior "longstanding policies." *Encino Motorcars v. Navarro*, 579 U.S. 211, 221–22 (2016) (internal quotes omitted). The Impoundment Policy violates these standards.

*First*, "Defendants' decision to simply not spend [millions] of dollars in congressionally appropriated [funds] and instead let those funds expire" is arbitrary and capricious because "Defendants have not offered any explanation for the decision," *AVAC II*, 803 F.Supp.3d at 185, let alone a "satisfactory explanation" that makes "a rational connection between the facts found and the choice made," *State Farm*, 463 U.S. at 43. And of course, by failing to provide any explanation whatsoever, Defendants have not met their obligation to "display awareness that [they are] changing position" from their prior policy of awarding funds appropriated to CDFI Fund programs, much less "show that there are good reasons for the new policy." *Encino Motorcars*, 579 U.S. at 221–22.

*Second*, Defendants failed to "consider[] the reliance interests of Plaintiffs and other organizations, [as well as] the beneficiaries of their services, who have relied on the agencies' longstanding policies and practices" of awarding these funds. *AVAC II*, 803 F.Supp.3d at 185.

Consistent with Congress's objectives, CDFIs have developed significant reliance interests on the CDFI Fund's programs both to access low-cost capital from the government and, because the government's financial support increases CDFIs' stability and lending capacity, to attract investment from other lenders including commercial banks, private lenders, and philanthropy. *See* IA Dec. at ¶ 24

(Defendants' actions "have also had ripple effects on Inclusive Action's support from non-government sources."); *see also* CAMEO Dec. at ¶¶ 21, 29, 33, 35. CDFIs' awards from the CDFI Fund allow them to fulfill their mission of providing low-cost capital to entrepreneurs underserved by traditional financial institutions. *See* IA Dec. at ¶ 21–22; CAMEO Dec. at ¶¶ 27, 29–30, 31, 33–36. CDFI Fund awards are also uniquely important to CDFIs because they can be used more flexibly than funds from other sources, allowing CDFIs to fund critical operational expenses that they could not otherwise cover reliably. *See* CAMEO Dec. at ¶¶ 29, 34 (unlike other sources, "the CDFI Fund awards are unrestricted and thus provide CDFIs . . . the flexibility to use those funds to run their operations and other functions necessary to carrying out their mission"). Without CDFI Fund awards, CDFIs—including Inclusive Action and CAMEO's other members—will have to curtail their operations, pull back on their lending and grantmaking to underserved small business entrepreneurs, and reduce the financial education they provide to their clients and communities. IA Dec. at ¶ 23; CAMEO Dec. at ¶ 29–30. And alternative funding sources cannot bridge the gap left by the CDFI Fund's withdrawal. CAMEO Dec. at ¶ 35 ("the private sector alone cannot fill the gap created by the absence of the CDFI Fund awards.").

These serious reliance interests are at the heart of why Congress created the CDFI Fund and its programming: to provide "investment in and assistance to community development financial institutions, including enhancing the liquidity of community development financial institutions" in order to "promote economic revitalization and community development" with those investments. 12 U.S.C. § 4701(b). Under the APA, Defendants "must be cognizant" that their longstanding policy of timely obligating and disbursing CDFI Fund awards "engendered serious reliance interests that must be taken into account," *Nat'l Urb. League v. Ross*, 977 F.3d 770, 778 (9th Cir. 2020). But there is no evidence that they are.

*Third*, to the extent the Impoundment Policy was driven by Defendants' view that the CDFI programs are "woke"[21] and "do not align with the President's priorities,"[22] Defendants unlawfully relied

---

[21] *See* White House, *Cuts to Woke Programs* at 2 (date), https://perma.cc/X9W4-5N7P (proposing to "eliminat[e]" the CDFI Fund because it is a "woke program"); CBS News, *OMB Director Russell Vought testifies before House committee on 2027 budget* at 1:18:16 (Apr. 15, 2016), https://www.youtube.com/watch?v=Gf-Q2vqxngg&t=1s (Russ Vought testifying that CDFIs "continue to be woke").

[22] See Katherine Hapggood, PoliticoPro, *White House eliminates entire Community Development*

"on factors which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43. The 2025 and 2026 Appropriations Acts do not confer any discretion on Defendants "to refuse to spend [appropriated] funds," for any reasons, *In re Aiken Cnty.*, 725 F.3d at 261 n.1, much less based on the President's policy preferences. *See also id.* (the executive cannot refuse to spend appropriated funds for "policy reasons").

**B. Defendants' refusal to obligate funds constitutes unreasonably delayed and unlawfully withheld agency action in violation of APA § 706(1) (Count III)**

Section 706(1) of the APA provides that a "reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). In such circumstances, courts may compel an agency to take "a discrete agency action that it is required to take." *Norton v. S. Utah Wilderness All. (SUWA)*, 542 U.S. 55, 64 (2004). Here, Defendants have unreasonably delayed and unlawfully withheld agency action by failing to take the steps necessary to obligate the FY 2025 funds before they expire on September 30, 2026.[23]

As explained above, the 2025 and 2026 Appropriations Acts impose a mandatory duty on Defendants to spend appropriated funds before they expire. Defendants are thus "legally required" to take the "discrete" action of spending the funds appropriated for CDFI and its associated programs for FY 2025 before those funds expire on September 30, 2026. *SUWA*, 542 U.S. at 63.

Disregarding that duty, Defendants have unreasonably delayed in spending the FY 2025 funds before they expire on September 30, 2026. "The reasonableness of any delay is a fact-intensive inquiry analyzed under the so-called TRAC factors," which are:

> (1) the time agencies take to make decisions must be governed by a 'rule of reason'; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and

---

*Financial Institutions Fund staff* (Oct. 10, 2025), https://perma.cc/YFJ4-LRHL (explaining that Defendants were firing employees "abolish[]" the CDFI based on "the Department of the Treasury determination that its programs, projects, and activities do not align with the President's priorities.").

[23] This Court need not conclude there has been a final agency action to grant Plaintiffs relief on their § 706(1) claim. *See ONRC Action v. Bureau of Land Mgmt.*, 150 F.3d 1132, 1137 (9th Cir. 1998) ("A court's review of an agency's failure to act has been referred to as an exception to the final agency action requirement.").

> extent of the interests prejudiced by the delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*Al Otro Lado v. EOIR*, 138 F.4th 1102, 1121 & n.11 (9th Cir. 2025), *rev'd and remanded on other grounds sub nom. Mullin v. Al Otro Lado*, No. 25-5, 2026 WL 1825741 (U.S. June 25, 2026) (cleaned up).

Beginning with factors one and two, Defendants' delay is unreasonable in light of the fact that "Congress provided a clear timetable to act" by setting "specific expiration dates for the relevant funds" on September 30, 2026—a date that is just over a month away. *AVAC II*, 803 F.Supp.3d at 186. Notwithstanding this deadline, Defendants have repeatedly stalled the award process for the 2025 funds. With respect to the central CDFI Program, which provides Technical and Financial Assistance awards, Defendants have abandoned their original, orderly timeline. Defendants initially published a NOFA in January 2025, setting an application deadline of March 2025[24] and stating on their website (which remains as of the date of this filing) that awards would be announced in the fall of 2025.[25] But Defendant CDFI Fund has twice extended the application deadline via amendments to the NOFA: first to October 27, 2025[26] and ultimately to April 10, 2026.[27] Yet Defendants have not announced or issued any awards for the program, nor given any indication they will award funds before they expire. Award announcements are nearly a year behind the announced Fall 2025 award timeline.[28]

Defendants' delay is even more pronounced for the Bank Enterprise Award Program, Small Dollar Loan Program, and Bond Guarantee Program. Defendants waited until June 30, 2026 to issue the respective NOFAs, three months prior to the funds' September 30 expiration. *Supra* at 7. In light of Defendants' historic timeline (*see, e.g.*, taking approximately seven months to review applications and

---

[24] *Notice of Funds Availability*, 90 Fed. Reg. 6051 (Jan. 17, 2025).
[25] CDFI Fund, *CDFI Program*, www.cdfifund.gov (last visited Aug. 6, 2026), https://perma.cc/NPQ6-K4G4 (stating that the "ANNOUNCEMENT DATE" for awards is "Fall 2025").
[26] *Amendment of Notice of Funds Availability for Community Development Financial Institutions Program; Revised Application Submission Deadline*, 90 Fed. Reg. 46303 (Sep. 25, 2025).
[27] *Amendment of Notice of Funds Availability for Community Development Financial Institutions Program; Revised Application Submission Deadline*, 91 Fed. Reg. 11595 (Mar. 10, 2026).
[28] *See* CDFI Fund, *CDFI Program*, www.cdfifund.gov (last visited Aug. 6, 2026), https://perma.cc/NPQ6-K4G4 (stating that the "ANNOUNCEMENT DATE" for awards is "Fall 2025").

announce awards, Inclusive Action Decl. ¶ 12), this last-minute publication of NOFAs leaves Defendants insufficient time to complete their review and make awards. Defendants' delay is thus "significant, as the date by which the funds must be obligated is [just over] a month away." *AVAC II*, 803 F.Supp.3d at 186 (concluding under similar circumstances that factors one and two indicated unreasonable delay).

Likewise, factors three, four, and five also weigh in favor of Plaintiffs. On the one hand, "expediting [the] delayed action" will not negatively impact "agency activities of a higher or competing priority." *Al Otro Lado*, 138 F.4th at 1121 & n. 11. To the contrary, obligating the funds serves the CDFI Fund's central purpose to "promote economic revitalization and community development." 12 U.S.C. § 4701(b). In fact, these programs, which provide "investment in and assistance to [CDFI]s," are the primary mechanisms by which Congress has directed Defendants to achieve this goal. *Id.* Further, there is "no indication that competing agency priorities have prevented Defendants from obligating the funds in question." *AVAC II*, 803 F.Supp.3d at 186. Rather, the CDFI Fund "has no other priorities to pursue because Defendants have [repeatedly] sought to abolish it." *Id.* Indeed, even if Defendants had identified some other agency priority, refusing to spend the appropriation for its intended purpose would not enable them to spend it for a new purpose, because Congress only provided the CDFI Fund awards for the specific programs Congress has created for the CDFI Fund to administer. *See supra* at 3–4.

Conversely, Defendants' delay will greatly "prejudice" CDFIs (such as Plaintiff Inclusive Action and Plaintiff CAMEO's members) and the communities they serve, including through inevitable detrimental impacts on "human health and welfare." *Al Otro Lado*, 138 F.4th at 1121 & n.11. If the FY 2025 funds expire, CDFIs and their communities will never receive the investments and assistance Congress intended for them. As Congress itself explained, the CDFI programs at issue are intended to "restor[e] and maint[ain] the economies of these communities" that "face critical social and economic problems arising in part from the lack of economic growth," such as "people living in poverty." 12 U.S.C. § 4701(a). And "residents of impoverished communities are at increased risk for mental illness, chronic disease, higher mortality, and lower life expectancy."[29]

[29] *See, e.g.*, Office of Disease Prevention and Health Promotion, Dep't of Health & Human Servs., *Poverty Literature Summary* (last visited Aug. 4, 2026), https://perma.cc/6XMB-ZEQ8; Centers for Disease Control, HHS, *Social Determinants of Health* (Jan. 17, 2024), https://perma.cc/P9HQ-UUH5.

As for factor six, although the "court need not find any impropriety . . . to hold that agency action is unreasonably delayed," *Al Otro Lado*, 138 F.4th at 1121 & n.11, the evidence suggests that Defendants have "delayed in bad faith" by displaying "utter indifference to a congressional deadline," *Indep. Min. Co. v. Babbitt*, 105 F.3d 502, 510 (9th Cir. 1997) (cleaned up). The White House has unequivocally conveyed its desire to eliminate—or at the very least defund—the CDFI Fund, including through the "Woke Program" Fact Sheet and its budget proposals. *Supra* at n.6. And Defendants have likewise made efforts to implement this objective by, among other things, attempting to fire nearly every CDFI employee. *Supra* at n.22. Against this background, and as explained further below, Defendants' delay is likely an effort to accomplish this same goal by allowing the FY2025 funds to expire notwithstanding Congress' deadline. Here, Defendants "will have a hard time claiming legitimacy for [their] priorities" and the "court . . . should conclude that the delay is unreasonable." *Indep. Min. Co.*, 105 F.3d at 510.

Although Defendants' unreasonable delay is sufficient to warrant an order compelling agency action, Plaintiffs are also likely to succeed in showing that withholding the 2025 funds constitutes unlawfully withheld action. Withholding occurs when an agency "refuses to act in disregard of its legal duty." *Al Otro Lado*, 138 F.4th at 1122 (citations omitted). Plaintiffs may demonstrate that the agency is withholding—not merely delaying—agency action in multiple ways, such as by showing that the agency has "fail[ed] to meet a hard statutory deadline," *id.* at 1121 n.12, or by otherwise making clear that "no amount of waiting can be expected to change the situation," *id.* at 1122. "If an agency withholds a required action, it violates § 706(1) regardless of its reason for doing so." *Id.* at 1121.

As just noted, the evidence strongly indicates that Defendants are withholding the funds to defund the CDFI Fund's award programs. Accordingly, "no amount of waiting can be expected to change the situation." *Al Otro Lado*, 138 F.4th at 1122. *See also, e.g.*, *Widakuswara*, 779 F.Supp.3d at 36, 37 (agency likely unlawfully withheld agency action by "withholding of appropriated funds" and failing to "provide[] any indication that the . . . appropriations [are] being spent"). Defendants have "violate[d] § 706(1)" by "withhold[ing] a required action." *Al Otro Lado*, 138 F.4th at 1121.

### C. The Impoundment Policy violates the Separation of Powers doctrine and Take Care

---

("poverty is highly correlated with poorer health outcomes and higher risk of premature death").

**Clause (Count IV)**

Defendants' refusal to spend appropriated funds before those funds expire also violates the constitutional separation of powers. The Constitution "exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018). The Spending Clause and the Appropriations Clause together make clear that only "Congress shall have the power to" distribute funds and control appropriations from the federal fisc. U.S. Const. art. I, § 8 cl. 1 & § 9 cl. 7. By reserving these powers for Congress alone, these clauses together serve as a "bulwark of the Constitution's separation of powers among the three branches of government." The Federalist No. 28, at 359 (Alexander Hammilton) (Clinton Rossiter, ed., 1961).

As noted, Defendants are withholding approximately $289 million of appropriated funding for the CDFI Fund's discretionary award programs for FY 2025. Despite the President's repeated attempts to defund and dismantle the CDFI Fund through, among other things, eliminating funding for the CDFI Fund's discretionary awards in the President's proposed budget, attempting to fire every CDFI Fund employee, and unlawfully impounding and delaying apportionment of FY 2025 funds, Congress nonetheless appropriated funds to the CDFI Fund at a level commensurate with prior fiscal years. Defendants' actions thus violate the separation of powers.

Defendants have refused to spend funds that Congress has appropriated for the CDFI Fund's programs—funds which will expire imminently unless obligated. Although the Executive Branch "sometimes has policy reasons for . . . wanting to spend less than the full amount appropriated by Congress for a particular project or program, . . . even the President does not have unilateral authority to refuse to spend the funds." *In re Aiken Cnty.*, 725 F.3d at 261 n.1 (Kavanaugh, J). Congress provided, in specific detail, that "not less than" the specific appropriations amounts be spent on each program and the date on which those funds would expire. Indeed, where a statute mandates that appropriated sums "shall be allotted," the Executive is "not permitt[ed]" to "allot . . . less than the entire amount[]" appropriated. *Train v. City of New York*, 420 U.S. 35, 42 (1975); *see also Kendall v. United States*, 37 U.S. 524, 610 (1838) (compelling Executive to pay a congressionally mandated award it had attempted to withhold). Defendants lack any constitutional authority to defy Congress's choice to appropriate money to the CDFI

Fund for specific programs before those funds expire. Defendants have thus unconstitutionally "claimed for [themselves] Congress's exclusive spending power." *See City and Cnty. of S.F.*, 897 F.3d at 1234.

**D. Defendants' Actions are *Ultra Vires* (Count V)**

Plaintiffs are also likely to succeed on their independent claim that Defendants' actions are ultra vires. An agency "literally has no power to act … unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). "When an executive acts ultra vires, courts are normally available to reestablish the limits on his authority." *Sierra Club v. Trump*, 963 F.3d 874, 891 (9th Cir. 2020), *vacated and remanded on other grounds, sub nom. Biden v. Sierra Club*, 142 S. Ct. 46 (2021). Thus, any action that agency officials take outside the bounds of their statutory authority is ultra vires and subject to judicial review. *Id.*; *see also Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (ability to enjoin officials' unconstitutional action "reflects a long history of judicial review of illegal executive action, tracing back to England.").

Here, as explained above, no statute gives Defendants authority to refrain from obligating the funds at issue. Nor does any statute authorize Defendants to impound the funds for policy reasons. To the contrary, numerous statutes specifically prohibit it. Had Congress intended to give Defendants discretion to take such action of vast "economic and political significance," it would have said so expressly in either the CDFI Fund's authorizing legislation or in the subsequent appropriations acts funding its discretionary award programs. *West Virginia v. EPA*, 597 U.S. 697, 703, 716 (2022) (agencies must identify "clear congressional authorization" for major questions affecting "billions of dollars of impact"). Defendants' choice to act anyway underscores that they have acted ultra vires. *See, e.g.*, *AIDS Vaccine Advocacy Coal. v. Dep't of State* ("*AVAC I*"), 770 F.Supp.3d 121, 148 n.18 (D.D.C. 2025) (defendants likely acted ultra vires by impounding billions of dollars in congressionally appropriated foreign aid). Defendants' actions are ultra vires and should be enjoined. *See Armstrong*, 575 U.S. at 326–27; *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949) ("[W]here [an] officer's powers are limited by statute, his actions beyond those limitations . . . are ultra vires . . . and therefore may be made the object of specific relief.").

### II. Plaintiffs Have Standing and Will Suffer Irreparable Harm if the Funds Expire.

Defendants are causing, and are on track to cause further, irreparable harm to Inclusive Action and other members of CAMEO Network in three ways. First, Defendants' refusal to apportion and award the funds "renders [Plaintiffs] unable to fairly compete for [the] benefit" of those funds, which is an "injury-in-fact." *Preston v. Heckler*, 734 F.2d 1359, 1365 (9th Cir. 1984); *Teton Historic Aviation Found. v. U.S. Dep't of Def.*, 785 F.3d 719, 724 (D.C. Cir. 2015) ("loss of an opportunity to pursue a benefit" is a "cognizable injury . . . even [where] the plaintiff may not be able to show that it was certain to receive the benefit had it been accorded the lost opportunity."). This injury will fast become irreparable if the Court fails to grant relief to before the FY 2025 funds expire, at which point the opportunity to compete for the funds will be forever lost. *See City of Houston v. HUD*, 24 F.3d 1421, 1426 (D.C. Cir. 1994) ("courts cannot order the expenditure of funds" after "an appropriation has lapsed"); *Population Inst. v. McPherson*, 797 F.2d 1062, 1081 (D.C. Cir. 1986) (irreparable harm where funds could not "be recouped" and court was "unable to grant effective relief.").[30]

Second, Defendants' efforts to defund the CDFI Fund's programs, including through the delays in apportioning and announcing FY 2025 awards, have caused and will continue to cause irreparable harm by introducing uncertainty that jeopardizes the financial stability of the entire CDFI industry, including Plaintiff Inclusive Action and Plaintiff CAMEO's other members. By calling into question whether these funds will ever become available, Defendants' indefinite hold on the FY 2025 funds have already created "acute budgetary uncertainty" that "is irreparable." *King*, 785 F.Supp.3d at 890; *Cnty. of Santa Clara v. Trump*, 250 F.Supp.3d 497, 537 (N.D. Cal. 2017) (similar).

Inclusive Action is one of multiple CAMEO members that timely applied for a FY 2025 award from the CDFI Program. IA Dec. at ¶ 14, 16; CAMEO Dec. at ¶ 15, 28. Every month of uncertainty is one in which Plaintiffs cannot commit capital that they have sought from the CDFI Fund and matching

---

[30] There can be little doubt that Plaintiffs also meet the second two prongs of Article III standing. Plaintiffs' inability to compete for the funds is directly traceable to Defendants' withholding of those funds. Further, the requested relief will redress that injury by preventing the funds' expiration and restoring the opportunity to compete for the funds. Accordingly, Plaintiffs have also established that they have standing to bring their challenge to Defendants' unlawful activities.

sources, plan their loan books against it, calibrate their personnel and operations according to what their budgets can support, or extend credit to as many underserved entrepreneurs—their core mission. CAMEO Dec. at ¶ 30 ("Since the administration has thrown the fiscal year 2025 awards and future of the CDFI Fund into doubt, and introduced significant uncertainty for Member A and other members of the CDFI industry, Member A has had to revise its performance expectations downward dramatically. That translates to Member A extending fewer loans and grants to entrepreneurs than it had planned . . . forc[ing them] to choose between going without the funds they need to sustain their small businesses or seeking capital from much higher risk sources, such as predatory payday lenders."); IA Dec. at ¶ 24. In short, "the uncertainty . . . impermissibly interferes with [Plaintiffs'] ability to operate, to provide key services, to plan for the future, and to budget," and forces Plaintiffs "to take . . . mitigating steps [that] cause [them] irreparable harm," such as "making cuts to services." *King.*, 785 F.Supp.3d at 890 (quoting *Santa Clara*, 250 F.Supp.3d at 537).

This year-plus-long period of instability has also damaged Inclusive Action's and CAMEO's other members' ability to raise money from alternative, non-governmental, sources. *See* IA Dec. at ¶ 24 (the FY 2025 delay has already "had ripple effects on Inclusive Action's support from non-government sources[,]" and losing access to that funding "damage[es] our ability to attract outside investment from non-governmental supporters for the short and long-term."); CAMEO Dec. at ¶¶ 35–36 ("If CDFIs, including Member B, the private sector, and philanthropic funders cannot rely on the CDFI Fund to provide capital for CDFIs each fiscal year, the industry will face significant difficulty fulfilling its core mission."). Thus, the budgetary uncertainty imposed by Defendants has already compounded.

Third, should Defendants succeed in allowing the FY25 appropriations to lapse unspent, the permanent loss of those funds would result in irreparable and reverberating harms to Plaintiffs.[31] The

[31] Although Inclusive Action and CAMEO members are not guaranteed awards based on their applications, Plaintiffs are nonetheless irreparably injured by the denial of their fair opportunity to compete for funds—a denial that has been ongoing for the past year that awards have been delayed, and that will become permanent when those funds have expired. Moreover, Plaintiffs have every reason to expect that they would receive awards under a fairly administered process: Inclusive Action is one of multiple CAMEO members who have been notified that their application has advanced to "Step 4" of the award process, which is the final step before awards are determined and announced. And CAMEO

loss of this critical funding would upend their budgets, leading to reduced educational offerings, diminished access to capital for small businesses and entrepreneurs, and potential reductions in staffing. IA Dec. at ¶ 23. If the FY 2025 funds expire, Plaintiffs and their affected members will never be able to use them to fulfill their organizational missions to support critically underserved communities. That gap will be permanent: Plaintiffs will never be able to recover the funds that have expired. *See California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) ("economic harm" is "irreparable" where plaintiffs are not "able to recover money damages"); *City of Houston*, 24 F.3d at 1426 (appropriations become permanently unavailable upon expiration).

Inclusive Action will serve fewer small businesses and entrepreneurs; it will have to scale back its free educational offerings; and it may have to reduce the staffing that delivers that educational programming to its clients and community members. IA Dec. at ¶¶ 21–23 (current award application "represents approximately one fourth of the remaining capital we need to achieve our lending goals for 2026[,]" which equates to "support[ing] around 34 small businesses."). These harms will be felt not just by Inclusive Action, but by the small businesses and entrepreneurs it serves. *Id*. Permanent loss of the FY 2025 funds will also damage CAMEO's members' institutional viability, making it more difficult for them to pay their basic operational costs and putting their ability to sustain their operations at risk. CAMEO Dec. at ¶ 29 ("Access to [FY 2025 award] funds may make the difference between Member A operating in the red or in the black. . . . Permanently losing access to CDFI Fund awards for the 2025 Fiscal Year will put Member A's ability to sustain its operations at risk."); IA Dec. at ¶¶ 21–24 ("Without [the CDFI Fund's] public capital, CDFI viability overall will contract[.]"). The permanent loss of FY 2025 funds will also increase the perceived risk that Inclusive Action and other CAMEO members present to private investors, further impairing their ability to attract outside investment. IA Dec. at ¶ 24. These harms are irreparable and, after September 30, 2026, will become even more acute.

has experienced members receiving awards from the CDFI Fund every year in the past, while many of CAMEO's CDFI members applied for CDFI Fund fiscal year 2025 awards. CAMEO Dec. ¶¶8–9.

## III. The Remaining Factors Favor Plaintiffs.

The final two preliminary injunction factors—balancing the equities and weighing the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, Plaintiffs' strong likelihood of success on the merits tips in favor of awarding Plaintiffs their requested relief. And the government "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013). Thus, Defendants cannot show that "dispersing congressionally appropriated funds for statutorily mandated purposes" would harm them. *Cmty. Legal Servs. in E. Palo Alto v. HHS.*, 137 F.4th 932, 942 (9th Cir. 2025); s*ee also New York v. Trump*, 769 F.Supp.3d 119, 146 (D.R.I. 2025) ("The Defendants are not harmed where [an] order requires them to disburse funds that Congress has appropriated . . . .").

Moreover, there is a strong public interest in supporting CDFIs that in turn support small businesses and entrepreneurs in economically disinvested areas. Plaintiffs' declarations establish how vital the CDFI Fund is to enable capital to flow to struggling communities and the small businesses trying to grow and flourish there. IA Dec. ¶¶ 8–13; CAMEO Dec. ¶¶25, 29–30, 35–36. Absent relief, the Plaintiffs and CDFIs nationwide will lose the chance to compete fairly for critical funds that Congress intended to be invested in economically disinvested communities that traditional lenders fail to serve. *See, e.g.*, 12 U.S.C. § 4701(b). And those funds are at risk of being lost altogether following their expiration absent court intervention.

## IV. This Court should stay the Impoundment Policy and enjoin Defendants to obligate the FY 2025 funds or, in the alternative, preserve the status quo by tolling the expiration of FY 2025 funds pending the resolution of the merits of this case

Because Plaintiffs are likely to succeed on their claims, the Court should immediately stay Defendants' implementation of the Impoundment Policy under section 705 of the APA. 5 U.S.C. § 705 (authorizing courts to order relief "to the extent necessary to prevent irreparable injury . . . postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings"). Under § 705 of the APA, this Court has the authority to stay Defendants' policy to not spend or otherwise delay or withhold the funds, and thus require Defendants to make available for obligation and obligate, by September 30, 2026, for the uses and purposes specified by Congress the

expiring funds Congress appropriated for the CDFI Fund. Should this Court choose to issue a preliminary injunction instead of a § 705 stay, it should enjoin Defendants to obligate the FY 2025 funds before September 30, 2026.

In the alternative, Plaintiffs urge the Court to preserve the status quo and suspend the FY 2025 funds' September 30 expiration pursuant to the Court's inherent equitable authority, 31 U.S.C. § 1502(b), and Section 705 of the APA (authorizing courts to "preserve status or rights"). This alternative measure would ensure that the funds are not irretrievably lost while the Court considers the merits of Plaintiffs' claims. In the event that the Court adopts the alternative measure, Plaintiffs respectfully move this Court to issue an order directing Defendants to preserve the FY 2025 CDFI Fund appropriation until the Court has issued a final ruling on the merits. In the context of cases involving government funding, such an order prevents the case from becoming moot if the relevant appropriation has lapsed. *See, e.g.*, *City of Houston v. HUD*, 24 F.3d 1421, 1426 (D.C. Cir. 1994); *Nat'l Ass'n of Regional Councils v. Costle*, 564 F.2d 583 (D.C. Cir. 1977). "Congress has expressly authorized courts to suspend the lapse of budget authority while lawsuits play out." *Goodluck v. Biden*, 104 F.4th 920, 928 (D.C. Cir. 2024) (citing 31 U.S.C. § 1502(b)); *see also Washington v. Dep't of Ed.*, 161 F.4th 1136 (9th Cir. 2025). And "[t]he equity powers of the courts allow them to take action to preserve the status quo of a dispute and protect their ability to decide a case properly before them. In such situations, the courts simply suspend the operation of a lapse provision and extend the term of already existing budget authority." *Multnomah Cnty. v. Azar*, 340 F.Supp.3d 1046, 1055 (D. Or. 2018) (citing *City of Houston*, 24 F.3d at 1426). In this case, the Court can exercise this power because Plaintiffs filed suit before the appropriation lapsed. *Id*; *see also Population Inst. v. McPherson*, 797 F.2d 1062, 1081 (D.C. Cir. 1986).

## CONCLUSION

For these reasons, the Court should grant Plaintiffs' motion for preliminary relief.

Date: August 14, 2026

Respectfully submitted,

*/s/ Daniel "Sparky" Abraham*
Daniel "Sparky" Abraham (SBN 299193)
**JUBILEE LEGAL**
300 E. Esplanade Dr., 9th Floor

*/s/ Andrea Matthews*
Andrea J. Matthews (M.A. Bar No. 694538)*
Anna L. Deffebach (D.C. Bar No. 241346)*
Johanna M. Hickman (D.C. Bar No. 981770)*

Oxnard, CA 93036
(805) 946-0386
sparky@jubilee.legal

Kristen Miller (D.C. Bar No. 229627)*
Steven Y. Bressler (D.C. Bar No. 482492)*
Elena Goldstein (D.C. Bar. No. 90034087)*
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
(202) 304-3457 (Matthews)
amatthews@democracyforward.org
adeffebach@democracyforward.org
hhickman@democracyforward.org
consultantkmiller@democracyforward.org
sbressler@democracyforward.org
egoldstein@democracyforward.org

*Counsel for Plaintiffs*
**Pro hac vice motion forthcoming*