BRETT A. SHUMATE
Assistant Attorney General
STEPHEN M. ELLIOTT
Assistant Director, Federal Programs Branch
ALEXANDER J. SEVERANCE
Trial Attorney, Federal Programs Branch
1100 L St., NW
Washington, DC 20005
Telephone: 202-598-3123
Alexander.j.severance@usdoj.gov

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| INCLUSIVE ACTION FOR THE CITY, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>OFFICE OF MANAGEMENT AND BUDGET, *et al.*,<br><br>Defendants. | Case No. 3:26-cv-08433-EMC<br><br>**DEFENDANTS' MEMORANDUM IN OPPOSITION OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND § 705 STAY**<br><br>The Hon. Edward M. Chen |

**TABLE OF CONTENTS**


INTRODUCTION ........ 1

PROCEDURAL POSTURE ........ 2

BACKGROUND ........ 2

1. Evaluation and Selection of Applicants ........ 3

2. Recent CDFI Fund Appropriations and Apportionment History ........ 4

3. Agency Conduct ........ 6

a. Bank Enterprise Award Program and Small Dollar Loan Program ........ 6

b. CDFI, Native Financial Assistance, and Technical Assistance ........ 7

c. Bond Guarantee Program ........ 8

LEGAL STANDARD ........ 8

ARGUMENT ........ 9

A. The Impoundment Control Act Precludes this Suit. ........ 9

B. Plaintiffs are Unlikely to Succeed on the Merits ........ 11

1. No Final Agency Action Supports Counts I and II ........ 11

2. The CDFI Program's discretionary structure defeats Plaintiffs' contrary-to-law-and arbitrary-and-capricious theories ........ 12

a. Defendants' Conduct is Not Contrary to Law ........ 12

b. Defendants' Conduct is Not Arbitrary and Capricious ........ 14

3. Plaintiffs cannot satisfy the TRAC factors as to Count III ........ 16

4. Plaintiffs' separation-of-powers and Take Care Clause claim is a restyled APA claim ........ 19

5. Ultra Vires ........ 20

C. Plaintiffs Have Not Shown Irreparable Harm ........ 21

D. The Balance of Equities and the Public Interest Favor Defendants ........ 22

E. The Court Lacks Authority to Order the Relief Plaintiffs Seek, and Any Relief the Court Nonetheless Orders Must be Narrowly Tailored ....................... 23

1. The Court lacks authority to toll the expiration of funds for these Plaintiffs. ....................................................................................... 23

2. Relief, if any, must be limited to Plaintiffs' own documented injury....... 25

CONCLUSION ........................................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*AIDS Vaccine Advocacy Coalition v. Department of State*,
803 F.Supp.3d 164 (D.D.C. Sep. 3, 2025), appeal dismissed,
No. 25-5317, 2026 WL 476138 (D.C. Cir. Feb. 18 2026) .......... 10, 14, 18

*All. For the Wild Rockies v. Pena,*
865 F.3d 1211 (9th Cir. 2017) .......... 9

*Aviation Consumer Action Project v. Washburn*,
553 F.2d 101 (D.C. Cir. 1976) .......... 25

*Bennett v. Spear*,
520 U.S. 154 (1997) .......... 1, 11

*Block v. Cmty. Nutrition Inst.*,
467 U.S. 340 (1984) .......... 9

*Blocktree Props., LLC v. Pub. Util. Dist. No. 2 of Grant Cnty.*,
783 F.App'x 769 (9th Cir. 2019) .......... 22

*CC Distribs., Inc. v. United States*,
883 F.2d 146 (D.C. Cir. 1989) .......... 22

*City of Houston v. HUD*,
24 F.3d 1421 (D.C. Cir. 1994) .......... 24

*City of L.A. v. Barr*,
929 F.3d 1163 (9th Cir. 2019) .......... 16

*Clerks v. Ass'n for Benefit of Non-contact Emps.*,
380 U.S. 650 (1965) .......... 20

*Dalton v. Specter*,
511 U.S. 462 (1994) .......... 20

*Dep't of State v. AIDS Vaccine Advoc. Coal.,*
146 S. Ct. 19 (2025) .......... 1, 10, 15

*DISH Network Corp. v. FCC*,
653 F.3d 771 (9th Cir. 2011) .......... 9

*E. Bay Sanctuary Covenant v. Barr*,
934 F.3d 1026 (9th Cir. 2019) .......... 9, 24

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) ..... 14

*Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs*,
543 F.3d 586 (9th Cir. 2008) ..... 11

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ..... 14, 15

*Fed. Express Corp. v. U.S. Dep't of Com.*,
39 F.4th 756 (D.C. Cir. 2022) ..... 21

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ..... 20

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010) ..... 20

*Goodluck v. Biden*,
104 F.4th 920 (D.C. Cir. 2024) *denying reh'g en banc,*
2024 WL 4092894 (D.C. Cir. Sep. 3, 2024) ..... 23

*Global Health Council v. Trump*,
153 F.4th 1. (D.C. Cir. 2025) ..... 9, 10, 21

*In re Barr Lab'ys, Inc.*,
930 F.2d 72 (D.C. Cir. 1991) ..... 18, 23

*L.A. Press Club v. Noem*,
2025 WL 2658327 (C.D. Cal. Sept. 10, 2025) ..... 11

*Lewis v. Casey,*
518 U.S. 343 (1996) ..... 25

*Madsen v. Women's Health Ctr Inc.*,
512 U.S. 753 (1994) ..... 25

*Mashpee Wampanoag Tribal Council, Inc. v. Norton*,
336 F.3d 1094 (D.C. Cir. 2003) ..... 17

*Mississippi v. Johnson*,
71 U.S. (4 Wall.) 475 (1866) ..... 20

*M-J-M-A v. Hermosillo*,
822 F.Supp. 3d 1147 (D. Or. 2026) ..... 11

*Motor Vehicle Manufacturers. Ass'n. of the U.S. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S 29 (1983) ..... 14

*Nat'l Ass'n of Clean Air Agencies v. EPA*,
489 F.3d 1221 (D.C. Cir. 2007) ........ 16

*National Ass' of Regional Councils v. Costle*,
564 F.2d 583 (D.C. Cir. 1977) ........ 24

*Neb. Dep't of Health & Hum. Servs. v. HHS*,
435 F.3d 326 (D.C. Cir. 2006) ........ 25

*Nken v. Holder*,
556 U.S. 418 (2009) ........ 9, 13

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) ........ 16

*Nuclear Regul. Comm.'n v. Texas*,
605 U.S. 665 (2025) ........ 20, 21

*Oestereich v. Selective Serv. Sys. Loc. Bd. No. 11*,
393 U.S. 233 (1968) ........ 21

*Ohio v. EPA*,
603 U.S. 289 (2024) ........ 14

*Population Institute v. McPerson*,
797 F.2d 1062 (D.C. Cir. 1986) ........ 24

*Schroer v. Billington*,
525 F. Supp. 2d 58 (D.D.C. 2007) ........ 20

*Telecommunications Research & Action Center v. FCC*,
750 F.2d 70 (D.C. Cir. 1984) ........ 1, 17

*Teton Historic Aviation Foundation v. U.S Department of Defense,*
785 F.3d 719 (D.C. Cir. 2015) ........ 22

*Trudeau v. FTC*,
456 F.3d 178 (D.C. Cir. 2006) ........ 21

*U.S. Dep't of Just. v. Fed. Lab. Rels. Auth.*,
981 F.2d 1339 (D.C. Cir. 1993) ........ 21

*Velesaca v. Decker*,
458 F.Supp. 3d 224 (S.D.N.Y 2020) ........ 11

*Wis. Gas Co. v. Fed. Energy Regul. Comm'n,*
758 F.2d 669 (D.C. Cir. 1985) ........ *22*

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .... 8, 21, 22

**Statutes**

2 U.S.C. § 686 .... 10

2 U.S.C. § 687 .... 10

5 U.S.C. § 705 .... 2, 9

5 U.S.C. § 706(1) .... 2

5 U.S.C. § 706(2) .... 2

12 U.S.C. § 4701 .... 2

12 U.S.C. § 4706 .... *passim*

31 U.S.C. § 1502(b) .... 2, 23, 24

31 U.S.C. § 1513(b)(2)(B) .... 11, 17

Further Consolidated Appropriations Act, 2024,
Pub. L. No. 118-47, 138 Stat. 460 .... 4, 5

Full-Year Continuing Appropriations and Extensions Act, 2025,
Pub. L. No. 119-4, 139 Stat. 9 .... 5

Consolidated Appropriations Act, 2026,
Pub. L. No. 119-75, 140 Stat. 173 .... 5

**Administrative and Executive Materials**

Amendment of Notice of Funds Availability for the Community Development Financial Institutions Program; Revised Application Submission Deadline,
90 Fed. Reg. 46,303 (Sept. 25, 2025). .... 7

Notice of Funds Availability for the Community Development Financial Institutions Program Fiscal Year 2025 Funding Round,
90 Fed. Reg. 6,051 (Jan. 17, 2025) .... 7

Notice of OFAC Sanctions Action,
91 Fed. Reg. 11,595 (Mar. 10, 2026) .... 8

Notice of Funds Availability Inviting Applications for the Small Dollar Loan Program Fiscal Year 2026 Funding Round,
91 Fed. Reg. 39,666 (June 30, 2026). .... 6

Notice of Funds Availability Inviting Applications for the Fiscal Year 2026 Funding Round of the Bank Enterprise Award Program, 91 Fed. Reg. 39,682 (June 30, 2026) .......... 6

Notice of Guarantee Availability Inviting Applications for the Bond Guarantee Program Fiscal Year 2026 Funding Round, 91 Fed. Reg. 39,697 (June 30, 2026) .......... 8

**<u>Other Authorities</u>**

CDFI Program, CDFI Fund, (last visited August 28, 2026), https://www.cdfifund.gov/programs-training/programs/cdfi-program .......... 3, 24

U.S. Government Accountability Office, *Principles of Federal Appropriations Law*: Third Edition, Volume II, (February, 2006), https://www.gao.gov/assets/gao-06-382sp.pdf .......... 13, 14

## INTRODUCTION

Plaintiffs ask this Court to compel the Office of Management and Budget ("OMB") and the U.S Department of the Treasury ("Treasury") to obligate, on an emergency timeframe, appropriated funds that Congress committed to the "sole discretion" of the Community Development Financial Institutions ("CDFI") Fund (the "Fund") through a competitive, merit-based grant process. *See* 12 U.S.C. § 4706(a). Whatever labels Plaintiffs attach to their six causes of action, each seeks the same relief: an order forcing Defendants to select award winners and disburse money by side-stepping the Congressionally prescribed evaluation process the statute mandates.

Plaintiffs' request fails for four reasons. First, the Impoundment Control Act ("ICA") precludes this suit in its entirety. The Supreme Court has already held that the ICA's comprehensive enforcement scheme—which reserves enforcement of potential impoundment violations to the Comptroller General—precludes private Administrative Procedure Act ("APA") suits seeking to enforce appropriated spending. *Dep't of State v. AIDS Vaccine Advoc. Coal. ("AVAC"),* 146 S. Ct. 19 (2025). Second, there is no final agency action to review under the APA. *Bennett v. Spear,* 520 U.S. 154, 177-78 (1997). Third, even if Plaintiffs' claims were reviewable, each fails on the merits because (i) the CDFI Program's "sole discretion" merit-review structure, and the text of the appropriations, forecloses Plaintiffs' contrary to law and arbitrary and capricious theories; (ii) Plaintiffs' unreasonable-delay claim cannot satisfy the required factors articulated in *Telecommunications Research & Action Center v. FCC,* 750 F.2d 70, 80 (D.C. Cir. 1984) ("*TRAC* Factors"); and (iii) Plaintiffs' constitutional and residual claims simply recast the same APA claims under a constitutional theory. Finally, the equities and public interest weigh against emergency relief, particularly relief ordered days before the expiration of the FY 2025 appropriation. Such an approach would force Defendants to abandon the merit-review process mandated by Congress, instead *requiring* the Government to make a final evaluation of an incomplete application on an unreasonable timetable.

At minimum, any relief this Court is inclined to grant must be far narrower than what Plaintiffs request. Ordering Defendants to "obligate and announce" $289 million in awards

within days is not administratively achievable without abandoning statutorily required review, and relief extending beyond the concrete, documented injury of these two Plaintiffs is unmoored from Article III and this Circuit's tailoring requirements. It is for these reasons that Defendants ask this Court to deny Plaintiffs requested preliminary injunction.

## PROCEDURAL POSTURE

Plaintiffs Inclusive Action for the City and CAMEO Network filed this action, ECF No. 1 ("Compl."), against the Office of Management and Budget, the Department of the Treasury, the Community Development Financial Institutions Fund, and associated officials in their official capacities, asserting six causes of action. Compl. At 32-39.

Counts I, II, and III sound in the APA. *See* 5 U.S.C. § 706(2). Specifically, Plaintiffs allege that Defendants' conduct regarding the CDFI Fund appropriation is arbitrary and capricious (Count I), Compl. ¶¶ 169-183 and contrary to law (Count II), *id.* ¶¶184-191. 5 U.S.C. § 706(2). Plaintiffs also allege that the delay in appropriations constitutes an unreasonable delay under the APA (Count III). *Id.* ¶¶ 192-203; *see also* 5 U.S.C. § 706(1).

Counts IV, V, and VI recast the same underlying conduct in different doctrinal terms. Count IV alleges violations of separation-of-powers principles and the Take Care Clause. *Id.* ¶¶ 204-207. Count V, pleaded in the alternative, alleges the conduct is *ultra vires*. *Id.* ¶¶ 208-215. Count VI, also in the alternative, seeks mandamus relief. *Id.* ¶¶ 216-219.

On August 14, 2026, concurrent with the filing of their Complaint, Plaintiffs moved for a preliminary injunction and a stay under 5 U.S.C. § 705, ECF No. 9 & 9-1 ("Mot. in Supp.") seeking an order compelling Defendants to "obligate the FY 2025 funds before September 30, 2026[,]" Mot. in Supp. at 25, and, in the alternative, Plaintiffs ask this Court to "suspend the FY 2025 funds' September 30 expiration pursuant to. . . 31 U.S.C. § 1502(b), and Section 705 of the APA." *Id.*

## BACKGROUND

The CDFI Fund was established by the Riegle Community Development and Regulatory Improvement Act of 1994 (Subtitle A of Title I, the Community Development Banking and Financial Institutions Act of 1994), codified at 12 U.S.C. § 4701, *et seq*. Its purpose is to

promote economic revitalization and community development through investment in and assistance to CDFIs. 12 U.S.C. § 4701(b). The financial assistance provided under the CDFI Program generally goes to financial institutions that focus on serving low-income individuals, historically underserved demographic populations, and distressed communities. *CDFI Program, CDFI Fund,* https://www.cdfifund.gov/programs-training/programs/cdfi-program (last visited August 28, 2026). The CDFI Fund uses a discretionary, competitive application framework to distribute federal awards across programs like the CDFI Program, Native American CDFI Assistance ("NACA") Program, Bank Enterprise Award ("BEA") Program, and Small Dollar Loan ("SDL") Program.

*1. Evaluation and Selection of Applicants*

Under 12 U.S.C. section 4706, Congress directs the CDFI Fund to evaluate applications using fourteen statutory selection factors, organized around four broad areas. 12 U.S.C. § 4706. First, operational and structural readiness (Factor 1), its management team's experience and capacity (Factor 2), and, where applicable, its status as an insured depository institution (Factor 9). Second, market need and economic distress: the extent of the community's investment need (Factor 3), objective economic distress measures in the applicant's investment area (Factor 4), and the potential for expanding economic opportunity in the region (Factor 8). Third, financial leverage and capitalization: the concentration of the applicant's activities on its targeted populations (Factor 5), the firmness of matching-fund commitments (Factor 6), and the availability of private matching funds (Factor 7). Finally, community impact and long-term alignment: community support of the applicant's activities (Factor 10), community ownership or governance participation (Factor 11), coordination with other entities and secondary-market participation (Factor 12), and a demonstrated track record serving the targeted population (Factor 13), plus a catch-all authorizing any other appropriate factors (Factor 14). *Id.* Together, these factors ensure federal awards go to institutions with strong operational capacity, demonstrated need, sound financial leverage, and durable community roots.

The CDFI Fund coordinates its competitive process by establishing explicit evaluation metrics within each program's respective Notice of Funding Availability ("NOFA"), factoring in

an applicant's financial health, organizational capacity, community development track record, and compliance history, among others. In addition to evaluating the above-mentioned factors, the CDFI Fund must carefully work to ensure a balanced distribution of awards across diverse urban, rural, and Native communities nationwide, carefully implement a specialized funding set-asides for Persistent Poverty Counties ("PPCs") and Native communities, and enforce strict statutory caps on individual award amounts.

The CDFI Fund implements its competitive award cycles by communicating evaluation metrics through each program's respective NOFA. The evaluation process for the CDFI Program and others generally consists of five steps. Step 1 is an eligibility review conducted by CDFI Fund staff. Step 2 involves a financial analysis and compliance risk evaluation conducted by CDFI Fund staff using the Application Assessment Tool ("AAT"). Step 3 is a business plan review performed by external reviewers under the supervision of CDFI Fund staff. Step 4 is a policy objective review conducted by CDFI Fund staff. Step 5 concludes the process with the determination of award amounts. Decl. of Alexandria Smith in Supp. of Defs.' Opp'n to Pls.' Mot for a Prelim. Inj. ¶6 ("Alexandria Smith Decl.").

For comparison, in the fiscal year 2022 CDFI/NACA Program funding round, the funding round opened February 10, 2022, applications were due April 14, 2022, Technical Assistance awards were announced September 26, 2022, and Financial Assistance awards were announced February 28, 2023. In the fiscal year 2024 CDFI/NACA Program funding round (which combined appropriations from fiscal years 2023 and 2024), the funding round opened December 8, 2023, applications were due February 15, 2024, Financial Assistance awards were announced September 26, 2024, and Technical Assistance awards were announced November 21, 2024. Decl. of Pooja Patel in Supp. of Defs.' Opp'n to Pls.' Mot for a Prelim. Inj. ¶11 ("Patel Decl.").

*2. Recent CDFI Fund Appropriations and Apportionment History*

On March 23, 2024, Congress appropriated $324 million to the CDFI Fund through the Consolidated Appropriations Act, 2024 (Pub. L. No. 118 47, 138 Stat. 460), with the appropriations expiring on September 30, 2025. Congress appropriated the same amount again

on March 15, 2025, through the Full-Year Continuing Appropriations and Extensions Act, 2025 (Pub. L. No. 119 4, 139 Stat. 9), with the appropriations expiring on September 30, 2026, and on February 3, 2026, through the Consolidated Appropriations Act, 2026 (Pub. L. No. 119 75, 140 Stat. 173), with the appropriations expiring on September 30, 2027. *See* Pub. L. No. 118 47; Pub. L. No. 119 4; Pub. L. No. 119 75.

In each instance, Congress directed that the CDFI Fund receive appropriations for grants as follows: (1) not less than $188 million for financial assistance and technical assistance programs (operationalized through the CDFI Program); (2) not less than $40 million to the Bank Enterprise Award Program; (3) not less than $28 million for financial assistance, technical assistance, training, and outreach programs for Native American, Native Hawaiian, and Alaska Native communities (operationalized through the NACA Program); (4) not less than $24 million to the Healthy Food Financing Initiative; and (5) not less than $9 million for grants for loan loss reserve funds and technical assistance for small dollar loan programs (operationalized through the Small Dollar Loan Program). *See, e.g.,* Pub. L. No. 118 47. The remaining amount under each of those appropriations—up to or not less than $35 million—was dedicated to administrative costs. *See id.*

For the 2026 bill, Congress added:

> "None of the funds made available in this or any other appropriations Act may be used to increase, eliminate, or reduce funding for a program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act, or unless such change is made pursuant to the reprogramming or transfer provisions of this or any other appropriations Act."

2026, Pub. L. No. 119 75, 140 Stat. at 502.

Of significance here, OMB apportioned $289 million in Fiscal Year 2025 CDFI Program funds to the CDFI Fund on April 8, 2026. Until that date, the only Fiscal Year 2025 appropriated funds OMB had apportioned to the CDFI Fund were for administrative costs. Decl. of Jason Papaj in Supp. of Defs.' Opp'n to Pls.' Mot. for a Prelim. Inj. ¶ 3 ("Papaj Decl."). That Fiscal Year 2025 apportionment includes a condition requiring the CDFI Fund to notify OMB at least three days in advance of any public announcement or obligation of award amounts under that

apportionment. Consistent with ordinary practice, the CDFI Fund will provide OMB with the required notice shortly before any such announcement or obligation. *See id.* ¶ 4.

With respect to the Fiscal Year 2026 appropriation, $35 million has already been apportioned to the CDFI Fund for administrative costs. The CDFI Fund submitted its request for apportionment of the remaining $289 million in Fiscal Year 2026 program funds to the Office of Performance and Budgeting ("OPB") on February 6, 2026. *See id.* ¶ 5. OPB transmitted that request to OMB on March 24, 2026. OMB has not yet approved that request. *Papaj Decl.* ¶ 5.

The CDFI Fund also holds certain "no year" funds not tied to a specific fiscal year, currently apportioned through a Category C apportionment that defers their availability to a future fiscal year. *See id.* ¶ 6. These no year funds are not part of the Fiscal Year 2025 or Fiscal Year 2026 appropriations described above; they consist of principal, interest, and dividend collections transferred to the CDFI Fund from the Emergency Capital Investment Program ("ECIP"). *Id.*

*3. Agency Conduct*

a. *Bank Enterprise Award Program and Small Dollar Loan Program*

Treasury leadership engaged in continuous discussions with OMB regarding the timeline for apportioning the Fiscal Year 2025 BEA and SDL Program funds, to ensure those funds could be obligated by September 30, 2026, and developed several internal scheduling contingencies depending on when OMB approved the apportionment. *See* Alexandria Smith Decl. ¶ 2.

Once the Fiscal Year 2025 BEA and SDL Program funds were apportioned in April 2026, the CDFI Fund moved to finalize and clear a NOFA for publication in the Federal Register as soon as practicable, including obtaining all required reviews from both OMB and Treasury leadership. *See id.* ¶ 3. The Fund published the NOFAs for both programs on June 30, 2026. *See* Alexandria Smith Decl. ¶ 3; *see also* 91 Fed. Reg. 39,682 (June 30, 2026) (BEA); 91 Fed. Reg. 39,666 (June 30, 2026) (SDL).

Application reviews for 2025 Fiscal year rounds for both programs are currently underway. *See* Alexandria Smith Decl. ¶ 4. The CDFI Fund is conducting the BEA and SDL funding rounds simultaneously, on an accelerated timeline, and has diverted internal resources to

support review and related activities. *Id.* Each program uses a three-level application review process, in addition to required eligibility, compliance, regulator, and certification checks. *Id.* For this cycle, internal CDFI Fund staff are conducting all levels of review. *Id.*. The CDFI Fund's has completed its first level of review for the BEA program, and its target is to complete initial award sizing by September 9, 2026. The CDFI Fund's internal target is to complete the first level for the SDL Program by September 9, 2026, and to complete initial award sizing by September 16, 2026. *Id.* Subject to any required Treasury or OMB reviews, and barring unforeseen information technology delays, staffing disruptions, or other unanticipated circumstances, both programs remain on track to announce awards and obligate funds by September 30, 2026. *Id.* ¶ 5.

*b. CDFI, Native Financial Assistance, and Technical Assistance*

The CDFI Fund issued the Fiscal Year 2025 CDFI Program NOFA on January 17, 2025, with applications due March 21, 2025. Patel Decl. ¶ 2; *see also* 90 Fed. Reg. 6,051 (Jan. 17, 2025).

On September 25, 2025, the CDFI Fund published an amendment to the NOFA. 90 Fed. Reg. 46,303 (Sept. 25, 2025). The amendment allowed Financial Assistance ("FA") applicants that had advanced to Step 4 in the scoring/evaluation process to revise certain portions of their applications, with a submission deadline of October 27, 2025. *See* Patel Decl. ¶ 3. Plaintiff Inclusive Action for the City was among those applicants. The 2025 federal government lapse in appropriations caused a historic 43-day government shutdown from October 1 to November 12, 2025, severely disrupting operations at the CDFI Fund, including furlough of relevant staff. *See* Alexandria Smith Decl. ¶ 2. Unfortunately, that submission deadline fell during the lapse in appropriations. Patel Decl. ¶ 3.

Immediately after the lapse ended, CDFI Program staff prepared the documentation necessary to issue a second amendment to the NOFA extending the revision deadline. *See id.* ¶ 4. They initiated internal clearance on December 1, 2025; the amendment was cleared internally on December 5, 2025, and transmitted to Treasury officials for approval on December 8, 2025. *Id.*

Because the Fund was awaiting Treasury approval of the extended deadline, no action was taken on Inclusive Action's application—or any Fiscal Year 2025 FA application—from

approximately November 2025 through March 2026. *Id.* ¶ 5. On March 10, 2026, the CDFI Fund published another amendment extending the deadline to April 10, 2026. *See* 91 Fed. Reg. 11,595 (Mar. 10, 2026). Inclusive Action submitted its revised application in April 2026. *Id.* ¶6. As of August 28, 2026, the CDFI Fund is completing Step 4 review of Fiscal Year 2025 FA applications and has begun Step 5 (award sizing). *See Id.* ¶ 7.

The CDFI Fund is currently conducting internal clearance for the Fiscal Year 2026 CDFI Program and NACA Program NOFAs and will transmit them to Treasury for approval once clearance is complete. *See* Patel Decl. ¶ 8. The Fund anticipates publishing the Fiscal Year 2026 NOFAs in October 2026, following the conclusion of the Fiscal Year 2025 funding round. *Id.*

*c. Bond Guarantee Program*

The CDFI Fund published the Notice of Guarantee Availability ("NOGA") for the Fiscal Year 2026 Bond Guarantee Program round on June 30, 2026, with a guarantee application deadline of July 8, 2026. 91 Fed. Reg. 39,697 (June 30, 2026). The CDFI Fund received two applications. Decl. of Brian Jackson in Supp. of Defs.' Opp'n to Pls.' Mot. for a Prelim. Inj. ¶ 2 ("Jackson Decl."). On August 17, 2026, CDFI Fund staff submitted underwriting folios for the two applications to OMB for review. To provide a guarantee under the Bond Guarantee Program, the CDFI Fund and the qualified issuer must execute an Agreement to Guarantee—a binding contract committing Treasury to provide the guarantee—and that agreement must be signed no later than September 30, 2026. *See id.* ¶ 3

**LEGAL STANDARD**

A party seeking a preliminary injunction must show (1) likelihood of success on the merits; (2) irreparable harm absent relief; (3) that the balance of equities favors relief; and (4) that relief serves public interest. *See Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008). Under the Ninth Circuit's sliding-scale variant of this test, a plaintiff who shows only "serious questions going to the merits" may still obtain relief if "the balance of hardships tips sharply in the Plaintiff's favor" and the remaining factors are satisfied. *All. For the Wild Rockies v. Pena,* 865 F.3d 1211, 1217 (9th Cir. 2017) (emphasis and citation omitted). Under either variant, a plaintiff must satisfy all four elements and failure on any one is dispositive. *See DISH*

*Network Corp. v. FCC,* 653 F.3d 771, 776-77 (9th Cir. 2011). The standard for a Section 705 stay is "essentially the same." *Nken v. Holder,* 556 U.S. 418, 434 (2009). "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of [the Court's] discretion." *Id.* at 433-34. Plaintiffs' request for a Section 705 stay therefore rises or falls with their request for a preliminary injunction and fails for the same reasons.

Any relief granted, whether by injunction or stay, must be "narrowly tailored to remedy the specific harm shown," and not sweep more broadly than necessary to address Plaintiffs' own injury. *E. Bay Sanctuary Covenant v. Barr,* 934 F.3d 1026, 1029 (9th Cir. 2019).

## ARGUMENT

### A. The Impoundment Control Act Precludes this Suit.

Congress did not leave disputes over appropriated spending to be resolved through open-ended litigation by whichever private party wishes to receive the funds. Rather, it built a multi-step framework through the ICA that channels any dispute over appropriations through a specific sequence of political branch notification, and if that process fails to resolve the dispute, to judicial enforcement limited to a particular legislative official—the Comptroller General. This case is a dispute over the use and pace of Congressionally appropriated spending. Plaintiffs' effort to enforce a Congressional appropriation as a private party, without regard to the framework Congress enacted for precisely this type of dispute, is foreclosed by the ICA. If accepted, this threshold argument resolves every count in the Complaint, without need to address the merits.

The D.C. Circuit has held that the ICA's Comptroller General-only enforcement scheme precludes APA suits in which private parties, such as the two Plaintiffs here, seek to compel appropriated spending. *See Glo. Health Council v. Trump,* 153 F.4th 1, 17-18. (D.C. Cir. 2025) (quoting *Block v. Cmty. Nutrition Inst.,* 467 U.S. 340, 349 (1984)). The Supreme Court has since stayed a materially similar injunction on the same grounds, finding the government "made a sufficient showing that the Impoundment Control Act precludes [a private party's] suit, brought pursuant to the Administrative Procedure Act, to enforce the appropriations at issue." *AVAC,.* 146 S. Ct. at 19 (2025) ("the Stay Order") (staying the preliminary injunction in *AIDS Vaccine*

*Advocacy Coalition v. Department of State,* 803 F.Supp.3d 164 (D.D.C. Sep. 3, 2025), appeal dismissed, No. 25-5317, 2026 WL 476138 (D.C. Cir. Feb. 18 2026 ("*AVAC II"*)). Whatever label Plaintiffs attach to their claims, each seeks the same relief in the form of an order compelling Defendants to obligate CDFI Fund appropriations on a more accelerated timetable. That is the relief the ICA's enforcement scheme commits to its own specialized process. *See* 2 U.S.C. §§ 686-687.

Plaintiffs argue that preclusion applies only where the Executive has formally invoked the ICA by transmitting a special message to Congress, and that because Defendants have not done so here, the Supreme Court's *AVAC* Stay Order does not control. Mot. in Supp. at 10, n.17. The D.C. Circuit has already rejected the premise underlying that argument. The ICA's preclusive force does not depend on whether the Executive issued a special message. Instead, it rests on the more basic fact that only the Comptroller General may sue over an alleged failure to obligate appropriated funds. *See Glob. Health Council* 153 F.4th at 17-18; 2 U.S.C. § 687 (authorizing suit whenever budget authority "is required to be made available for obligation" but "is not made available for obligation"). The Comptroller General's authority under that provision is a backstop that exists independently of whether the President invokes the special-message process. Accepting Plaintiffs' theory that private parties may sue whenever no special message has issued would create exactly the result the D.C. Circuit found Congress did not intend in its holding that "it does not make sense that the Congress would craft a complex scheme of interbranch dialogue but *sub silentio* also provide a backdoor for citizen suits" through the APA "at any time and without notice to the Congress of the alleged violation." *Id.* at 19. The Supreme Court's Stay Order does not limit the ICA's preclusive scope to when the Executive issues a special message. If anything, the absence of a special message confirms Defendants have not made the final, consummated decision that would trigger ICA procedures in the first place.

Neither the appropriations acts nor the Antideficiency Act supply a statute separate and apart from the ICA, "enforceable on its own terms," as courts require to escape preclusion. The language of the appropriations acts say nothing about the timing of obligation and does not purport to displace the ICA's deferral and recission procedures. And the Antideficiency Act's

apportionment deadline, 31 U.S.C. § 1513(b)(2)(B), reaches only OMB's apportionment timing, not Treasury's separate, discretionary award-selection process, and in any event that apportionment is now complete.

**B. Plaintiffs are Unlikely to Succeed on the Merits**

*1. No Final Agency Action Supports Counts I and II*

Judicial review under § 706(2) is available only to "final agency action." An action is final only where it "mark[s] the consummation of the agency's decisionmaking process" and is one by which "rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear,* 520 U.S. 154, 177-78 (1997) (cleaned up); *accord Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs,* 543 F.3d 586, 591 (9th Cir. 2008). The burden rests on Plaintiffs to establish both elements.

Plaintiffs argue that an "unwritten" policy can nonetheless satisfy *Bennett*. Mot in Supp. at 9 (citing *L.A. Press Club v. Noem,* 2025 WL 2658327 (C.D. Cal. Sept. 10, 2025), *Velesaca v. Decker,* 458 F.Supp. 3d 224, 237, n.7 (S.D.N.Y 2020), and *M-J-M-A v. Hermosillo,* 822 F.Supp. 3d 1147, 1178 (D. Or. 2026)). Even accepting Plaintiffs' premise, each of these cases required proof of a consistently documented pattern of purported agency conduct that was sustained over an extended period. Not to mention the alleged conduct had to be corroborated by evidence beyond a single funding cycle, before a court treated the unwritten practices as consummated agency inaction. Plaintiffs' record here does not clear that bar.

Plaintiffs offer a single still-pending FY2025 funding cycle, two deadline extensions reflecting continued administrative engagement with award distribution, and public statements reflecting the Administration's general policy preferences regarding the CDFI Program's future, *see* Compl. ¶¶ 174. A generalized policy preference disfavoring a program is not the same as a final, consummated decision to withhold a specific fiscal year's appropriation from that program, and Plaintiffs' own Complaint, which alleges an active and ongoing evaluation process, does not establish the funds will be withheld. Because Counts I and II both require final agency action that Plaintiffs cannot show, both counts fail at the threshold before any merits analysis of Defendants' discretion under § 4706.

*2. The CDFI Program's discretionary structure defeats Plaintiffs' contrary-to-law-and arbitrary-and-capricious theories*

The CDFI grant fund is not a formula or entitlement program, and this discretionary, competitive structure defeats both of Plaintiffs' § 706(2) theories, discussed in turn below.

*a. Defendants' Conduct is Not Contrary to Law*

Plaintiffs' contrary to law theory depends on reading more into the appropriations act than the text supports. The Further Consolidated Appropriations Act, 2024, provides that, of the $324,000,000 appropriated to carry out the Riegle Community Development and Regulatory Improvement Act of 1994, "not less than $188,000,000 . . . *is available* until September 30, 2025, for financial assistance and technical assistance" under CDFI Program. Pub. L. No. 118-47, div. B, tit. I, 138. Stat. at 523-25 (emphasis added). This is the operative language governing the FY2025 funds at issue since the FY2025 Continuing Resolution incorporated the FY 2024 Act's CDFI Fund appropriation in "[s]uch amounts as may be necessary . . . and under the authority and conditions provided in applicable appropriations Acts for fiscal year 2024." Pub. L. No. 119-4, § 1101(a), 139 Stat. at 10-12. The FY2026 Act uses identical operative language for the following fiscal year's funds. Pub. L. No. 119-75, div. E, 140 Stat. at 441-42 ("not less than $188,000,000 . . . is available until September 30, 2027"). Congress did not say the funds "shall be obligated," "shall be disbursed," or "shall be awarded" by the relevant date. It *authorizes* the agency to obligate the funds for a specified purpose, and where a larger appropriation covers multiple activities, it sets a floor ensuring at least that amount goes to a specified purpose rather than somewhere else in the agency's budget. It does not, on its own, require that the full amount actually be paid out before the appropriation expires. When Congress wants to impose a distribution deadline or mandate the distribution of an appropriation, it can do so directly, and it did not do so here.

Plaintiffs cite, inaccurately, Mot. in Supp. at 4, § 739 of the 2026 Appropriations act, which prohibits using appropriated funds "to increase, eliminate, or reduce funding for a program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act." Pub. L. No. 119-75, §

739, 140 Stat. at 502. No such reduction has occurred. OMB apportioned that amount to Treasury on April 8, 2026. Compl. ¶ 7. Nothing about the amount available for the competitive process Congress created has been increased, eliminated, or reduced from what the statute specifies because the full amount Congress appropriated is available for exactly the purpose Congress specified in the appropriations act.

Congress's own drafting practice confirms the point. Within the FY 2024 Appropriations Bill that contains the CDFI Fund's "is available" language, Pub. L. No. 118-47, Congress elsewhere paired "available" with an explicit, mandatory disbursement commands where it wanted one. For example, Foreign Military Financing grants for Israel are "available" and "*shall be disbursed within 30 days* of enactment of this Act." Pub. L. No. 118-47, div. F, 138 Stat. at 805 (emphasis added). Defense Production Act purchase funds likewise "remain available for obligation" and "*shall be obligated and expended by the Secretary of Defense*." *Id.* at 476-77 (emphasis added). Congress plainly knows how to write a distribution mandate and did not do so for the CDFI Program. Nor was this an oversight that was later corrected. The FY 2026 Act, that added § 739 to police the implementation of unenacted budget proposals also reenacted the CDFI Fund's "is available" formulation without modification, even though the FY2026 Budget had proposed eliminating the program's funding entirely. Congress's consistent choice, across two separate Acts and multiple opportunities to change course, reinforces the reading that "available" was not intended to impose a distribution mandate or a distribution deadline Plaintiffs now ask this Court to find.

Where an appropriation act uses "available" language to earmark a portion of a lump-sum appropriation for a particular purpose, that language does not, by itself reflect a congressional command to make the full sum available for obligation. *See* 2 GAO, *Principles of Federal Appropriations Law* 6-26 to 6-31 (3d ed. 2006) (GAO Red Book), available at https://www.gao.gov/assets/gao-06-382sp.pdf. Such language instead reflects Congress's effort to designate portions of a broader appropriation for particular purposes, providing direction on how funds should be allocated among purposes, not a mandate that every dollar be obligated. *Id.* That is precisely the CDFI Fund's appropriation here.

Section 4706 reinforces this reading. Section 4706(a) directs that "the Fund shall, in its sole discretion, select" applicants for assistance based on thirteen enumerated, merit-based factors, including likelihood of success under the applicant's strategic plan, management experience, economic distress and need, matching-fund commitments, community support and governance, and prior performance, plus a catch-all authorizing consideration of "other factors deemed to be appropriate by the Fund." 12 U.S.C. § 4706(a)(1)-(14). Congress appropriated a pool of money for the Fund to distribute through a competitive process in which the Fund exercises its own judgment among many applicants. Because neither the appropriations acts' plain text nor § 4706's discretionary, merit-based selection criteria impose the disbursement mandate that Plaintiffs' theory requires, Count II fails and it is apparent that Plaintiffs are not likely to succeed on the merits.

*b. Defendants' Conduct is Not Arbitrary and Capricious*

Plaintiffs' arbitrary and capricious theory fails for separate reasons. It depends on treating an ongoing, multi-step review process as a reviewable, reasoned explanation requiring "decision" under *Motor Vehicle Manufacturers. Ass'n. of the U.S. v. State Farm Mutual Automobile Insurance Co.,* 463 U.S 29 (1983), when no final decision has been made at all. But even setting finality aside, each of Plaintiffs' three *State Farm* arguments fails.

Plaintiffs argue Defendants have "offered [no reasoned] explanation" for the pace of review Mot. in Supp. at 13, citing *AVAC II, 803* F.Supp.3d at 185*, Encino Motorcars, LLC v. Navarro,* 579 U.S. 211, 221-22 (2016), and *Ohio v. EPA,* 603 U.S. 289, 292 (2024). Mot. in Supp. at 13. Notwithstanding Plaintiffs' meritless argument, Defendants would need only show "that there are good reasons for the new policy" and that the agency believes it to be better, "which the conscious change of course adequately indicates." *FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 515 (2009). An agency need "not demonstrate to a court's satisfaction that the reasons for [a] new policy are better than the reasons for the old one." *Id.*

Plaintiffs' reliance on *AVAC II* is also misplaced on the facts of this case. *AVAC II* involved funds the President had formally proposed to rescind through a special message transmitted to Congress under the ICA. The dispute there centered on a discrete proposal

covering identified funds, followed by the Executive's continued refusal to obligate those funds, after the ICA's 45-day congressional review period expired without rescission, and without offering any explanation for that continued inaction. That combination led the district court to find no reasoned explanation under *State Farm.* Notably, the Supreme Court subsequently stayed the injunction the court in *AVAC II* issued on the grounds Plaintiffs now argue are required here, finding the government had "made a sufficient showing that the Impoundment Control Act precludes [their] suit . . . to enforce the appropriations at issue." *AVAC*, 146 S. Ct. at 19. No special message has been issued as to the CDFI funds at issue here, and no dollar-specific rescission has been proposed, considered, or left unexplained. Rather, the record here reflects an ongoing, multi-step evaluation process. Where *AVAC II* addressed an agency's silence following a completed decision, this case presents, at most, the pace of an agency's ongoing exercise of discretionary judgment, a materially different question that does not implicate the same reasoned-explanation concerns.

*Fox* recognizes that an agency changing course "may sometimes need to account for . . . certain reliance interests created by a prior policy." 556 U.S. at 515. No such reliance interests exist here. The CDFI Program is competitive and awarded annually. An applicant that received an award in one cycle has no entitlement to, or reasonable expectation of, an award in the next. Inclusive Action's own declaration confirms it has applied across seven separate funding cycles and received awards of varying amounts over the years. Decl. of Doug Smith ¶¶ 11-14, ECF No. 9-2 ("Doug Smith Decl."). An organization that must submit a new application and compete anew each year against a pool of applications has nothing resembling the kind of settled, accrued reliance interest *Fox* contemplates. The Ninth Circuit's treatment of a comparable competitive federal grant program confirms the point. An applicant who "applied for a grant, but failed to score highly enough to earn one" has no cognizable entitlement to it, and an agency's chosen scoring and selection criteria receive highly deferential review, upheld unless "manifestly inconsistent with the statute or lack[ing] any reasonable basis." *City of L.A. v. Barr,* 929 F.3d 1163, 1169, 1177 (9th Cir. 2019). There is no prior policy of guaranteed funding to account for here, because no such policy ever existed.

Plaintiffs next argue Defendants "considered factors that Congress did not permit them to consider," namely alignment with "the [President's] policy goals." Compl. ¶ 178. This argument mischaracterizes Defendants' position as well as the statutory scheme. The appropriations act requires that the appropriated funds be available for the competitive process Congress created, and they are. OMB apportioned the CDFI Fund's full statutory allocation, including the $289 million at issue, on April 8, 2026. *Id.* ¶ 7. What § 4706 requires is that awards be selected according to specific, merit-based criteria, exercised in the Fund's "sole discretion," 12 U.S.C. § 4706(a), and no final decision has yet been made that a court could evaluate for permissible or impermissible reasoning. Plaintiffs' allegations that Defendants considered impermissible factors challenge reasons that have not yet been given for a decision that has not been made. That is a premature challenge to an ongoing process and not evidence that the outcome will rest on impermissible considerations by Treasury.

Even accepting Plaintiffs' framing that a reasoned-explanation requirement already applies, the arbitrary-and-capricious standard remains "[h]ighly deferential" and "presumes the validity of agency action." *Nat'l Ass'n of Clean Air Agencies v. EPA,* 489 F.3d 1221, 1228-29 (D.C. Cir. 2007) (citations omitted). A reviewing court may not "substitute [its] judgment for that of the agency." *Id.* Where, as here, an agency is administering a merit-based, multi-factor competitive process Congress committed to its "sole discretion," a court is particularly ill-suited to second-guess the pace and sequencing of that review absent a showing far more concrete than the declarations Plaintiffs have provided.

*3. Plaintiffs cannot satisfy the TRAC factors as to Count III*

Section 706(1) permits courts to compel "discrete agency action" that an agency is legally "required to take." *Norton v. S. Utah Wilderness All.,* 542 U.S. 55, 64 (2004) (emphasis omitted). The discretionary nature of the CDFI Program's award process is difficult to reconcile with the kind of discrete, non-discretionary duty § 706(1) requires. Even if that threshold is met, the reasonableness of any delay is governed by the six factors set out in *Telecommunications Research & Action Center v. FCC,* 750 F.2d 70, 80 (D.C. Cir. 1984) ("TRAC"), each of which favors Defendants on this record. These factors ask: (1) whether the time agencies take to make

decisions is governed by a "rule of reason"; (2) whether Congress has supplied an indication of the speed it expects, which can inform that rule of reason; (3) whether human health and welfare are at stake, since delays tolerable in a purely economic context are less tolerable where they are not; (4) the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the nature and extent of the interests prejudiced by the delay; and (6) that the court need not find any impropriety in order to hold that an agency's delay is unreasonable, through the presence or absence of bad faith remains relevant to the analysis. *TRAC,* 750 F.2d at 80.

Factors one and two ask whether the agency's pace is governed by a "rule of reason," informed by any statutory timetable. Resolving an unreasonable-delay claim is "ordinarily a complicated and nuanced task requiring consideration of the particular facts and circumstances." *Mashpee Wampanoag Tribal Council, Inc. v. Norton,* 336 F.3d 1094, 1100 (D.C. Cir. 2003). Treasury's relevant clock began on April 8, 2026, when OMB apportioned the $289 million and Treasury first had usable funds to administer. Measured from that date, roughly four and a half months have passed. Inclusive Action's own declaration shows that this Fund's applications have historically taken as long as seven months from submission to decision. Doug Smith Decl. ¶ 12. The elapsed time falls well within, the range Plaintiffs' own declarant identifies as ordinary for this process.

Plaintiffs' own theory of illegality confirms the mismatch between what they allege was unlawful and what they now ask this Court to expedite. Plaintiffs allege that OMB's duty to apportion the FY2025 funds arose, and on their account was violated, no later than thirty days after the March 15, 2025 Continuing Resolution took effect, that is by mid-April 2025. *See* 31 U.S.C. § 1513(b)(2)(B); Compl. ¶¶ 112-13. Under Plaintiffs' own theory, that is the discrete act they contend was unlawfully delayed. But OMB apportioned the funds on April 8, 2026. What Plaintiffs now ask this Court to expedite under Count III is Treasury's *administration* of the competitive award process.

Plaintiffs also argue that Congress "provided a clear timetable to act" by setting the funds' September 30, 2026 expiration date. Mot. in Supp. at 16 (quoting *AVAC II,* 803 F. Supp. 3d at 186). That conflates two different things. An expiration date tells Treasury when unspent

funds lapse. It does not say anything about the pace at which Treasury must conduct its application review. The expiration date is a backstop of the funds' availability, not a statutory timetable for the second *TRAC* factor.

Factor four asks the Court to weigh the effect of relief on Defendants' competing priorities. Courts do not "reorder[] agency priorities," because the agency, itself, is "in a unique position to view its projects as a whole . . . and allocate its resources in the optimal way." *In re Barr Lab'ys, Inc.,* 930 F.2d 72, 76 (D.C. Cir. 1991). Plaintiffs assert that the CDFI Fund has no other priorities to pursue. The public record, however, refutes this assertion. On June 30, 2026, the Fund issued Notices of Funding Availability for the Bank Enterprise Award Program, the Small Dollar Loan Program, and the Bond Guarantee Program, three additional, statutorily mandated programs the Fund was simultaneously administering during the same period the Plaintiffs claim the agency was doing nothing. Patel Decl. ¶ 1; Jackson Decl. ¶ 2. An agency processing multiple competitive award programs with the same finite staff is entitled to sequence and prioritize its work, and a court ordering expedited action on Plaintiffs' claims would necessarily come at the expense of other, equally deserving, applications; an outcome *TRAC*'s fourth factor specifically counsels against. *See id.* at 75 ("a judicial order putting [petitioner] at the head of the queue simply moves all others back one space and produces no net gain.").

Factors three and five, concerning the alleged nature and extent of the interests prejudiced by delay, do not counteract the life, safety, and foreign affairs concerns at issue here. Plaintiffs do not allege that delay threatens that existence or ability to continue operating. At most, Inclusive Action states it "would need to scale back" its lending program and CAMEO's declaration identifies a single unnamed member for whom continued funding "may make the difference" between operating at a profit or a loss. That is not the kind of prejudice TRAC's third and fifth factors are calibrated to weigh heavily. Nor is the interest at stake a vested one. Plaintiffs seek the chance to compete for a discretionary award under a merit-based selection process, not an already-accrued entitlement Defendants are withholding. Where the underlying interest is itself contingent on an agency's exercise of discretion Plaintiffs may or may not have won, the prejudice from delay in reaching that decision is correspondingly diminished.

Factor six asks whether the agency's delay reflects impropriety— it does not, and the record shows the opposite. Defendants apportioned the full $289 million at issue, issued three additional Notices of Funding Availability for other CDFI programs, and administered the same evaluation process the Fund has applied for years. Nothing in this record suggests bad faith, and Plaintiffs cannot identify a concrete example of Defendants exercising bad faith. Mot. in Supp. at 18. While bad faith is not required to find unreasonable delay, its absence here is reinforced by a record of ongoing, good-faith administration of the CDFI grant program.

Taken together, the *TRAC* factors weigh decisively against Plaintiffs. Treasury's pace, measured from the date it first had usable funds, falls within its own historical practice; the delay Plaintiffs' own complaint identifies as unlawful is a separate, already-completed act that says nothing about the reasonableness of the process Plaintiffs now ask this Court to expedite. Further, the Fund's competing statutory obligations to other applicants and other programs counsel against judicial reordering of its priorities; and the nature of the interests at stake here, a discretionary, competitive grant program, does not carry the urgency of the life-safety and foreign-assistance contexts Plaintiffs' authorities address. Plaintiffs have not shown the kind of unreasonable delay § 706(1) requires, and Count III fails on the merits.

*4. Plaintiffs' separation-of-powers and Take Care Clause claim is a restyled APA claim*

Plaintiffs' constitutional claims fare no better than their statutory ones. Court IV alleges that "[b]y flouting Congress's statutory directives to spend appropriated CDFI Fund money, Defendants have acted contrary to separation of powers principles and the Take Care Clause." Compl. ¶ 207. That is nothing more than an attempt to circumvent the limitations of the APA by asserting a broad programmatic attack under Art. II. The Supreme Court has held that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims, subject to judicial review . . ." *Dalton v. Specter,* 511 U.S. 462, 473 (1994). A claim that an official exceeded statutory authority is not thereby transformed into a constitutional merely because it is captioned as one. *Id.* The factual predicates for Count IV, that Defendants have not spent money "as directed" by Congress, is identical to the predicate for Counts I and II, and fails for the same reasons.

The Take Care Clause claim fails independently as a matter of law on two grounds. First, the Clause does not supply a cause of action against the President or any other Defendant, and this Court lacks jurisdiction to issue declaratory or injunctive relief against the President in his official capacity. *Mississippi v. Johnson,* 71 U.S. (4 Wall.) 475, 501 (1866) ("[T]his court has no jurisdiction of a bill to enjoin the President in the performance of his official duties."); *Franklin v. Massachusetts,* 505 U.S. 788, 802-03 (1992). Second, and independently, the Clause does not reach subordinate Executive Branch officials actually named as Defendants here. The Clause speaks only to the President, and ensures the President, not his subordinates, is politically accountable for the Executive Branch's actions. *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,* 561 U.S. 477, 492-93 (2010). Any claim against the Treasury and OMB Defendants named here cannot proceed under the Take Care Clause; it must be brought, if at all, through the APA, where it fails for the reasons set forth above. *See supra,* Part B.2.

5. Ultra Vires

Count V, pleaded "[i]n the [a]lternative," Compl. ¶ 208, alleges that "Defendants' impoundment of CDFI Fund funds is contrary to specific prohibitions" in the 2024, 2025, and 2026 appropriations acts, id ¶¶ 210-12, citing *Nuclear Regul. Comm.'n v. Texas,* 605 U.S. 665, 681 (2025), for the standard governing ultra vires review.

Plaintiffs' own cited standard defeats their claim. Ultra vires review is available only "when an agency has taken action entirely in excess of its delegated powers and contrary to a specific prohibition in a statute." *NRC,* 605 U.S. at 681 (quoting R.R. Clerks v. Ass'n for Benefit of Non-contact Emps., 380 U.S. 650, 660 (1965) (emphasis omitted)). It is "a doctrine of last resort," *Schroer v. Billington,* 525 F. Supp. 2d 58, 65 (D.D.C. 2007), "essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds." *NRC,* 605 U.S. at 681-82. The limitations on non-statutory review of this kind are "nearly insurmountable." U.s. *Dep't of Just. v. Fed. Lab. Rels. Auth.,* 981 F.2d 1339, 1343 (D.C. Cir. 1993). Any overstep must amount to a "clear departure by the [agency] from its statutory mandate" or be "blatantly lawless," *Oestereich v. Selective Serv. Sys. Loc. Bd. No. 11,* 393 U.S. 233, 238 (1968)— a violation "so

extreme that one may view it as jurisdictional or nearly so," where "the prohibition at issue must confer rights upon the individual seeking ultra vires review." *GHC,* 153 F.4th at 20.

Because ultra vires review has "an even narrow[er] scope" than APA review, a claim that fails under the APA "necessarily could not succeed under ultra vires review." *Fed. Express Corp. v. U.S. Dep't of Com.,* 39 F.4th 756, 765 (D.C. Cir. 2022) (quoting *Trudeau v. FTC,* 456 F.3d 178, 190 (D.C. Cir. 2006)). Because Plaintiffs' § 706(2) claims fail for the reasons set forth *supra,* Part B.2, their *ultra vires* claim necessarily fails as well.

### C. Plaintiffs Have Not Shown Irreparable Harm

To establish irreparable harm, Plaintiffs must show injury that is "*likely* in the absence of" preliminary relief, *Winter,* 555 U.S. at 22, not merely possible, and that there is no adequate remedy at law. Plaintiffs cannot make that showing because what they claim to lose is not a legal entitlement but, at most, the chance to compete for one.

Congress committed CDFI Program award selection to the Fund's "sole discretion," to be exercised based on thirteen qualitative, merit-based factors. 12 U.S.C. § 4706(a). *See supra,* Part B.2. Neither Inclusive Action nor CAMEO's members have ever had a vested right to any specific FY2025 award or dollar amount because not every applicant will be recommended for an award. Plaintiffs' asserted harm—the loss of an opportunity to compete for a discretionary award they were never guaranteed—is inherently speculative, not "certain" or "actual." A plaintiff cannot establish irreparable harm from the loss of something it never had a legal right to receive in the first place. Where the underlying interest is speculative and contingent on an agency's exercise of discretion, the actual and imminent standard is not met.

Plaintiffs invoke *Teton Historic Aviation Foundation v. U.S Department of Defense* for the proposition that "loss of an opportunity to pursue a benefit" is a cognizable injury "even [where] the plaintiff may not be able to show that it was certain to receive that benefit." 785 F.3d 719, 724 (D.C. Cir. 2015) (quoting *CC Distribs., Inc. v. United States,* 883 F.2d 146, 150 (D.C. Cir. 1989) (emphasis omitted)).That reliance conflates two distinct inquiries. *Teton* addressed only Article III standing and whether a plaintiff has suffered any injury-in-fact sufficient to be in federal court. It said nothing about the separate and more demanding question presented here of

whether that same injury rises to the "extraordinary remedy" showing of irreparable harm required for a preliminary injunction, which this Court must find is "likely," not merely possible, before compelling government action. *Winter,* 555 U.S. at 22. An injury can clear the low bar of Article III standing while falling short of the "certain and great . . . actual and not theoretical" showing irreparable harm demands. *Wis. Gas Co. v. Fed. Energy Regul. Comm'n,* 758 F.2d 669, 674 (D.C. Cir. 1985). Plaintiffs do not cite a single case holding that a lost opportunity to compete—as opposed to an already-awarded and then withdrawn benefit— satisfies the irreparable harm standard specifically, and this Court should decline to extend a standing case into this new territory.

This distinction is reinforced by the nature of the harm Plaintiffs actually allege. Where a plaintiff claims economic harm rises to the level of irreparable injury, that showing requires evidence that the loss threatens the very existence of the plaintiff's operations, not merely that it will cause the plaintiff to scale back or operate less comfortably. *See Blocktree Props., LLC v. Pub. Util. Dist. No. 2 of Grant Cnty.,* 783 F.App'x 769, 771 (9th Cir. 2019) (mem.), (denying relief where plaintiffs "failed to introduce" competent evidence that they would be driven out of business). Plaintiffs make no such showing here. Inclusive Action's declarations state only that it "would need to scale back" its lending program, that technical assistance and coaching "would be impacted," and that it "may need to scale back staffing." Doug Smith Decl. ¶ 23. CAMEO's sole quantified example states that continued access to funds "may make the difference between Member A operating in the red or in the black," Decl. of Carolina Martinez ¶ 29, ECF No. 9-3 ("CAMEO Decl."). Neither declaration alleges that Plaintiff faces closure, insolvency, or an inability to continue operating. A reduction in the scale of an organization's activities is not the kind of existential harm that justifies the "extraordinary remedy" of a preliminary injunction.

**D. The Balance of Equities and the Public Interest Favor Defendants**

The public has a strong interest in the orderly administration of a merit-based, statutorily mandated review process. This process was designed to ensure funds are allocated on the basis of statutory mandates, including demonstrated capacity, financial soundness, and community impact. Ordering Defendants to "obligate and announce" $289 million in awards within mere

days of the end of the fiscal year on September 30 would force an impossible choice: the CDFI Fund would either have to abandon the multi-step merit review Congress mandated in favor of a rushed, indefensible selection process, or issue awards that do not reflect a genuine exercise of the CDFI Fund's discretion. Neither outcome serves the public interest nor serves the interests of the many CDFIs that apply for these grants, including the Plaintiffs, who are entitled to a fair and competitive process rather than a hurried one.

Plaintiffs ask this Court to impose an unreasonable timetable. Defendants would be forced either to abandon the merit-review process Congress mandated by selecting awardees without the evaluation § 4706(a) requires, or to disburse funds on an indefensible basis simply to meet the Court's deadline. Mot. in Supp. at 24-25. An agency is "in a unique . . . position to view its projects as a whole. . . and allocate its resources in the optimal way," *In re Barr Lab'ys.,* 930 F.2d at 76, and a court order that strips the agency of the ability to conduct the review Congress assigned to its discretion is not equitable relief. The Court should decline to order relief that is impossible to perform lawfully.

**E. The Court Lacks Authority to Order the Relief Plaintiffs Seek, and Any Relief the Court Nonetheless Orders Must be Narrowly Tailored**

*1. The Court lacks authority to toll the expiration of funds for these Plaintiffs.*

Plaintiffs alternatively ask the Court to suspend the FY2025 appropriation's expiration under § 705 and 31 U.S.C. § 1502(b). Defendants maintain the Court lacks authority to grant that relief as to these Plaintiffs, and nothing that follows should be construed as a concession otherwise.

Plaintiffs' own authorities do not support extending that relief to them. Plaintiffs quote *Goodluck v. Biden* for the proposition that "Congress has expressly authorized courts to suspend the lapse of budget authority while lawsuits play out." 104 F.4th 920, 928 (D.C. Cir. 2024), *denying reh'g en banc,* 2024 WL 4092894 (D.C. Cir. Sep. 3 2024). But the statute *Goodluck* cites for that proposition, 31 U.S.C. § 1502(b), reaches only "lawsuits or rights of action involving the right to an amount payable." Plaintiffs have no such right. Inclusive Action and CAMEO Network are, at most, prospective applicants to a competitive discretionary award process and neither Plaintiff has accrued a "right to an amount." They have, at most, a claim to a

fair opportunity to compete for an award they may or may not receive. Section 1502(b) does not reach a claim resting only on the lost opportunity to compete for funds.

Plaintiffs' quotation from *Multnomah County v. Azar,* 340 F.Supp. 3d 1046 (D. Or. 2018), fares no better. That case describes courts' "equity powers" to "preserve the status quo of a dispute and protect their ability to decide a case properly before them" by "simply suspend[ing] the operation of a lapse provision and extend[ing] the term of already existing budget authority." *Id*. at 1055 (citation omitted). This authority preserves a court's ability to award effective relief to a plaintiff who could actually obtain that relief on the merits. It does not manufacture a substantive entitlement to a discretionary competitive award that Plaintiffs would not otherwise have. Because Plaintiffs cannot show a clear entitlement to any specific award that would make relief on the merits available in the first place, there is no "status quo" of a right to preserve.

Plaintiffs' remaining authorities, *City of Houston v. HUD,* 24 F.3d 1421, 1426 (D.C. Cir. 1994), *National Ass' of Regional Councils v. Costle,* 564 F.2d 583 (D.C. Cir. 1977), and *Population Institute v. McPerson,* 797 F.2d 1062, 1081 (D.C. Cir. 1986), stand only for the narrower proposition that a suit filed before an appropriation lapses is not automatically mooted by the lapse itself. Plaintiffs are correct that they filed before September 30, 2026, so their claims are not moot on that ground alone. But the timing of their filings answers only the mootness question. It does not establish the separate, substantive right to an amount that § 1502(b) and the cases above require before a court will exercise its equitable power to keep that amount available. Indeed, *City of Houston* itself, states the default rule in the starkest terms. "It is a well-settled matter of constitutional law that when an appropriation has lapsed . . . federal courts cannot order the expenditure of funds that were covered by that appropriation." *City of Houston,* 24 F.3d at 1424. The narrow exception Plaintiffs invoke exists to prevent that default rule from mooting a live claim before it can be decided; it is not a freestanding basis to freeze $289 million in appropriated funds for applicants who have not established an entitlement to them.

*2. Relief, if any, must be limited to Plaintiffs' own documented injury*

Defendants maintain that no relief is warranted for the reasons set forth above, including because the Court lacks authority to preserve the FY2025 appropriations as to Plaintiffs

specifically. Defendants address the following solely in the event the Court disagrees, and nothing in this section concedes that the Court possesses the authority Plaintiffs seek.

Any injunctive or equitable relief "must be narrowly tailored to remedy the specific harm shown," *Neb. Dep't of Health & Hum. Servs. v. HHS,* 435 F.3d 326, 330 (D.C. Cir. 2006) (quoting *Aviation Consumer Action Project v. Washburn,* 553 F.2d 101, 108 (D.C. Cir. 1976)), and may not exceed "the inadequacy that produced [Plaintiffs'] injury in fact*," Lewis,* 518 U.S. at 357; *see also Madsen v. Women's Health Ctr Inc..,* 512 U.S. 753, 765 (1994) (relief must not be "more burdensome to the defendant than necessary"). The evidentiary record here supports, at most, relief scaled to Inclusive Action's own documented award history, a range of $125,000 to $583,000 across seven prior applications, *see* Doug Smith Decl. ¶¶ 11-14, not a program-wide order covering the full $289 million appropriated for every CDFI Fund applicant nationwide.

CAMEO Network's showing does not support broader relief. CAMEO's declaration references a single, unnamed "Member A" without identifying that member or quantifying any historical or requested award amount. CAMEO Decl. ¶ 29. On this record, there is no evidentiary basis to extend relief beyond Inclusive Action's documented interest.

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' Motion for a Preliminary Injunction and § 705 Stay in its entirety. In the alternative, any relief granted should be limited as set forth in Part E.

Dated: September 1, 2026

*<u>/s/ Alexander Severance</u>*
ALEXANDER J. SEVERANCE
Trial Attorney
Federal Programs Branch
U.S. Department of Justice
1100 L St., NW
Washington, DC 20005
(202) 598-3123
alexander.j.severance@usdoj.gov
Kan. Bar No. 27618