Daniel "Sparky" Abraham (SBN 299193)
**JUBILEE LEGAL**
300 E. Esplanade Dr., 9th Floor
Oxnard, CA 93036
(805) 946-0386
sparky@jubilee.legal

Andrea J. Matthews (pro hac vice)
Anna L. Deffebach (pro hac vice)
Johanna M. Hickman (pro hac vice)
Steven Y. Bressler (D.C. Bar No. 482492)*
Elena Goldstein (pro hac vice)
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
(202) 304-3457 (Matthews)
amatthews@democracyforward.org
adeffebach@democracyforward.org
hhickman@democracyforward.org
sbressler@democracyforward.org
egoldstein@democracyforward.org

**Pro hac vice motion pending*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| INCLUSIVE ACTION FOR THE CITY, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DEPARTMENT OF TREASURY, *et al.*,<br><br>Defendants. | Case No. 3:26-cv-08433<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND § 705 STAY**<br><br>Judge: The Honorable Edward M. Chen<br>Ctrm: 5 – 17th Floor<br>Date: September 24, 2026<br>Time: 1:30pm |

## TABLE OF CONTENTS


INTRODUCTION ........ 1

ARGUMENT ........ 2

I. Plaintiffs have established a likelihood of success on the merits of their claims. ........ 2

A. Defendants have made a final decision not to obligate the FY 2025 funds before they expire. ........ 2

B. Defendants' decision to allow FY 2025 funds to expire unobligated is contrary to law. ........ 3

C. Defendants' failure to obligate FY 2025 funds is arbitrary and capricious. ........ 5

D. Defendants' delay in obligating the funds until they expire constitutes unreasonably delayed and unlawfully withheld agency action in violation of APA § 706(1). ........ 6

E. Defendants' unilateral decision to withhold congressional appropriations violates the Separation of Powers doctrine and Take Care Clause. ........ 8

F. Defendants' actions are *Ultra Vires*. ........ 9

II. None of Plaintiffs' claims is precluded by the Impoundment Control Act. ........ 10

III. Plaintiffs have established current and imminent irreparable harm. ........ 12

IV. The remaining factors sharply favor Plaintiffs. ........ 14

V. This Court can and should provide relief to the fullest extent available under the law. ........ 14

CONCLUSION ........ 15

## TABLE OF AUTHORITIES

**Cases**

*22nd Century Techs., Inc. v. U.S.*, 176 Fed. Cl. 389 (2025) ........ 12
*AIDS Vaccine Advocacy Coalition v. Department of State ("AVAC II")*, 803 F.Supp.3d 164 (D.D.C. 2025) ........ 2, 3, 4, 6, 7
*American Academy of Pediatrics v. FDA*, 330 F.Supp.3d 657 (D. Mass. 2018) ........ 8
*Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053 (9th Cir. 2014) ........ 12
*Baird v. Bonta*, 81 F.4th 1036 (9th Cir. 2023) ........ 14
*Bennett v. Spear*, 520 U.S. 154 (1997) ........ 2
*Block v. Cmty. Nutrition Inst.*, 467 U.S. 340 (1984) ........ 10
*Brown v. Ruckelshaus*, 364 F.Supp. 258 (C.D. Cal. 1973) ........ 4
*Chicago v. DHS*, 815 F.Supp.3d 727 (N.D. Ill. 2025) ........ 3, 11, 12
*Chicago Women in Trades v. Trump*, No. 25-cv-2005, 2025 WL 1331743 (N.D. Ill. May 7, 2025) ........ 9
*Child Trends, Inc. v. Dep't of Educ.*, 795 F.Supp.3d 700 (D. Md. 2025) ........ 4, 9
*City & Cnty. of S.F. v. Trump*, 783 F.Supp.3d 1148 (N.D. Cal. 2025) ........ 9
*City & Cnty. of S.F. v. Trump*, 816 F.Supp.3d 1017 (N.D. Cal. 2026) ........ 3, 9, 11
*City & Cnty. of S.F. v. Trump*, 897 F.3d 1225 (9th Cir. 2018) ........ 3, 9, 11
*City of Arlington v. FCC*, 569 U.S. 290 (2013) ........ 10
*City of Houston v. HUD*, 24 F.3d 1421 (D.C. Cir. 1994) ........ 15
*Clinton v. City of New York*, 524 U.S. 417 (1998) ........ 4
*Cmty. Legal Servs. v. HHS*, 137 F.4th 932 (9th Cir. 2025) ........ 14
*Cnty. of Santa Clara v. Trump*, 250 F.Supp.3d 497 (N.D. Cal. 2017) ........ 13
*Dalton v. Specter*, 511 U.S. 462 (1994) ........ 9
*Department of State v. Aids Vaccine Advisory Coalition*, 146 S. Ct. 1 (2025) ........ 10
*DHS v. Regents of Univ. of Cal.*, 591 U.S. 1 (2020) ........ 6
*E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742 (9th Cir. 2018) ........ 14
*FCC v. Fox Tele. Stations, Inc.*, 556 U.S. 502 (2009) ........ 5
*Global Health Council v. Trump*, 153 F.4th 1 (D.C. Cir. 2025) ........ 11
*Goodluck v. Biden*, 104 F.4th 920 (D.C. Cir. 2024) ........ 15
*Guadamuz v. Ash*, 368 F.Supp. 1233 (D.D.C. 1973) ........ 10
*In re Aiken Cnty.*, 725 F.3d 255 (D.C. Cir. 2013) ........ 3, 5

*Kane Cnty. v. U.S.*, 127 Fed. Cl. 696 (2016) .......... 4

*Martin Luther King, Jr. Cnty. v. Turner*, 785 F.Supp.3d 863 (W.D. Wash. 2025) .......... 6, 11, 13

*Maryland v. King*, 567 U.S. 1301 (2012) .......... 14

*Multnomah Cnty. v. Azar*, 340 F.Supp.3d 1046 (D. Or. 2018) .......... 9, 15

*Murphy Co. v. Biden*, 65 F.4th 1122 (9th Cir. 2023) .......... 9

*Nat'l All. to End Homelessness v. Turner*, 827 F.Supp.3d 281 (D.R.I. 2026) .......... 6, 15

*Nat'l Council of Nonprofits v. OMB*, 763 F.Supp.3d 36 (D.D.C. 2025) .......... 3

*New York v. Noem*, 812 F.Supp.3d 321 (S.D.N.Y. 2025) .......... 13

*New York v. Trump*, 769 F.Supp.3d 119 (D.R.I. 2025) .......... 3

*New York v. Trump*, 171 F.4th 1 (1st Cir. 2026) .......... 6

*Novedades Y Servicios, Inc. v. FINCEN*, 181 F.4th 961 (9th Cir. 2026) .......... 13

*Or. Council for Humans. v. U.S. DOGE Serv.*, 794 F.Supp.3d 840 (D. Or. 2025) .......... 3, 6, 11

*Rhode Island v. Trump*, 781 F.Supp.3d 25 (D.R.I. 2025) .......... 9

*Sierra Club v. Trump*, 929 F.3d 670 (9th Cir. 2019) .......... 9

*State Highway Comm'n v. Volpe*, 347 F.Supp. 950 (W.D. Mo. 1972) .......... 10

*Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) .......... 7

*Thakur v. Trump*, 176 F.4th 1187 (9th Cir. 2026) .......... 13, 14

*Train v. City of New York*, 420 U.S. 35 (1975) .......... 10

*U.S. v. McIntosh*, 833 F.3d 1163 (9th Cir. 2016) .......... 3

*Washington v. Dep't of Educ.*, 807 F.Supp.3d 1275 (W.D. Wash. 2025) .......... 6

*Washington v. Dep't of Educ.*, 161 F.4th 1136 (9th Cir. 2025) .......... 15

*Washington v. Dep't of Transp.*, 792 F.Supp.3d 1186 (W.D. Wash. 2025) .......... 9, 11

*Washington v. DHS*, 2026 WL 1469538 (W.D. Wash. May 26, 2026) .......... 4

*Widakuswara v. Lake*, 779 F.Supp.3d 10 (D.D.C. 2025) .......... 5

*Woonasquatucket River Watershed Council v. Dep't of Agric.*, No. 25-1428, 2026 WL 2279789 (1st Cir. Aug. 7, 2026) .......... 6

**Constitutional Provisions**

U.S. Const. art. II, § 3 .......... 9

**Statutes**

2 U.S.C. § 681 .......... 10

2 U.S.C. § 683 .......... 5

2 U.S.C. § 684 .......... 5
5 U.S.C. § 705 .......... 1, 15
5 U.S.C. § 706 .......... 6, 7, 15
12 U.S.C. § 4701 .......... 8
12 U.S.C. § 4706 .......... 6
31 U.S.C. § 1502 .......... 15
Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, 140 Stat. 173 .......... 5
Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460 .......... 3, 4

**Other Authorities**

GAO, Impoundment Control Act Overview, https://perma.cc/N9TZ-Z95R .......... 3
GAO, Principles of Federal Appropriations Law ("GAO Red Book") .......... 4, 15
Report to the Office of Mgmt. & Budget Under Exec. Order "Continuing the Reduction of the Federal Bureaucracy" (Mar. 21, 2025), https://perma.cc/6ULG-6VQM .......... 4

## INTRODUCTION

On March 15, 2025, Congress appropriated "not less than" several hundred million dollars in funding for the Community Development Financial Institutions Fund (CDFI Fund) award programs and set the funding to expire on September 30, 2026. Despite knowing about that statutory deadline for nearly 18 months, Defendants now insist that complying with their obligation to spend the fiscal year (FY) 2025 funds before they expire would be "impossible." Though Defendants maintain that they are in the process of reviewing applications and "anticipate" announcing awards by September 30, they conspicuously do not represent that they intend to obligate *all* of the funding that Congress appropriated. Faced with Defendants' decision to not spend the funds before they expire, Plaintiffs properly moved for a stay under Section 705 of the APA or, in the alternative, a preliminary injunction in order to forestall the irreparable harm that would flow from the expiration of the funds—which CDFIs like Plaintiffs rely on to provide crucial capital investments into economically distressed and underserved communities. Absent Court intervention, that will occur in 20 days.

Plaintiffs are likely to succeed on the merits of their claims. Defendants assert a broad unilateral executive authority to refuse to spend congressionally appropriated funds. But such an executive power grab has been repeatedly rejected by courts in the Ninth Circuit and around the country, and finds no support in either black letter appropriations law or the Constitution. Defendants' decision to drag their feet until the funds expire on September 30 is contrary to law, arbitrary and capricious, and agency action unreasonably delayed and unlawfully withheld. It also violates fundamental Constitutional principles including the Separation of Powers and the Executive's duty to faithfully execute the law.

If there were any doubt that Defendants have decided not to obligate the funds before they expire, Defendants' opposition has removed it. And while Plaintiffs have already established they will suffer irreparable harm without an injunction, Defendants' opposition confirms that if they are allowed to proceed unchecked, Plaintiffs will permanently lose the opportunity to fairly compete for an entire funding cycle of CDFI award funds. Once sustained, there is no adequate legal remedy for this loss, and its impacts will be felt by entrepreneurs in underserved communities across the country. This Court can, and should, grant Plaintiffs' requested relief.

## ARGUMENT

### I. Plaintiffs have established a likelihood of success on the merits of their claims.

#### A. Defendants have made a final decision not to obligate the FY 2025 funds before they expire.

Defendants argue both that there has been no final agency action to withhold the FY 2025 funds and that Defendants cannot obligate the funds before they expire on September 30, 2026. *Compare* Defs.' Opp. to Pls.' Mot. for PI (Opp.) 11–12, ECF No. 20, *with* Opp. 23 (obligating money by September 30, 2026 would be an "unreasonable timetable"). Defendants cannot have it both ways.[1] Given Defendants' insistence that they cannot possibly meet the September 30 deadline, and their strident opposition to any order from this Court tolling that deadline, the reasonable conclusion is that Defendants have decided to allow the funds to expire unobligated.[2]

This sequence tracks that in *AIDS Vaccine Advocacy Coalition v. Department of State* (*AVAC II*), where the court found final agency action based partly on the defendants' representations that they "continue to intend to allow a substantial portion of those funds expire on September 30, 2025." 803 F.Supp.3d 164, 180 (D.D.C. 2025). Here, as in *AVAC II*, Defendants have told the Court they oppose any order requiring them to spend the FY 2025 funds before they expire. Like the defendants in *AVAC II*, Defendants here argue that their decision is not final because there is "an active and ongoing evaluation process." Opp. 11; *see AVAC II*, 803 F.Supp.3d at 180. And just like in *AVAC II*, Defendants do not claim that they plan to obligate *all* expiring FY 2025 funds before September 30. *Id.*

That decision alters legal rights and obligations, from which consequences will flow. *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). Allowing funding to expire unobligated denies all CDFIs, including CAMEO's members and Inclusive Action, the opportunity to fairly compete for the funds, leads to a

---

[1] Although Defendants' declarations state they "anticipate" announcing awards by September 30, they are conspicuously silent as to whether those awards will obligate all, or even a substantial amount, of the FY 2025 funds.

[2] Defendants' position bolsters Plaintiffs' previously cited evidence that Defendants have decided not to obligate Congress's appropriation: repeated attempts to eliminate CDFI Fund program funding on the basis that the programs are "woke," terminating the Fund's employees, delaying apportionment by more than a year, and announcing zero awards with (at this point) only 20 days before the funds expire. Pls.' Mem. in Supp. of Mot. for PI (Pls.' Mem.) 9–10, ECF No. 9-1.

substantial reduction in spending on CDFIs, causes irreparable harm to the CDFIs themselves, and reduces investment in underserved communities. A decision that deprives entities of "access to Federal funds" is one "from which legal consequences will flow." *City & Cnty. of S.F. v. Trump*, 816 F.Supp.3d 1017, 1043 (N.D. Cal. 2026); *see also Or. Council for Humans. v. U.S. DOGE Serv.*, 794 F.Supp.3d 840, 882 (D. Or. 2025). Other courts agree that freezing or withholding federal funding—including by simply letting funds expire unobligated—is a final agency action. *See AVAC II*, 803 F.Supp.3d at 180 (defendants' "unilateral decision not to spend the funds Congress has directed" was final agency action); *New York v. Trump*, 769 F.Supp.3d 119, 135 (D.R.I. 2025); *Chicago v. DHS*, 815 F.Supp.3d 727, 761 (N.D. Ill. 2025); *Nat'l Council of Nonprofits v. OMB*, 763 F.Supp.3d 36, 53–54 (D.D.C. 2025).

**B. Defendants' decision to allow FY 2025 funds to expire unobligated is contrary to law.**

Defendants' decision to allow the FY 2025 funds to expire unobligated is contrary to the 2025 and 2026 Appropriations Acts. Absent an express indication to the contrary, an appropriation requires the Executive Branch to spend "the full amount appropriated by Congress for a particular project or program." *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.); *see also* GAO Impoundment Control Act Overview, https://perma.cc/N9TZ-Z95R (explaining the "constitutional premise that the President must obligate funds appropriated by Congress, unless otherwise authorized to withhold them."). Thus, "[a]bsent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018); *see also U.S. v. McIntosh*, 833 F.3d 1163, 1175 (9th Cir. 2016).

The CDFI Program's financial and technical assistance awards illustrate this point. Congress provided that of the full amount it appropriated "to carry out the Riegle" Act, "not less than $188,000,000, . . . is available until September 30, 2025, for financial assistance and technical assistance." *See* Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460, 524. Defendants argue the word "available" means Congress made spending the funding optional—so long as the funding is parked in a CDFI Fund account, the Fund can simply wait for it to expire without spending a penny. Opp. 12–13. But Congress specified that the funds are "for financial assistance and

technical assistance" and, in case there is any doubt, cited the statutory provisions defining the awards themselves. 138 Stat. at 524.[3] When Congress specified that the funds are "available until September 30," it was defining when the funds would expire, not describing the executive branch's handling of the funds it appropriated. *See Kane Cnty. v. U.S.*, 127 Fed. Cl. 696, 697 (2016) (the phrase "appropriated 'sums shall be made available . . . for obligation or expenditure'" is "mandatory language") (emphasis omitted); *Child Trends, Inc. v. Dep't of Educ.*, 795 F.Supp.3d 700, 721-22 (D. Md. 2025) (refusal to spend funds where "$50,000,000 shall be available" was unlawful); *Washington v. DHS*, 2026 WL 1469538, at *8 (W.D. Wash. May 26, 2026) (refusing to spend funds for purpose Congress specified was contrary to law); *see also* GAO, *Principles of Federal Appropriations Law* (GAO Red Book), 3-9 ("availability" refers to whether an expenditure's purpose, timing, and amount were authorized by Congress).

Defendants argue that "not less than" language merely "authorizes"—but does not compel—spending. Opp. 12. But Defendants' selective citation to the GAO Red Book undermines their own argument: "The words 'not less than' most effectively establish a minimum (but not maximum). These are all phrases with well-settled plain meanings." *See* GAO Red Book, 6-32.[4] In other words, Congress set a floor for spending, not a ceiling, when it appropriated "*not less than*" $188 million for financial and technical assistance. Defendants' reading would also render the ICA's procedures superfluous and the statute a nullity.[5] Congress legislates against the backdrop of the ICA, which requires an agency to spend all appropriated funds *unless* specific procedures are followed: Though a President might want to spend "less than the full amount appropriated by Congress" for a program for "policy reasons," "even the President does not have unilateral authority to refuse to spend [funds appropriated by Congress]. Instead,

---

[3] Defendants have characterized these programs as "statutorily mandated" or "required." *See* Opp. 2, 18; Report to the Office of Management and Budget (OMB) Under Executive Order "Continuing the Reduction of the Federal Bureaucracy" (Mar. 21, 2025), https://perma.cc/6ULG-6VQM.

[4] Congress knows how to make spending permissive when it wants to, including by using language such as "up to" or "not to exceed." *AVAC II*, 803 F.Supp.3d at 184; GAO Red Book at 6-28 ("Under a "not to exceed" earmark, the agency is not required to spend the entire amount on the object specified.") (quoting *Brown v. Ruckelshaus*, 364 F.Supp. 258, 266 (C.D. Cal. 1973)).

[5] Defendants' reading is also inconsistent with the Supreme Court's ruling in *Clinton v. City of New York*, 524 U.S. 417 (1998), holding the Line Item Veto Act unconstitutional. A decision to spend less than the full amount appropriated for a program would amount to a line item veto over the specific dollar amounts Congress appropriated.

the President must propose the rescission of funds, and Congress then may decide whether to approve a rescission bill." *In re Aiken Cnty.*, 725 F.3d at 261 n.1; *see also Widakuswara v. Lake*, 779 F.Supp.3d 10, 35–36 (D.D.C. 2025).

Allowing the FY 2025 funds to expire unspent is also contrary to the 2026 Continuing Appropriations Act, which bars the executive branch from unilaterally implementing the President's proposed budget by using any appropriated funds to "eliminate[] or reduce funding for a program . . . as proposed in the President's budget request." Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, 140 Stat. 173, 502. The President has twice proposed eliminating CDFI award-program funding and Congress has twice rejected that proposal. *See* Pls.' Mem. 9–10. Defendants' reading—that OMB need only apportion the money to make it "available," leaving the agency complete discretion whether to spend it—would give the Executive unfettered discretion to defund entire programs based on policy preference. Opp. 12–13. Congress again forbade that in the 2026 Continuing Appropriations Act.

Defendants also argue that the discretionary nature of the CDFI Fund awards—not every applicant succeeds—gives the agency discretion whether to spend the appropriated funds at all. Opp. 14. But discretion as to *how* to spend an appropriation (which applicants get how much) is not discretion *whether* to spend it. If the CDFI Fund determines that there are too few competitive applicants to justify disbursing the full appropriation, the ICA supplies the appropriate procedures for it to follow. *See* 2 U.S.C. §§ 683; 684. Finally, Defendants do not represent that there are, in fact, too few meritorious applicants to the CDFI Fund to justify withholding some or all of the FY 2025 funds.

**C. Defendants' failure to obligate FY 2025 funds is arbitrary and capricious.**

Defendants' decision to allow the FY 2025 funds to expire unobligated is also arbitrary and capricious. Defendants have offered no explanation for spending less than Congress appropriated for the CDFI Fund's award programs, nor have they indicated that they considered reasonable alternatives to impounding the funds or the reliance interests of CDFIs and the economically distressed communities they serve. Even if Defendants need only show "that there are good reasons for the new policy" of withholding appropriated funds, Opp. 14 (quoting *FCC v. Fox Tele. Stations, Inc.*, 556 U.S. 502, 515

(2009)), they have provided no explanation at all for allowing the FY 2025 funds to expire unobligated.

Instead, Defendants respond with a straw man: They treat Plaintiffs' argument as challenging a decision not to award funds to a particular applicant—a decision governed by the statutory and regulatory factors that ordinarily control the (still-ongoing) award process. Opp. 14–16. But Plaintiffs are not challenging any applicant-specific award decision; they challenge Defendants' decision to withhold funding from the CDFI Fund's award programs in part or in whole. Defendants' reliance on 12 U.S.C. § 4706, which supplies the factors governing which applicants receive awards, is thus entirely misplaced. Plaintiffs and CDFIs are entitled to a reasonable, and reasonably explained, decision as to why Defendants are withholding congressionally appropriated FY 2025 award funding until it expires.[6]

Defendants' attempt to distinguish *AVAC II* misses the point. There, the agency at least offered some explanation for allowing the funds to lapse unobligated. 803 F.Supp.3d at 185. Here, Defendants have offered none. And if the Executive Branch withheld the funding because it views CDFI Fund as "woke," that decision would be arbitrary and capricious. Courts have repeatedly held that withholding federal funding—whether to further Executive policy goals, for other reasons, or with no articulated reason at all, is arbitrary and capricious. *See Or. Council for Humans.*, 794 F.Supp.3d at 890; *Washington v. Dep't of Educ.*, 807 F.Supp.3d 1275, 1287 (W.D. Wash. 2025) (unexplained failure to renew grants was arbitrary and capricious because grantees "are left guessing why the Grants were discontinued"). Defendants' actions are also arbitrary and capricious because they failed to consider the reliance interests of CDFIs and the communities they support. *See DHS v. Regents of Univ. of Cal.*, 591 U.S. 1, 30 (2020); *Woonasquatucket River Watershed Council v. Dep't of Agric.,* No. 25-1428, 2026 WL 2279789, at *13 (1st Cir. Aug. 7, 2026) (agency acted arbitrarily and capriciously by withholding funding without considering grantees' reliance interests); *New York v. Trump*, 171 F.4th 1, 24 (1st Cir. 2026) (same).

**D. Defendants' delay in obligating the funds until they expire constitutes unreasonably delayed and unlawfully withheld agency action in violation of APA § 706(1).**

---

[6] CDFIs, including Plaintiffs, have a right to a fair adjudication of their application based on the statutory and regulatory criteria and not based on impermissible or arbitrary factors. Should Defendants insist on applying criteria other than those identified in the statute and regulations for selecting CDFI Fund award recipients, such a decision would likely be contrary to law and arbitrary and capricious. *See, e.g., Nat'l All. to End Homelessness v. Turner*, 827 F.Supp.3d 281, 290 (D.R.I. 2026); *see also Martin Luther King Jr. Cnty. v. Turner*, 785 F.Supp.3d 863, 886–87 (W.D. Wash. 2025).

Plaintiffs have also established a likelihood of success on their claim that Defendants have unlawfully withheld or unreasonably delayed agency action by delaying—and, increasingly likely, ultimately withholding—the FY 2025 funds until they expire on September 30, 2026.

Since Congress enacted the Fiscal Year 2025 Continuing Resolution on March 15, 2025, Defendants have known that the deadline to obligate the FY 2025 CDFI Fund money was September 30, 2026. Defendants' rebuttal to Plaintiffs' Section 706(1) claims rests on two misconceptions. First, they mischaracterize Plaintiffs as asking them to "expedite" the awards process, Opp. 17–18, when Plaintiffs are simply asking Defendants to abide by Congress's deadline. Second, Defendants treat September 30 as distinct from the deadline for Treasury to complete its review and obligate the funds. *Id*. But that date has always been the backstop for Defendants to act; they would be wasting agency resources reviewing award applications they are powerless to fund otherwise. These misconceptions undermine Defendants' entire *TRAC* analysis. *See Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984).

As to the first and second *TRAC* factors, Defendants' statutory obligation—and the action unlawfully withheld and unreasonably delayed—is to obligate the funds before they expire. That delay is unreasonable given the clear statutory deadline Defendants have known about for 18 months. *AVAC II*, 803 F.Supp.3d at 186. Congress provided a "clear timetable to act," *id*., by setting the funds to expire on September 30, 2026, which is necessarily also the date by which Defendants must complete application review and obligate awards, *contra* Opp. 18. Yet Defendants do not appear poised to meet their longstanding deadline, and their argument that doing so would require bypassing ordinary review procedures confirms as much. Opp. 18. No "rule of reason" governs conduct marked by long, unexplained delays, including OMB's unexplained failure to apportion the money for over a year and Treasury's unexplained failure to clear the NOFA amendment notice from December 2025 through March 2026, during which applications sat untouched, Patel Dec. at ¶¶ 4–5.

Defendants also misapprehend Plaintiffs' argument on the fourth *TRAC* factor: whether higher or competing agency priorities justify the delay. Defendants claim they must prioritize multiple CDFI Fund award programs before funding expires on September 30, 2026. Opp. 18. But Plaintiffs' 706(1) claim pertains to *all* FY 2025 funds that are set to expire on September 30—including funding for the programs

Defendants mention. *Compare* Opp. 18 (citing Bank Enterprise Award Program, Small Dollar Loan Program, and Bond Guarantee Program) *with* Pls. Mem. 16 (discussing same programs and the CDFI Program). Because Plaintiffs' claim concerns the FY 2025 funds outstanding for all programs, Defendants cannot identify a higher priority program—nor could they, since awarding funds is the CDFI Fund's central purpose. *See, e.g.*, 12 U.S.C. § 4701(b).

The third and fifth *TRAC* factors ask the Court to consider the effects of the delay and withholding, and the consequences to CDFIs and the communities they serve if funds are never awarded. CDFIs invest in economically distressed communities, support small businesses and entrepreneurs, and finance affordable housing—work directly tied to human health and welfare. Withholding the funding would severely prejudice Plaintiffs and the communities they serve. As discussed below, failing to award the FY 2025 funds would have catastrophic effects on the CDFI industry; prevent Plaintiffs from fulfilling their core missions; and cause losses of staff, profitability, and funding from other sources.

As to the sixth factor, Defendants deny any impropriety but offer no explanation for the delay in OMB's apportionment of the FY 2025 funds or Main Treasury's delay in approving the amended NOFA notices. *See, e.g.*, Papaj Dec. ¶ 6 ("To my knowledge, there is no programmatic reason for deferring the availability of these funds.") (referring to OMB's decision to apportion no-year funds into "Category C" where Treasury cannot access them). Coupled with the Administration's repeated derogatory statements about the CDFI Fund, bad faith is the most reasonable explanation. Pls.' Mem. 5–6.

Taken together, the *TRAC* factors decisively favor Plaintiffs. And Defendants' insistence that they are working toward completing the evaluation process does not immunize them from an order compelling agency action. In *American Academy of Pediatrics v. FDA*, the court ordered an agency to issue a rule "unlawfully withheld" even though the agency had attempted to comply with the statutory deadline "in a timely fashion." 330 F.Supp.3d 657, 664 (D. Mass. 2018). Relief was warranted nonetheless because "the statute and deadlines set forth by Congress continue to apply." *Id*. So too here.

### E. Defendants' unilateral decision to withhold congressional appropriations violates the Separation of Powers doctrine and Take Care Clause.

Defendants' refusal to obligate congressionally appropriated CDFI Fund money violates separation-of-powers principles and the Take Care Clause. Defendants mischaracterize Plaintiffs'

constitutional claim and established caselaw by claiming the Supreme Court precluded them in *Dalton v. Specter*, 511 U.S. 462 (1994). But the claim in *Dalton*—that the President exceeded his statutory authority—is entirely distinguishable from this case, where Defendants lack any authority to refuse to spend congressionally appropriated funds. *See City & Cnty. of S.F.*, 897 F.3d at 1233–34 ("[W]hen it comes to spending, the President has none of 'his own constitutional powers' to 'rely' upon."). Here, Plaintiffs' "separation of powers claim does not rely on the ICA [or any other statute] to survive; rather, it alleges that there is a separate, independent constitutional argument rooted in the Executive Branch's interference with Congress's Article I powers," *City & Cnty. of S.F.*, 816 F.Supp.3d at 1036. *See, e.g.*, Compl. ¶¶ 205–207. Because Plaintiffs' constitutional claim does not arise from a statutory violation, *Dalton* does not preclude it. *See City & Cnty. of S.F.*, 897 F.3d at 1235 (Defendants' refusal to distribute or spend properly appropriated funds violated separation of powers); *Murphy Co. v. Biden*, 65 F.4th 1122, 1130 (9th Cir. 2023); *Sierra Club v. Trump*, 929 F.3d 670, 696–97 (9th Cir. 2019). [7]

Defendants ignore that the Ninth Circuit has held that constitutional claims are viable where, as here, "a plaintiff claims that the President has 'violat[ed] . . . constitutional separation of powers principles' because the President's action lacked both 'statutory authority' and 'background constitutional authority.'" *Murphy Co.*, 65 F.4th at 1130. *See also, e.g.*, *City & Cnty. of S.F.*, 816 F.Supp.3d at 1035; *Washington v. Dep't of Transp.*, 792 F.Supp.3d 1186 (W.D. Wash. 2025) (same); *Chicago Women in Trades v. Trump*, No. 25-cv-2005, 2025 WL 1331743, at *4–5 (N.D. Ill. May 7, 2025) (same). Defendants do not acknowledge or grapple with this authority.

**F. Defendants' actions are *Ultra Vires*.**

Defendants' actions—acting improperly and without legal authority—are *ultra vires*. Courts have held that an agency acts *ultra vires* when it exceeds its authority to circumvent funding conditions dictated by Congress. *Multnomah Cnty. v. Azar*, 340 F.Supp.3d 1046, 1070 (D. Or. 2018). Defendants are thus wrong to argue that *ultra vires* claims are basically incapable of succeeding. Opp. 20–21.

---

[7] Defendants are wrong (at 20) that courts cannot review whether the President is complying with the command that he "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3. That ignores the caselaw reviewing just those sorts of claims. *See, e.g., Rhode Island v. Trump*, 781 F.Supp.3d 25, 51–52 (D.R.I. 2025); *Child Trends, Inc.*, 795 F.Supp.3d at 725; *City & Cnty. of S.F.*, 783 F.Supp.3d 1148, 1190 (N.D. Cal. 2025). And none of Defendants' cases hold that such claims are nonjusticiable.

Defendants point to no principle of *ultra vires* law, and there is none, that would limit the doctrine to particular types of disputes. Rather, when agencies act "beyond their jurisdiction"—as Defendants have done by flouting congressional appropriations and claiming the power to dictate whether to spend appropriated funds—"what they do is *ultra vires*." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013).

## II. None of Plaintiffs' claims is precluded by the Impoundment Control Act.

Defendants argue that the Impoundment Control Act (ICA) precludes Plaintiffs' entire suit. Opp. 9. This argument mischaracterizes both Plaintiffs' claims and Defendants' principal authority, and ignores controlling Ninth Circuit precedent and recent decisions from this District rejecting the same argument. Plaintiffs' claims do not turn on whether Defendants complied with ICA procedures, and this suit does not seek to enforce the ICA.

As an initial matter, the APA operates under a strong presumption in favor of judicial review. "Whether and to what extent a particular statute precludes judicial review is determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984). And on top of that strong presumption of judicial review, Congress included an express provision in the ICA itself refuting Defendants' preclusion argument. 2 U.S.C. § 681(3) ("[n]othing contained in [the ICA]. . . shall be construed as . . . affecting in any way the claims or defenses of any party to litigation concerning any impoundment.").[8]

Defendants are simply wrong that "[t]he Supreme Court has already held that the ICA . . . precludes private [APA] suits seeking to enforce appropriated spending." Opp. 1. In *Department of State v. Aids Vaccine Advisory Coalition,* the Court's order and limited reasoning was cabined to "the funding subject to the President's August 28 special message" under the ICA and emphasized that it "should not be read as a final determination on the merits." 146 S. Ct. 1, 19 (2025). The order did not apply to APA claims relating to appropriations not included in a rescission proposal like Plaintiffs'

---

[8] Congress enacted this clear textual command against the backdrop of numerous cases where private plaintiffs had successfully challenged agency refusals to spend funds as Congress directed, including under the APA based on violations of appropriations laws. *See, e.g.*, *Train v. City of New York*, 420 U.S. 35 (1975); *State Highway Comm'n v. Volpe*, 347 F.Supp. 950, 954 (W.D. Mo. 1972); *Guadamuz v. Ash*, 368 F.Supp. 1233 (D.D.C. 1973).

claims here. *See also City & Cnty. of S.F.*, 816 F.Supp.3d at 18 n.17 (declining to conclude that stay order indicated a particular holding); *Chicago*, 815 F.Supp.3d at 758 (same).

*Global Health Council v. Trump*, on which Defendants rely, likewise cannot bear the weight they place on it to overcome the presumption of judicial review. That case held only that the ICA's statutory scheme (providing for GAO enforcement) precluded private suits "to enforce the ICA." 153 F.4th 1, 17-18 & n.17 (D.C. Cir. 2025). Defendants seek to broaden that holding to preclude any suit involving a funding dispute. Opp. 9. But the D.C. Circuit expressly declined to hold that the APA was unavailable to challenge violations of appropriations acts. *Global Health Council*, 153 F.4th at 18 & n.17 ("we need not and do not decide whether the ICA precludes suits under the APA to enforce appropriations acts"). And D.C. Circuit decisions are not binding in the Ninth Circuit, where multiple courts have found plaintiffs may state APA claims based on an agency's violation of appropriations laws—and that the ICA did not preclude them. *See, e.g.*, *Or. Council for Humans.*, 794 F.Supp.3d at 881–82; *Washington*, 792 F.Supp.3d at 1186–87; *King Cnty.*, 785 F.Supp.3d at 884–94. Those courts correctly concluded that the ICA does not preclude even APA claims based on violations of the ICA—a closer question than is presented here, where Plaintiffs allege violations of appropriations statutes—because "[t]here is a meaningful distinction between direct challenges under the ICA and an APA challenge asserting that an agency action is contrary to law because it violates the ICA[.]" *Or. Council for Humans*., 794 F.Supp.3d at 882.

The Ninth Circuit has likewise sustained lawsuits—including APA claims—based on the executive's failure to comply with appropriations laws. For example, in *City and County of San Francisco*, the Ninth Circuit mentioned the Impoundment Control Act only in passing when affirming summary judgment for plaintiffs, citing it merely to show that "Congress ha[d] affirmatively and authoritatively spoken" on "the President's duty to execute appropriations laws." 897 F.3d at 1234. The court's holding that "the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals" is hardly compatible with a rule that the ICA precludes all suits touching on appropriations disputes. *Id.* at 1235. Moreover, the cases Defendants cite about whether the ICA precludes APA contrary-to-law claims say nothing about the availability of constitutional claims or

other types of APA claims, including arbitrary and capricious and agency action unreasonably delayed, which Plaintiffs also bring here. Even crediting Defendants' cases, none suggest that the ICA could possibly preclude *all* of Plaintiffs' claims. *Chicago*, 815 F.Supp.3d at 759 ("plaintiffs' cause of action under the APA based on arbitrary and capricious agency action was not impacted by" *AVAC*).

**III. Plaintiffs have established current and imminent irreparable harm.**

Plaintiffs have established that they are likely to suffer three types of irreparable injury in the absence of an injunction. In response, Defendants mischaracterize Plaintiffs' injuries and misunderstand the test for irreparability. But the law is clear: Irreparable harm "is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).

Defendants appear to concede that the loss of an opportunity to compete for a monetary award from the government constitutes an injury. Opp. 21. Nonetheless, they quibble that the injury is not irreparable. *Id*. at 22. But the imminent expiration of the FY 2025 funds renders Plaintiffs' injuries irreparable. After September 30, the funds will be unavailable permanently and Plaintiffs will permanently lose the opportunity to compete for them. This is precisely the kind of injury for which there is no adequate legal remedy: The Court cannot order Defendants to make the FY 2025 funds available for competition after they have expired absent pending litigation. And in their opposition, Defendants confirm that Plaintiffs' irreparable harm is likely in the absence of an injunction by asserting that obligating the FY 2025 funds before September 30 "is impossible to perform lawfully." Opp. 23.[9]

Next, Defendants claim that an economic injury *must* "threaten[] the very existence of the plaintiff's operations" to be irreparable, Opp. 22. That assertion is irrelevant and incorrect. It is irrelevant because Plaintiffs' injury is their loss of the fair opportunity to compete for an award at all, not of a specific award amount. *See* IA Dec. ¶ 20; CAMEO Dec. ¶ 29. And it is incorrect because the test for irreparability turns on the lack of an adequate legal remedy, not the size of a monetary loss. Precisely because money damages are a legal remedy, "loss of money is not typically considered irreparable

[9] It is hardly the case, *contra* Opp. 22, that concluding the loss of a fair opportunity to compete is "new territory." *See, e.g.*, *22nd Century Techs., Inc. v. U.S.*, 176 Fed. Cl. 389, 401 (2025) ("[L]oss of an opportunity to compete fairly" for government funds "constitutes irreparable harm.").

harm[.]" *Thakur v. Trump*, 176 F.4th 1187, 1205 (9th Cir. 2026). But monetary harm can deviate from this principle in several ways: A loss so great that it poses an existential threat to continued operations can be irreparable. Another is when "the funds 'cannot be recouped' and are thus 'irrevocably expended.'" *Id*. Here, Plaintiffs' injuries are irreparable because the FY 2025 funds cannot be recouped after September 30, and there is no adequate legal remedy for that loss. *New York v. Noem*, 812 F.Supp.3d 321, 337 (S.D.N.Y. 2025).

These injuries satisfy Plaintiffs' burden. But Plaintiffs have established additional irreparable injuries Defendants make no attempt to address. First, Plaintiffs are already suffering irreparable harm caused by the uncertainty Defendants have wreaked on the past year's funding cycle. The steps Plaintiffs have had to take to mitigate the uncertainty have damaged their core mission, forcing them to revise "performance expectations downward dramatically" and extend fewer loans to entrepreneurs. CAMEO Dec. ¶ 30. Courts have repeatedly found that these "cuts to services" constitute irreparable harm. *King Cnty.*, 785 F.Supp.3d at 890; *Cnty. of Santa Clara v. Trump*, 250 F.Supp.3d 497, 537 (N.D. Cal. 2017).

Second, Plaintiffs are also suffering an intangible irreparable injury: damage to their relationships with non-governmental funders. Such "intangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm . . . because they are often not quantifiable and cannot be fully remedied with a financial award." *Novedades Y Servicios, Inc. v. FINCEN*, 181 F.4th 961, 977 (9th Cir. 2026). Plaintiffs (and the CDFI industry as a whole) are dependent on non-government funders by design, because the CDFI Fund's programs require matching awards with outside capital. *See* IA Dec. ¶ 24. But those funders, in turn, count on Defendants' obligation of award funds to increase the stability and attractiveness of CDFIs as investments for private and philanthropic capital. *Id*. As Inclusive Action has explained, losing the ability to compete fairly for awards, even for a single cycle, "weakens our institution and increases our risk, damaging our ability to attract outside investment from non-governmental supporters for the short and long-term." *Id.*; *see also* CAMEO Dec. ¶¶ 35–36 ("If . . . the private sector, and philanthropic funders cannot rely on the CDFI Fund to provide capital for CDFIs each fiscal year, the industry will face significant difficulty fulfilling its core mission."). The deterioration of Plaintiffs' relationships with the non-governmental funders on whom they depend is a

third irreparable injury that they suffer already, and will continue to suffer, absent relief from this Court.

**IV. The remaining factors sharply favor Plaintiffs.**

Defendants do not even attempt to argue that their equities would be harmed by a preliminary injunction, focusing instead on the public interest entirely.[10] Nor could they: "the government cannot suffer harm from an injunction that merely ends an unlawful practice." *Thakur v. Trump*, 176 F.4th at 1205. It is no surprise that the government "fail[s] to demonstrate that spending congressionally appropriated funds as directed by Congress causes [it] irreparable injury." *Cmty. Legal Servs. v. HHS*, 137 F.4th 932, 942–43 (9th Cir. 2025).

Defendants claim instead a public interest "in the orderly administration" of the CDFI Fund's application review process. Opp. 22. Notwithstanding that the CDFI Fund has consistently proved capable of administering the same process under the same statute before Congress's previous appropriations expired, Defendants say that this time, adhering to the September 30 expiration date would "force an impossible choice" between implementing a rushed selection process or issuing awards "that do not reflect a genuine exercise of the CDFI Fund's discretion." *Id.* at 23. To the extent this characterization of the circumstances is accurate, Defendants created them through their months of deliberate inaction. Nonetheless, at this point, Defendants have a third choice: consent to an order tolling the expiration of funds. Refusing that intervention, *see* Opp. 23, underscores Defendants' true aim to wait out expiration of the FY 2025 appropriation and deprive Plaintiffs an opportunity to fairly compete.

"[T]he public [] has an interest in ensuring that 'statutes enacted by [their] representatives' are not imperiled by executive fiat." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 778–79 (9th Cir. 2018) (quoting *Maryland v. King*, 567 U.S. 1301, 1301 (2012) (Roberts, C.J., in chambers)). Here, the public interest lies in ensuring that the hundreds of millions of dollars Congress appropriated for obligation to CDFIs by September 30 are spent as federal law requires.

**V. This Court can and should provide relief to the fullest extent available under the law.**

This Court has the authority to grant Plaintiffs relief. Defendants' assertions to the contrary

[10] In any case, when the party opposing a preliminary injunction is the government, "the last two *Winter* factors merge." *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (cleaned up).

mischaracterize the nature of this suit: Plaintiffs do not ask for any particular CDFI Fund award, nor do they assert an entitlement to one. *Contra* Opp. 24. Plaintiffs instead challenge Defendants' unilateral decision to defund the CDFI Fund's award programs by refusing to spend FY 2025 funds before they expire—a decision that they seek to stay through Section 705 of the APA or, alternatively, seek to enjoin. Likewise, under 5 U.S.C. § 706(1), the Court should also compel Defendants to take the action they have unlawfully withheld and unreasonably delayed: spending the funds before they expire.

In the alternative, to preserve the Court's ability to offer meaningful relief, Plaintiffs respectfully request that this Court order Defendants to hold any unspent FY 2025 funds beyond the September 30, 2026 statutory lapse date, and suspend the lapse date's operation until Defendants can complete the award selection process fairly and in compliance with applicable law and regulation, or for the pendency of this litigation if necessary to ensure that the funds remain available.

The Court has both statutory and equitable authority to enter this interim relief, and exercising it is necessary and appropriate here. *See Washington v. Dep't of Educ.*, 161 F.4th 1136, 1141 (9th Cir. 2025) ("courts have the power to order that funds be held available beyond their statutory lapse date" citing a court's inherent equity power and 31 U.S.C. § 1502).[11] Preserving the funds is necessary here to afford meaningful relief and prevent this dispute from becoming moot. *See City of Houston v. HUD*, 24 F.3d 1421, 1426 (D.C. Cir. 1994) (courts may preserve expiring funds in order to protect their ability to decide a case properly before them). Defendants insist that compliance with Congress's longstanding September 30 deadline is "impossible[.]" Opp. 23. Without the Court's intervention, up to $289 million that Congress intended for CDFI Fund's award programs will expire without obligation. Extending the obligation deadline is warranted and comfortably within the Court's authority.

## CONCLUSION

For these reasons, the Court should grant Plaintiffs' motion for preliminary relief.

---

[11] Defendants' cramped contrary reading of 31 U.S.C. § 1502(b) is incorrect. *See e.g., Nat'l All. to End Homelessness*, 827 F.Supp.3d at 287 n.2 ("whether through 31 U.S.C. § 1502(b), the Court's own equitable authority, or the underlying mechanics of federal appropriations," the court "possess[es] the authority to suspend the expiration of the funds at issue here") (citing GAO Red Book 5-82); *Multnomah Cnty.*, 340 F.Supp.3d at 1055 (same); *Goodluck v. Biden*, 104 F.4th 920, 928 (D.C. Cir. 2024).

Date: September 10, 2026

Respectfully submitted,

*<u>/s/ Daniel "Sparky" Abraham</u>*
Daniel "Sparky" Abraham (SBN 299193)
**JUBILEE LEGAL**
300 E. Esplanade Dr., 9th Floor
Oxnard, CA 93036
(805) 946-0386
sparky@jubilee.legal

*<u>/s/ Andrea J. Matthews</u>*
Andrea J. Matthews (pro hac vice)
Anna L. Deffebach (pro hac vice)
Johanna M. Hickman (pro hac vice)
Steven Y. Bressler (D.C. Bar No. 482492)*
Elena Goldstein (pro hac vice)
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
(202) 304-3457 (Matthews)
amatthews@democracyforward.org
adeffebach@democracyforward.org
hhickman@democracyforward.org
sbressler@democracyforward.org
egoldstein@democracyforward.org

*Counsel for Plaintiffs*

* Motion to appear *pro hac vice* pending