Daniel "Sparky" Abraham (SBN 299193)
**JUBILEE LEGAL**
300 E. Esplanade Dr., 9th Floor
Oxnard, CA 93036
(805) 946-0386
sparky@jubilee.legal

Andrea J. Matthews (pro hac vice)
Anna L. Deffebach (pro hac vice)
~~Johanna M. Hickman (pro hac vice)~~
Steven Y. Bressler (pro hac vice)
Elena Goldstein (pro hac vice)
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
(202) 304-3457 (Matthews)
amatthews@democracyforward.org
adeffebach@democracyforward.org
~~hhickman@democracyforward.org~~
sbressler@democracyforward.org
egoldstein@democracyforward.org

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

INCLUSIVE ACTION FOR THE CITY and CAMEO NETWORK,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF THE TREASURY; SCOTT BESSENT, in his official capacity; COMMUNITY DEVELOPMENT FINANCIAL INSTITUTIONS FUND; ~~ALEXANDRIA SMITH~~CHRISTOPHER MILLER, in ~~her~~his official capacity; OFFICE OF MANAGEMENT AND BUDGET; and RUSSELL VOUGHT, in his official capacity,

Defendants.

Case No. 3:26-cv-08433

**SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1. Nearly one quarter of American households do not have bank accounts or must rely on costly payday lenders and check-cashing outlets to meet basic financial needs. In those communities, a corner-store owner who needs $2,000 to replace a freezer, or a street vendor who needs $500 to buy inventory, often cannot simply turn to a bank for a loan. The lack of ready access to capital investments for underserved small businesses forces these entrepreneurs to choose between foregoing the funding they need and resorting to high-cost lenders who might impose finance charges that approach or exceed 100%.

2. Community Development Financial Institutions (CDFIs) exist to close that gap. They are mission-driven lenders that make the loans conventional banks will not make, on terms borrowers can actually repay, in places other capital does not reach.

3. Congress created the CDFI Fund in 1994 to better capitalize those lenders, and has appropriated money to it every year since. Over three decades, the Fund has awarded more than $8 billion in monetary awards~~, allocated~~ and exercised other authorities Congress designed, including by allocating $81 billion in tax credits~~,~~ and ~~guaranteed~~guaranteeing nearly $3 billion in bonds. ~~It~~This support has built the capacity of more than 1,400 certified CDFIs operating in all fifty States, the District of Columbia, Guam, and Puerto Rico.

4. Despite strong bipartisan congressional support, the Trump-Vance Administration has set out to shut the CDFI Fund down. In May 2025, the President's proposed budget asked Congress to eliminate the Fund's award programs outright. The White House issued a fact sheet explaining the Presidential budget's proposed elimination of the CDFI Fund, calling the program "woke" and accusing it of "abus[ing] funds to advance a partisan agenda" that included "critical race theory," "racial justice," "gender extremism," and "climate radicalism." ~~And in October 2025, during~~Months later, the ~~government shutdown, the Trump-Vance~~ Administration ~~sent termination notices to~~ terminated every employee ~~of the Fund, asserting that the basis of the terminations was "to implement the abolishment" of~~at the CDFI Fund. And in April of 2026, the Administration's proposed budget sought to eliminate the CDFI Fund's award programs again.

5. Congress ~~refused to implement~~rebuked the ~~President's budget.~~Administration's attacks each time. It required the reinstatement of the civil servants the Administration had fired. And it rejected the President's proposed budget cuts, appropriated the same $324 million budget that it appropriated in ~~fiscal year~~ 2025 for fiscal year 2026~~,~~. In doing so, Congress rejected the Administration's proposed elimination of the programs it had created and ~~barred~~prohibited the use of any appropriated funds to "increase, eliminate, or reduce funding for a program, project, or activity as proposed in the President's budget request" unless Congress itself enacts that change. ~~Congress also passed legislation requiring the reinstatement of the CDFI Fund employees by November 17, 2025, along with others across the government, and the Fund reinstated the staff needed to run its programs.~~

~~6. Defendants are now accomplishing by delay what they could not~~Unable to accomplish ~~by~~the Administration's policy goals through legislation ~~or mass firing. Notwithstanding Congress's unambiguous directives~~, Defendants have ~~withheld virtually all of the money Congress appropriated for~~instead sabotaged the CDFI ~~programs, including funds that will expire within weeks.~~

~~7.~~6. Fund's implementation of its statutory duties. The contrast with prior policy and practice is stark. In 2024, OMB made the Fund's $289 million in program money available within weeks, and Treasury was able to award and disburse it to CDFIs. But in 2025, OMB ~~only immediately released $35 million Congress provided for the Fund's own administration (including staff salaries) and~~ withheld the $289 million Congress provided for the Fund's award programs~~. OMB withheld that money~~ from the Treasury Department~~, through an OMB process called "apportionment" of appropriations,~~ until April 8, 2026 — more than a year ~~late~~later than OMB was statutorily required to provide Treasury with access to the funds, and shortly before OMB Director Vought was scheduled to testify before Congress.

~~8.~~ Even after OMB finally acted, no further progress ~~has been~~was made. ~~As of~~ Plaintiffs filed this ~~filing, Treasury has not made a single award of~~ suit and sought preliminary relief on August 14, 2026, roughly six weeks before the fiscal year 2025 ~~funds.~~

~~9.~~7. ~~The result is that every dollar~~(FY2025) appropriation and authorities Congress ~~appropriated for fiscal year 2025 awards is at risk of expiring unspent~~provided would expire on September 30, ~~while the money Congress appropriated for the years that follow sits frozen in OMB accounts where the Fund~~

cannot reach it2026. When this suit was filed, none of the FY2025 $289 million in funds appropriated for CDFI awards had been obligated, nor had the CDFI Fund exercised its bond guarantee authority authorized to guarantee up to $500 million in bonds for the benefit of CDFIs.

8. Defendants' response to the lawsuit continued the Administration's commitment to sabotage the CDFI Fund, arguing that obligating the funds before they expired would be "unreasonable" and "impossible" to do "lawfully." Approximately three weeks later, and two days before oral argument on Plaintiffs' motion for preliminary relief, the CDFI Fund announced that it would in fact obligate the funds on September 22. Only following Plaintiffs' filing of their First Amended Complaint and a motion for a temporary restraining order regarding the CDFI Fund's Bond Guarantee program, which Defendants had previously announced no plans to fulfill, did the CDFI Fund exercise its guarantee authority on September 30—hours before that authority was set to expire.

9. Outside the spotlight of a motion for emergency relief, Defendants continue to sabotage the CDFI Fund's functions. Following the transition to FY2027, which occurred on October 1, OMB is still withholding from Treasury both the funds Congress appropriated for the CDFI Fund's programs and the money needed to sustain the Fund's own operations. The CDFI Fund has yet to publish any Notice of Funds Availability or Notice of Guarantee Authority for the FY2026 funding[1] and guarantee authority that will expire September 30, 2027, which are necessary steps before award applications can even be submitted for those programs by CDFIs. And a slew of forms for CDFI certification and application to various Fund programs are set to expire imminently, but Defendants have not issued or approved the necessary updated versions for CDFIs to use to apply for FY2026 resources.

10. Defendants have never explained any of this. They have identified no statute authorizing them to withhold the money. And they have said nothing at all about what the delay means for CDFIs that applied for those fundswho rely on the Fund's programs, or for the communities those CDFIs serve.

[1] Due to the Administration's withholding and severe delay in the FY2025 award cycle, the CDFI Fund's awards are now running on at least a one-year delay. As a result, FY2026 awards—money that was appropriated by Congress in FY2026 and that the CDFI Fund would traditionally have made available in a funding round during FY2026—still has not been made available even though we have entered FY2027. When referring to "FY2026 funds," this Second Amended Complaint refers to funds that were appropriated by Congress in FY2026.

~~11.~~10. The challenged delays~~ in apportioning and awarding the funds~~, if left unchecked, will thwart Congress's commands and cause ~~direct, immediate, significant, and irreparable harm~~severe damage to CDFIs nationwide, including Plaintiffs, and the communities they serve.

~~12.~~11. Defendants' conduct is unlawful several times over. Their refusal to apportion and obligate money Congress directed them to spend is arbitrary and capricious: Defendants have offered no reasoned explanation, have ignored the reliance interests of the CDFIs that applied, and have weighed a consideration Congress forbade them to weigh — alignment with a budget that Congress rejected. It is contrary to law, because the Antideficiency Act requires OMB to make the funds available for Treasury and the CDFI to use as Congress requires, and because the appropriations acts require this money to be obligated in the amounts, for the purposes, and by the dates Congress set. It is~~ also~~ agency action unlawfully withheld and unreasonably delayed. It cannot be squared with the Appropriations Clause or the Take Care Clause, which commit the power of the purse to Congress and leave the Executive the duty to spend what Congress has appropriated. And it is harming people and communities across the country that depend upon and benefit from CDFIs.

**PARTIES**

~~13.~~12. Plaintiff Inclusive Action for the City (Inclusive Action) is a not-for-profit corporation located in Los Angeles, California, and a federally certified CDFI whose mission is to champion working people, invest in entrepreneurs, and change systems to build an economy that works for all of us. It serves underinvested communities and builds thriving local economies by improving access to capital and advancing policy through collaborative research and community-driven advocacy. Inclusive Action has received ~~seven~~eight awards from the CDFI Fund.~~ As it had successfully for many years prior, Inclusive Action applied for a fiscal year 2025 Financial Assistance award seventeen months ago and continues to await a decision from the CDFI Fund.~~[2] And Inclusive Action would apply for ~~fiscal year 2026~~FY2026 funds if Defendants open that round. Inclusive Action is a member of Plaintiff CAMEO Network.

---

[2] As of the date this Second Amended Complaint is filed, Inclusive Action has not received an Assistance Agreement relating to its eighth award, from the FY2025 cycle. Those funds will not flow unless and until an assistance agreement is finalized.

~~14.~~13. Plaintiff California Association for Micro Enterprise Opportunity Network (CAMEO Network or CAMEO) is a San Francisco, California based association made up of over 400 organizations, agencies, and individuals dedicated to furthering business development across the nation with small and micro-business financing such as loans and credit, technical assistance, and business management training—including 57 CDFIs. CAMEO Network runs a CDFI Incubator, National Academy, Shared Services Center, and Impact Fund, through which it offers training, consulting, lending capital, and back-office services to help emerging and established CDFIs and technical assistance providers build critical operating capacity. It also provides public education on the economic impacts of micro-business through public awareness and advocacy at the local, state, and federal levels to support the growth of micro-business, start-ups, and entrepreneurs. CAMEO Network's members include Inclusive Action.

~~15.~~14. Defendant the United States Department of the Treasury (Treasury) is an executive department of the United States federal government, headquartered in Washington, D.C.

~~16.~~15. Defendant Scott Bessent is the Secretary of the Treasury. He is sued in his official capacity.

~~17.~~16. Defendant Community Development Financial Institutions Fund (CDFI Fund) is a component of the Department of the Treasury.

~~18.~~17. ~~Alexandria Smith~~Christopher Miller is the ~~Acting~~ Director of the CDFI Fund, the highest-ranking officer of the CDFI Fund. ~~She~~He is sued in ~~her~~his official capacity.

~~19.~~18. The Office of Management and Budget (OMB) is an executive department of the United States federal government, headquartered in Washington, D.C.

~~20.~~19. Russell Vought is the Director of OMB. He is sued in his official capacity.

## JURISDICTION AND VENUE

~~21.~~20. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331, because this action arises under the Constitution and laws of the United States, and under 28 U.S.C. § 1361 over Plaintiffs' claim for mandamus relief.

~~22.~~21. This Court may grant declaratory, injunctive, and other relief pursuant to 28 U.S.C. §§ 2201-2202, 5 U.S.C. §§ 702, 705, 706, and the Court's inherent authority to enjoin federal officials from acting unlawfully.

~~23.~~22. Venue is proper in this District under 28 U.S.C. § 1391(e)(1). Defendants are agencies of the United States and officers of the United States sued in their official capacities; Plaintiff CAMEO Network resides in this District, with its principal place of business in San Francisco, California.

## LEGAL BACKGROUND

### The Community Development Financial Institutions Fund

~~24.~~23. CDFIs are mission-driven financial institutions that create economic opportunity, promote quality affordable housing, and provide essential community services to rural and urban low-income people and communities across the nation that lack adequate access to affordable financial products and financial services.

~~25.~~24. Congress established the federal CDFI Fund in the Riegle Community Development and Regulatory Improvement Act of 1994 (P.L. 103-325), codified at 12 U.S.C. § 4701 *et seq.*, to expand economic opportunity for underserved people and communities by improving the supply of capital, credit, private investment, and development services in economically distressed areas.[3] Although the Fund is organized within Treasury's Office of Domestic Finance, Congress provides the Fund with its own budget authority through annual appropriations. The CDFI Fund is headed by a director appointed by the Secretary of the Treasury. Congress has appropriated funding for the CDFI Fund each year since the Fund's creation.

~~26.~~25. As Congress explained when it created the CDFI Fund, its purpose is to "promote economic revitalization and community development through investment in and assistance to community development financial institutions, including enhancing the liquidity of community development

---

[3] Although the Riegle Act created the Fund as a wholly owned, independent government corporation, a supplemental appropriations bill moved the Fund into the Department of the Treasury in 1996. Balanced Budget Downpayment Act, II, Pub. L. No. 104-134, Title I, § 101(e~~)~~f) [Title III], Apr. 26, 1996, 110 Stat. 1321-294; renumbered Title I. Pub. L. No. 104-140, § 1(a), May 2, 1996, 110 Stat. 1327.

financial institutions."[4] Accordingly, Congress recognized that providing capital to CDFIs would in turn allow CDFIs to promote economic development in communities that were not adequately served by traditional financial institutions.

~~27.~~26. Congress charged the CDFI Fund with pursuing those objectives by administering 11 programs or functions, including:

a. CDFI Program;
b. The New Markets Tax Credit Program;
c. Bank Enterprise Award Program;
d. Native American CDFI Assistance Program;
e. Housing Production-Financial Assistance;
f. Capital Magnet Fund;
g. CDFI Bond Guarantee Program;
h. Small Dollar Loan Program;
i. CDFI Equitable Recovery Program;
j. CDFI Rapid Response Program;
k. Certification of CDFIs and Community Development Entities.[5]

~~28.~~27. In order to ensure that its resources are allocated to appropriate institutions, the CDFI Fund is authorized to certify banks, credit unions, nonprofit loan funds, microloan funds, and venture capital funds as designated CDFIs.[6] Depending on the program, a CDFI must be certified, in the process of being certified, or must obtain certification within a certain period of time to be eligible for an award.[7]

~~29.~~28. Obtaining certification allows a CDFI to access the vital support the government's CDFI programming provides. Certification by the government is a rigorous process, requiring CDFIs to

[4] 12 U.S.C. § 4701(b).
[5] *See* 12 U.S.C. § 4701 et seq.; 26 U.S.C. § 45D; 12 U.S.C. § 4713; 12 U.S.C. §§ 4701-4718; 12 U.S.C. § 4703(a)(1); 12 U.S.C. § 4569; 12 U.S.C. § 4713a; 12 U.S.C. § 4719; Consolidated Appropriations Act, 2021, Title V, Sec. 523, (Pub. L. No. 116-260, 134 Stat. 1182, 2087 (2020);
[6] 12 C.F.R. § 1805.201.
[7] *See, e.g.*, 12 C.F.R. § 1805.200.

routinely provide key metrics on their lending portfolio and practices, information about their customer base, and financial information on the health of the organization.[8]

~~30.~~29. Certification also serves as an indicator of legitimacy for other types of funders, including large financial institutions and foundations. Because the financial assistance offered by the CDFI Fund usually requires that a CDFI find "matching" funds from non-government sources, the CDFI program and its certification are deliberately engineered to couple government support with private or nonprofit investment. In this way, CDFI certification from the government serves both as a formal gateway to government support and a driver of outside investment.

~~31.~~30. To be eligible for CDFI certification, an institution must demonstrate that at least 60% of its activities are directed toward either an Investment Area or a Targeted Population.[9]

***The CDFI Program***

~~32.~~31. The largest program administered by the CDFI Fund is the CDFI Program. The CDFI Program provides awards to CDFIs that focus on serving low-income people, historically underserved demographic populations, and distressed communities through awards of technical assistance (TA) and financial assistance (FA) including in the form of loans, grants, equity investments, deposits, and capital reserves.[10] FA awards include an award called the "Base Financial Assistance award" or "Base-FA" as well as supplemental awards that target specific areas such as hunger, persistent poverty, and individuals with disabilities.[11]

~~33.~~32. FA and TA awards are both subject to several restrictions. For example, the Fund requires an applicant to demonstrate that it can match award funds with those from other sources. Additionally, the

---

[8] 12 C.F.R. § 1805.201.

[9] 12 C.F.R. §§ 1805.200(a)(2), 1805.201(b)(3)(i); U.S. Dep't of the Treasury,~~-~~ CDFI Fund, *Target Market CDFI Certification Webinar*, https://perma.cc/9BJB-S2MA; *see also* 12 U.S.C. § 4702.

[10] 12 U.S.C. § 4707; 12 C.F.R. § 1805.100 et seq.

[11] These include Healthy Food Financing Initiative-Financial Assistance (HFFI-FA), Persistent Poverty Counties-Financial Assistance (PPC-FA), Disability Funds-Financial Assistance (DF-FA), and Housing Production-Financial Assistance (HP-FA). *See* U.S. Dep't of the Treasury, CDFI Fund, *Community Development Financial Institutions Program, Award Book, FY 2024* at 1, https://perma.cc/4UMU-B6JK.

Fund generally limits any one entity or its affiliates from receiving more than $5 million in awards from the Fund within a three-year period.[12]

~~34.~~33. Additionally, all financial assistance awarded by the CDFI Program must be matched with funds from sources other than the federal government.[13] Matching funds may be in the form of loans, grants, equity investments, deposits, and credit union shares.[14] Financial awards from the CDFI Program are made in the same form as the matching funds—in other words, if an organization obtains matching funds in the form of grants, the CDFI Fund award will likewise take the form of a grant.[15]

~~35.~~34. The CDFI Program made its first awards in 1996. Since its establishment, it has awarded over $3 billion in FA and TA grants.[16]

~~36.~~35. From FY 2010 through FY 2024, CDFI Program FA recipients have used their awards to originate nearly $300 billion in total loans and investments in distressed and economically underserved communities; provide more than $55.8 billion in financing to more than 1.34 million businesses; and support the development of more than 557,000 units of affordable housing.[17]

~~37.~~36. In fiscal year 2024~~, the last year for which awards were issued~~, 578 organizations received $433.6 million dollars in CDFI program awards. These included $257.1 million in Base-FA awards, $43 million in Persistent Poverty County awards, $13 million in Healthy Food Financing awards, and $72.7 million in TA awards. These awards were issued to 257 loan funds, 267 credit unions, 49 banks and bank holding companies, three venture capital funds, and two other institutions. The organizations were headquartered in 45 states, the District of Columbia, Puerto Rico, and the Virgin Islands.[18]

---

[12] 12 C.F.R. § 1805.500; *Notice of Funds Availability*, 90 Fed. Reg. at 6052.
[13] 12 U.S.C. § 4707.
[14] 12 C.F.R. § 1805.501.
[15] *Id.*
[16] U.S. Dep't of the Treasury, CDFI Fund, *Community Development Financial Institutions Program, Award Book, FY 2024*, supra note 11 at 1.
[17] *Id.*
[18] *Id.* at 2.

~~38.~~37. Of the fiscal year 2024 CDFI Program awardees, 66 serve rural areas, 113 serve minor urban areas, 17 serve micropolitan areas, and 136 serve major urban areas.[19] Sixty-three organizations are headquartered in Persistent Poverty Counties.[20]

***The Bond Guarantee Program***

~~39.~~38. The CDFI Fund's Bond Guarantee Program advances the Fund's objective of providing financial support and stabilization to CDFIs through government support, but achieves that objective through different means than the Fund's competitive award programs. Instead, the Bond Guarantee Program provides "long-term, low-cost capital" by providing applicants[21] the authorization to issue bonds worth a minimum of $100 million per application.[22] The Secretary of the Treasury provides a 100% guarantee on those bonds, which are sold to the Federal Financing Bank, "a government corporation that ensures the efficient use of federal financing[.]" The bond proceeds provide liquidity to CDFIs to use for their community development purposes.[23]

~~40.~~39. CDFIs then pay those proceeds back over a timeline of up to 30 years, at below-market interest rates. In the words of the CDFI Fund, "[t]his unique program incentivizes and empowers CDFIs to execute large-scale projects, including the development of commercial real estate, housing units, charter schools, daycare of healthcare centers, and municipal infrastructure."[24] Like the CDFI Fund's other programs, the Bond Guarantee Program "helps breathe new life into economically underserved areas."[25]

~~41.~~40. Congress created the Bond Guarantee Program through the Small Business Jobs Act of 2010, Pub. L. No. 111-240~~ sec.~~, § 1134, 124 Stat. 2504, 2515 (codified at 12 U.S.C. ~~4713~~§ 4713a), amending the Riegle Act to situate the Bond Guarantee Program alongside the CDFI Fund's other programs

[19] *Id*. at 4.
[20] *Id*. at 5. Persistent Poverty Counties are counties "where 20% or more of the population has lived in poverty over the past 30 years, as measured by the U.S. Census Bureau[.]" *Id*. at n.1.
[21] The Program provides for the application and designation, if the relevant criteria are met, of "Qualified Issuers" that are then eligible to apply for authority to issue the bonds guaranteed by the Secretary of the Treasury. One or more CDFIs can partner with a Qualified Issuer to apply for the authority to issue guaranteed bonds.
[22] CDFI Fund, CDFI Bond Guarantee Program, https://perma.cc/95UW-3ZVN.
[23] *Id.*
[24] *Id.*
[25] *Id.*

designed to capitalize CDFIs. *See* 12 U.S.C. Chapterch. 47 Subchapter, subch. I. Congress designed the program as a noncompetitive application process: the statute *requires* the Treasury Secretary to "approve a qualified issueissuer for a guarantee under the Program" if that issuer meets the requirements laid out in the statute and Treasury regulation. 12 U.S.C. § 4713a(a)(8)(B)(i). And it requires the Secretary to "guarantee payments on bonds or notes issued by any qualified issuer," if the proceeds of the bonds are used as prescribed by the statute and Treasury regulation. 12 U.S.C. § 4713a(b). In other words, when an application meets the criteria laid out in statute and regulation, the Treasury Secretary must approve it.

42.41. Congress put two limitations on this potent program. First, it initially provided that the program would last only until September 30, 2014—unless extended by statute. Pub. L. No. 111-240, § 1134, 124 Stat. 2504, 2520 sec. 114a(codified at 12 U.S.C. § 4713a(k).)). And indeed, Congress has extended the program consistently since: At present, Congress has authorized the program to continue until December 31, 2027. Public LawPub. L. No. 119-75, 140 Stat. 441 (February 6173, 443 (Feb. 3, 2026).

43.42. Second, in annual appropriations acts, Congress provided ceilings on the dollar amount in bonds the Secretary can guarantee. For fiscal year 2026FY2026, the Secretary maycould not guarantee bonds and notes in a total amount exceeding $500,000,000. *Id.* In recognition of this ceiling—and by implication, the noncompetitive nature of the program—Treasury reserves the right to "reduce the award amount to applicants as necessary in order to maximize utilization of the Guarantee authority." 91 Fed. Reg. 39698.

44.43. Since the Bond Guarantee Program's inception, Treasury consistently granted one or more applications and guaranteed hundreds of millions in bonds under the program: more than $300 million in 2013;[26] more than $500 million in 2014;[27] more than $300 million in 2015;[28] more than $200 million

---

[26] Press Release, CDFI Fund, U.S. Dep't of the Treasury, CDFI Fund, *Treasury Announces $325 Million in Community Development Bonds for Financing in Low-Income Areas Nationwide*, (Sep. 30, 2013), https://www.cdfifund.gov/news/92perma.cc/3EGR-ZZNF.

[27] Press Release, CDFI Fund, U.S. Dep't of the Treasury, CDFI Fund, *Treasury Guarantees Additional $200 Million in Bond Funding for Nationwide Community and Economic Development Projects*, (Oct. 2, 2014), https://www.cdfifund.gov/news/99perma.cc/Z6LK-LD44.

[28] Press Release, CDFI Fund, U.S. Dep't of the Treasury, CDFI Fund, *Treasury Guarantees $327*

in 2016[29] and 2017;[30] more than $100 million in 2018,[31] 2019,[32] 2020,[33] 2021[34]; more than $300 million in 2022,[35] 2023;[36] and nearly $500 million in 2024.[37]

***The CDFI Fund's Other Programs***

~~45.~~44. The CDFI Fund also runs a number of other programs that inject hundreds of ~~million~~millions of dollars into underserved communities.

~~46.~~45. The CDFI Fund's Small Dollar Loan Program was created by the Dodd-Frank Wall-Street Reform and Consumer Protection Act of 2010. Since the program launched in 2021, the CDFI Fund has provided more than $40.2 million in Small Dollar Loan Program awards to CDFIs. The program supports both loan loss reserve grants, which enable CDFIs to cover the losses on small dollar loans associated with starting a new small dollar loan program or expanding an existing small dollar award program, as well as grants for technical assistance.[38]

---

*Million in Bond Funding for Projects in Low-Income Communities*~~,~~ (Sep. 29, 2015), https://~~www.cdfifund.gov/news/178,~~perma.cc/RT84-GVYV.

[29] Press Release, CDFI Fund, U.S. Dep't of the Treasury, ~~CDFI Fund,~~ *Treasury Guarantees $265 Million in Bond Funding for Projects in Low-Income Communities* (Sep. 28, 2016), https://~~www.cdfifund.gov/news/232~~perma.cc/CU6A-GY9J.

[30] Press Release, CDFI Fund, U.S. Dep't of the Treasury, ~~CDFI Fund,~~ *Treasury Guarantees $245 Million in Bond Funding for Projects in Low-Income Communities* (Sep. 27, 2017), https://~~www.cdfifund.gov/news/272~~perma.cc/PX5X-ZAKD.

[31] Press Release, CDFI Fund, U.S. Dep't of the Treasury, ~~CDFI Fund,~~ *Treasury Guarantees $150 Million in CDFI Bond Funding* (Sep. 18, 2018), https://~~www.cdfifund.gov/news/322~~perma.cc/NG7R-ASSG.

[32] Press Release, CDFI Fund, U.S. Dep't of the Treasury, ~~CDFI Fund,~~ *Treasury Guarantees $100 Million in CDFI Bond Funding* (Oct. 8, 2019), *https://~~www.cdfifund.gov/news/359~~perma.cc/34YQ-WMPC.*

[33] Press Release, CDFI Fund, U.S. Dep't of the Treasury, ~~CDFI Fund,~~ *Treasury Guarantees $100 Million in CDFI Bond Funding* (Sep. 30, 2020), https://~~www.cdfifund.gov/news/396~~perma.cc/K75V-G9TC.

[34] Press Release, CDFI Fund, U.S. Dep't of the Treasury, ~~CDFI Fund,~~ *Treasury Guarantees $100 Million in CDFI Bond Funding* (Sep. 30. 2021), https://~~www.cdfifund.gov/news/449~~perma.cc/FRG2-L9QW.

[35] Press Release, CDFI Fund, U.S. Dep't of the Treasury, ~~CDFI Fund,~~ *Treasury Guarantees $355 Million in Bond Funding for Projects in Low-Income Communities* (Sep. 30, 2022, https://~~www.cdfifund.gov/news/486~~perma.cc/N7EJ-J3AP.

[36] Press Release, CDFI Fund, U.S. Dep't of the Treasury, ~~CDFI Fund,~~ *Treasury Guarantees $300 Million in Bond Financing for Projects in Low-Income and Distressed Communities* (Sep. 28, 2023), https~~://www.cdfifund.gov/news/541~~: https://perma.cc/X7RF-RZC5.

[37] Press Release, CDFI Fund, U.S. Dep't of the Treasury, ~~CDFI Fund,~~ *Treasury Guarantees $498 million in Bond Funding for Projects in Low-Income Communities, Marking Largest Bond Issuance in Program History* (Oct. 11, 2024), https://~~www.cdfifund.gov/news/606~~perma.cc/LE8S-4YT8.

[38] U.S. Dep't of the Treasury, CDFI Fund, *The Small Dollar Loan Program Award Book FY 2024* at 1, https://perma.cc/M4FS-ATE9.

~~47.~~46. The CDFI Fund's Bank Enterprise Award Program provides grants to FDIC-insured depository institutions. Award recipients are required to deploy those awards towards qualifying activities, which include increased investments in CDFIs or in their own lending, investing, or service-related activities in the most economically distressed communities.[39] Since the inception of the Bank Enterprise Award program in 1994, the CDFI Fund has awarded grants totaling over $638 million. From 2016 through 2024 alone, Bank Enterprise Award program recipients have increased their lending and direct investments in distressed communities by more than $4.5 billion.[40]

~~48.~~47. The Native American CDFI Assistance Program provides monetary awards for Financial Assistance and Technical Assistance, as well as training opportunities, to CDFIs that serve Native Communities. The CDFI Fund's Native Initiatives program creates jobs, builds businesses, and fosters economic self-determination in Native Communities nationwide.[41]

~~49.~~48. New Markets Tax Credit Program incentivizes community development and economic growth through tax credits that attract private investment to distressed communities. This tax incentive sparks the revitalization of communities in need.[42]

~~50.~~49. The CDFI Fund's Capital Magnet Fund program awards competitive grants to CDFIs and qualified non-profit housing organizations. These awards can be used to finance affordable housing activities, as well as related economic development activities and community service facilities.[43]

~~51.~~50. The CDFI Fund also administered two programs designed to respond to COVID-19 economic impacts: the CDFI Equitable Recovery Program and the CDFI Rapid Response Program.[44]

---

[39] U.S. Dep't of the Treasury, CDFI Fund, *The Bank Enterprise Award Program Award Book FY 2024*, at 1, https://perma.cc/7AME-FXJN.
[40] *Id.*
[41] *See* U.S. Dep't of Treasury, CDFI Fund, *Native Initiatives*, https://perma.cc/KW6J-VP8Q.
[42] *See* U.S. Dep't of Treasury, CDFI Fund, *New Markets Tax Credit Program*, https://perma.cc/XVZ3-C8WP.
[43] *See* U.S. Dep't of Treasury, CDFI Fund, *Capital Magnet Fund*, https://perma.cc/S4PH-PG2H.
[44] *See* U.S. Dep't of Treasury, CDFI Fund, *CDFI Equitable Recovery Program*, https://perma.cc/2PJD-PTQV; U.S. Dep't of Treasury, CDFI Fund, *CDFI Rapid Response Program*, https://perma.cc/6C3F-H9P8.

52.51. In total, since its creation, the CDFI Fund has awarded more than $8 billion to CDFIs, community development organizations, and financial institutions through its various programs.[45] Consistent with its objective of boosting CDFIs' ability to inject capital into underserved American communities, Congress has mandated that at least 10% of the funds awarded by the CDFI Fund be used for activities that serve populations living in Persistent Poverty Counties.[46] For the FY 24 funding round, each of the CDFI Fund's programs exceeded that Congressional mandate.[47]

***The CDFI Fund's AwardCDFI Fund Administration and the Paperwork Reduction Act Process***

53.52. The CDFI Fund announces funding opportunities through a Notice of Funding Availability (NOFA) published in the Federal Register. Similarly, the fund announces bond guarantee opportunities through a Notice of Guarantee Availability (NOGA) published in the Federal Register.

54. The NOFA or NOGA is the instrument that opens a funding round. It announces the total amount of funding available and its allocation among award categories, identifies who is eligible to apply, sets the application deadline, and specifies how applications will be evaluated. The Fund's regulations specify the eligibility and certification timing, the criteria for merit review, the treatment of matching funds, and applicants' reporting obligations.[48]

55. Under the Paperwork Reduction Act (PRA), OMB's Office of Information and Regulatory Affairs (OIRA) has final authority to approve these applications before they are released.[49] Failure to do so

---

[45] *See* U.S. Dep't of Treasury, CDFI Fund, *Empowering Underserved Communities* at 3, available at https://perma.cc/8EYQ-HVEN.

[46] PPCs are counties, including county equivalent areas in Puerto Rico, where 20% or more of the population has lived in poverty over the past 30 years, as measured by the U.S Census Bureau, or any other territory or possession of the United States that has had 20% or more of its population living in poverty over the past 30 years, as measured by the Island Areas Decennial Censuses or equivalent data of the Bureau of the Census. A link to the list of PPCs can be located on the CDFI Fund's website (www.cdfifund.gov).

[47] *See, e.g.*, U.S. Dep't of the Treasury, CDFI Fund, *CDFI Program, Award Book, FY 2024*, supra note 11 at 1; U.S. Dep't of the Treasury, CDFI Fund, *The Bank Enterprise Award Program Award Book FY 2024*, supra note 20 at 1; U.S. Dep't of the Treasury, CDFI Fund, *The Small Dollar Loan Program Award Book FY 2024*, supra note 19 at 1.

[48] *See, e.g.*, 12 C.F.R. §§§§§ 1805.200, 1805.301(d), 1805.500, 1805.600.

[49] *See* 44 U.S.C. § 3507.

prevents CDFI Fund from proceeding with the application process for these programs and can, therefore, ultimately prevent it from making the awards.

56.53. Without a NOFA or NOGA, there is no funding round. Prospective applicants cannot apply, the Fund cannot evaluate applications, and no award can be made. Publication of the notice is the necessary first step in converting an appropriation into capital deployed in a communityawards can be made.

54. ApplicationsOnce a NOFA or NOGA is published, CDFIs may submit applications using an approved application form.

55. Because the CDFI Fund's application forms facilitate the collection of information from applicants, they must undergo a review and approval process defined by the Paperwork Reduction Act (PRA).

56. Under the PRA process, the CDFI Fund must publish a proposed new or updated form in the Federal Register and provide a 60-day comment period.[50] Then, the agency must consider comments before submitting the form to the OMB Director and publishing a notice in the Federal Register disclosing the submission.[51] The OMB Director must provide an additional 30-day comment period before approving or disapproving the form, and must provide that decision within 60 days of the agency's publication of the Federal Register notice.[52] If the OMB Director does not provide a decision within 60 days, the agency may infer approval.[53]

57. The PRA process often takes approximately 120-180 days, with agencies often taking around 30 days to process comments following the initial 60-day comment period. Once approved, a form expires after a maximum of three years.

58. The current application forms for the CDFI Program and the Native American CDFI Assistance Program expire on December 31, 2026.[54] The Fund's CDFI Program Certification application form,

[50] *See* 44 U.S.C. § 3506(c)(2).
[51] *See* 44 U.S.C. § 3507(a)(1)(D).
[52] *See* 44 U.S.C. § 3507(b), (c).
[53] *See* 44 U.S.C. § 3507(c)(3)(A).
[54] Off. of Info. & Regul. Affs., Off. of Mgmt. & Budget, *CDFI Program and NACA Program Applications,* OMB Control No. 1559-0021, ICR Ref. No. 202412-1559-001, https://perma.cc/4PDZ-ETJA.

which gatekeeps the certification CDFIs must obtain or be in the process of obtaining in order to be eligible for CDFI Program awards, expires on February 28, 2027.[55]

59. The CDFI Fund issued a proposed CDFI Program Certification application form on September 30, 2026 and a proposed CDFI Program and Native American CDFI Assistance Program form on October 30, 2026. Under a 120-day timeline, those forms would complete the PRA process around January 28 and February 27, respectively. Even were the funding round for FY2026 awards to open immediately, it would open approximately one year later than the typical timing for the CDFI Fund's discretionary award program cycle. *See* ¶¶ 138-39, *infra*. Any further postponement of the FY2026 funding round will only exacerbate what is already an extraordinary delay.

~~57.~~60. Once applications are submitted, decisions on applications for CDFI Fund's programs are governed by statute, regulations, and procedures established by the CDFI Fund.[56]

~~58. An applicant must generally "establish that the applicant is, or will be, a community development financial institution" and include a comprehensive strategic plan for the organization that contains a business plan; an analysis of the needs of the investment area or targeted population and a strategy for how the applicant will attempt to meet those needs; a plan to coordinate use of assistance from the Fund with existing Federal, State, local, and tribal government assistance programs, and private sector financial services; an explanation of how the proposed activities of the applicant are consistent with existing economic, community, and housing development plans in the relevant area; and a description of how the applicant will coordinate with community organizations and financial institutions, and must include a detailed description of the applicant's plans and likely sources of funds to match the amount of assistance requested from the Fund.~~[57]

~~59.~~61. Congress defined thirteen statutory factors that the Fund must consider when evaluating applications, alongside considerations "deemed to be appropriate" by the CDFI Fund.[58] Through

---

[55] U.S. Dep't of The Treasury, Cmty. Dev. Insts. Fund, Community Development Financial Institutions Program – Certification Application, OMB Control No. 1559-0028, ICR Ref. No. 202503-1559-002, https://perma.cc/7Z5M-4RA6.

[56] 12 U.S.C. § 4704.

~~[57] *Id.*~~

[58] *Id.* § 4706.

rulemaking, the CDFI Fund established additional factors that include "evaluat[ion] on a merit basis and in a fair and consistent manner," considering the unique characteristics of the applicant that vary by institution type, asset size, stage of organizational development, markets served, products and services provided, and location.[59]

~~60.~~62. If the Fund selects an applicant, prior to issuing any funding, the parties must enter into an Assistance Agreement — a formal agreement between the Fund and the recipient specifying the terms of the assistance, the recipient's performance goals, and its reporting obligations.[60]

~~**OMB Apportionment**~~

**The Office of Management and Budget**

~~61.~~63. Appropriated funds do not become available for an agency to spend automatically. Before an agency may incur an obligation against an appropriation, the appropriation must be apportioned in a manner that a spending agency can access.[61]

~~62.~~64. The apportionment function is assigned to the President and ~~is exercised by~~transferred to the Director of the Office of Management and Budget.[62]

***The Antideficiency Act***

~~63.~~65. The Antideficiency Act helps to enumerate the executive branch's responsibility to implement Congress's appropriations, including by making the appropriate amounts of money available to executive agencies to spend for the purposes Congress defined. In exercising the apportionment function transferred from the President, OMB must make apportionments in writing to an executive agency ~~either~~ ~~twenty~~20 days prior to the start of the fiscal year for which the appropriations were provided or ~~thirty~~30 days after the date of enactment of the appropriations act, whichever is later.[63]

66. ~~An apportionment~~ When Congress appropriates money for an agency to spend both in the fiscal year in which the appropriations law is passed, as well as in future fiscal years, OMB's governing policies

---

[59] 12 C.F.R. §§ 1805.700; 1805.701.
[60] 12 U.S.C. § 4707.
[61] 31 U.S.C. § 1512.
[62] *Id.* § 1513; *See also* Off. of Mgmt. & Budget, *OMB Circular No. A-11, Preparation, Submission, and Execution of the Budget* §§ 120.1, 120.34, https://perma.cc/H466-36D6.
[63] 31 U.S.C. § 1513(b)(2).

implementing the Antideficiency Act provide that OMB apportions any "carryover balance" from the first fiscal year into the next fiscal year "by September 10[.]"[64] This ensures that when Congress appropriates money for use across multiple fiscal years and the present fiscal year turns over, agencies are able to use the remaining funds that Congress appropriated.

~~64.~~67. Apportionments must be requested by the executive agency to whom Congress has made the appropriation available.[65]An apportionment—or lack thereof—is legally binding on the agency. No officer or employee of the United States may make or authorize an obligation or expenditure that exceeds an apportionment.[66] A violation must be reported immediately to the President and Congress and transmitted to the Comptroller General.[67]

~~65.~~68. Apportionment is the first step in a fiscal year's budget execution process. Apportionment permits the agency to access the funds, and to include information about the funds in the agency's fund control and financial systems.

~~66.~~69. However, even after OMB apportions funds, the funding may still not be immediately available to an agency to obligate. An apportionment might divide an appropriation by time period; by activity, function, project, or object; or by a combination of the two.[68] For example, OMB might make an apportionment that does not allow funds to be spent until a future fiscal year, which is referred to as a Category C apportionment.

~~67.~~70. When Congress appropriates funds, it may make them available for any period of time—a single year, multiple years, or no specific year. For example, Congress might appropriate funds in the fiscal year 2025 budget that it intends to be available throughout fiscal year 2025 and 2026, and do not expire until the end of fiscal year 2026. Or, it might appropriate funds in the fiscal year 2025 budget that have no expiration date at all.

---

[64] Off. of Mgmt. & Budget, Exec. Off. of the President, OMB Circular No. A-11, *Preparation, Submission, and Execution of the Budget* § 120.40 at 120-21 (2026), https://perma.cc/XH2N-CMU6.
[65] 31 U.S.C. § 1513(b)(1).
[66] 31 U.S.C. § 1517(a~~).~~); *Section 16*, Executive Order 6166 (June 10, 1933), *reprinted as amended in* 5 U.S.C. § 901 note.
[67] *Id.* § 1517(b); *see also id.* § 1341.
[68] *Id.* § 1512(b)(1).

~~68.~~71. When OMB makes Category C apportionments of budgetary resources in multi-year and no-year appropriations into future fiscal years, it blocks an agency from being able to obligate or spend those funds ~~until~~in the current fiscal year ~~that OMB has designated through the apportionment~~ unless OMB provides otherwise in a new apportionment or in a binding apportionment footnote. When OMB uses a Category C apportionment to set aside, for use only in a future fiscal year, funds that Congress has deliberately made available across multiple fiscal years (multi-year money) or without fiscal-year limitation (no-year money), it contravenes Congress's express intention.

~~69.~~72. In some cases, a footnote to the apportionment will impose additional conditions on the obligation of funds that must be satisfied to OMB's satisfaction. Footnotes designated with the letter "A" purportedly impose legally binding conditions, subject to the Antideficiency Act, on the agency's use of the apportioned funds.[69]

~~70.~~73. Under the Antideficiency Act, OMB may not hold back appropriations using apportionments unless doing so to establish a "reserve" for a statutorily permissible purpose. OMB may establish a reserve only (A) to provide for contingencies; (B) to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (C) as specifically provided by law.[70] Prior to 1974, the Antideficiency Act had an additional provision allowing broader grounds for establishing reserves, but Congress repealed that provision to "preclude the President from relying on that Act as authority for implementing policy impoundments." *City of New Haven v. United States*, 809 F.2d 900, 906 & n.18 (D.C. Cir. 1987).

~~71.~~74. Congress has thus sharply limited the circumstances in which OMB may lawfully hold appropriated funds back in reserve. Disagreement with the program Congress chose to fund is not among the permitted grounds.

~~72.~~75. In sum, the law requires that ~~Congressionally~~congressionally appropriated funds be spent *unless* specific, narrow circumstances apply. If the apportioning official concludes that a reserved amount "will not be required to carry out the objectives and scope of the appropriation concerned," the official

---

[69] *See* Off. of Mgmt. & Budget, *OMB Circular No. A-11, Preparation, Submission, and Execution of the Budget*, supra note 38 §§ 120.1, 120.34.
[70] 31 U.S.C. § 1512(c).

must recommend that the amount be rescinded, through the process the Impoundment Control Act prescribes.[71]

~~73.~~76. Although apportionment is intended to be a ministerial exercise, the practical consequence of the apportionment process is that OMB has, including in its handling of appropriations for the CDFI Fund and its programs, abused it to functionally control when and whether appropriated money can be spent at all. Until OMB apportions an appropriation in a manner that an agency can obligate and spend, the agency to which Congress gave the money is legally forbidden to obligate it.

~~74.~~77. A decision to withhold an apportionment, or apportion funds in a manner that an agency cannot access, is therefore not a bookkeeping matter. It is a decision that the money will not be spent.

~~75.~~78. Prior to ~~this year~~the Trump-Vance Administration, OMB's apportionment policy and practice has made funds available for the CDFI Fund's obligation on a timeline that has allowed the CDFI Fund to issue awards and release funds well in advance of end of the fiscal year.

***The Impoundment Control Act***

~~76.~~79. ~~Similarly, the~~The Impoundment Control Act of 1974 (ICA) precludes agencies from "withholding or delaying the obligation or expenditure of" appropriated funds and from taking "any other type of Executive action or inaction which effectively precludes the obligation or expenditure of" appropriated funds.[72] If the Executive Branch wishes to "defer" the expenditure of funds in any of the above manners, it must send a special message to Congress detailing the money to be deferred and the reasons for the deferral.[73]

~~77.~~80. Congress enacted the Impoundment Control Act of 1974, 2 U.S.C. §§ 681–688, after President Nixon repeatedly refused to spend funds Congress had appropriated. The Act specifies the procedures by which the Executive Branch may propose to cancel or to postpone spending that Congress has directed, and it makes release of the funds the default consequence when those procedures are not followed.[74]

---

[71] 31 U.S.C. § 1512(c)(2).
[72] 2 U.S.C. § 682(1).
[73] *Id.* § 684.
[74] *See* U.S. Gov't Accountability Off., *Impoundment Control Act*, https://perma.cc/MU5Y-GSR8.

~~78.~~81. The ICA provides the same three grounds for deferral as the Antideficiency Act provides for a reserve. "In other words, deferrals are authorized only in those situations in which reserves are authorized under the Antideficiency Act."[75] The ICA does not permit a deferral for policy reasons.[76]

~~79.~~82. The Impoundment Control Act provides for two types of impoundments: rescissions and delays.[77]

~~80.~~83. Whenever the President determines that all or part of any budget authority "will not be required to carry out the full objectives or scope of programs for which it is provided," or "should be rescinded for fiscal policy or other reasons (including the termination of authorized projects or activities for which budget authority has been provided)," or whenever budget authority provided for a single fiscal year "is to be reserved from obligation for such fiscal year," the President "shall transmit to both Houses of Congress a special message" setting out specified information about the proposed rescission or reservation.[78]

~~81.~~84. Unless Congress completes action on a rescission bill within 45 days, "[a]ny amount of budget authority proposed to be rescinded or . . . reserved . . . shall be made available for obligation."[79]

~~82.~~85. If the Executive proposes only to delay rather than cancel spending, the President must likewise transmit a special message to both Houses of Congress. 2 U.S.C. § 684(a). Deferrals are permissible only to provide for contingencies, to achieve savings made possible by or through changes in requirements or greater efficiency of operations, or as specifically provided by law. *Id.* § 684(b). And a deferral may not extend beyond the end of the fiscal year in which it is proposed. *Id.* § 684(a).

~~83.~~86. The Impoundment Control Act thus leaves the Executive Branch two lawful courses when it does not wish to spend money Congress has appropriated. It may ask Congress to rescind the appropriation, and withhold the funds for 45 days while Congress decides. Or it may, under limited

[75] U.S. Gov't Accountability Off., *Principles of Federal Appropriations Law* at 2-48 n.56 (4th ed. 2016), https://perma.cc/VLX9-DH5E.
[76] *Id.*; 2 U.S.C. § 684(b).
[77] 2 U.S.C. §§ 683(a), 684(a).
[78] 2 U.S.C. § 683(a).
[79] *Id.* § 683(b); *see also id.* §§ 682(3), 688 (computation of the 45-day period).

circumstances that do not apply here, propose a temporary deferral on one of the narrow grounds Congress specified, to defer spending the funds for a period before the fiscal year ends. What the Executive may not do is withhold appropriated funds indefinitely while saying nothing to Congress at all.

~~84.~~87. Defendants have taken neither lawful course. They have transmitted no special message to Congress as to any of the funds at issue in this action. No rescission bill concerning these funds is pending. Defendants have simply declined to make the money available, without notifying Congress, invoking any statutory authority, or offering any explanation.

## FACTUAL ALLEGATIONS

### Congressional Appropriations for the CDFI Fund

~~85.~~88. In the Consolidated Appropriations Act of 2024, Congress appropriated $289 million to the CDFI Program. It appropriated $324 million in total "[t]o carry out the Riegle Community Development and Regulatory Improvement Act of 1994 (subtitle A of title I of Public Law 103-325), including services authorized by section 3109 of title 5, United States Code." Of that amount, it directs that "not less than $188,000,000 . . . is available until September 30, 2025," for the CDFI Fund's financial assistance and technical assistance programs. Specifically, Congress mandated that not less than $40 million is appropriated for the Bank Enterprise Award Program, $28 million for Native American Financial Assistance, Technical Assistance, and Training, $24 million for the Healthy Food Financing Initiative, and $9 million for the Small Dollar Loan Program. Congress then specified that these funds shall remain available through September 30, 2025.[80]

~~86.~~89. Congress also appropriated $35 million for the CDFI Fund to administer its programs.[81]

~~87.~~90. The fiscal year 2025 budget was passed as a continuing resolution. On March 15, 2025, Congress continued appropriations for fiscal year 2025 at the same levels, under the same conditions,

[80] *See* Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460, 524 (2024).
[81] *Id.*

and under the same authority provided in the fiscal year 2024 appropriations acts.[82] These fiscal year 2025 funds are available until September 30, 2026.

~~88.~~91. Congress again appropriated the same amount of funding for the CDFI Fund in 2026. In the Consolidated Appropriations Act of 2026, enacted into law on February 3, 2026, Congress appropriated the identical amounts for fiscal year 2026 and made those funds available until September 30, 2027.[83]

~~89.~~92. Congress included specific language in the Consolidated Appropriations Act of 2026 prohibiting the President or his agents from attempting to unilaterally eliminate programs funded by Congress: "None of the funds made available in this or any other appropriations Act may be used to increase, eliminate, or reduce funding for a program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act, or unless such change is made pursuant to the reprogramming or transfer provisions of this or any other appropriations Act."[84]

93. On September 2, 2026, Congress enacted a continuing resolution providing for the continued operation of the federal government through December 11, 2026 (the 2026 Continuing Resolution), providing for slightly more than two months into FY2027. Congress continued the appropriations "at a rate for operations as provided in the applicable appropriations Acts for fiscal year 2026" and "under the authority and conditions provided in such Acts," including in the Consolidated Appropriations Act of 2026.[85]

**The Trump-Vance Administration's Hostility towards the CDFI Fund**

~~90.~~94. Although the CDFI Fund enjoys strong bipartisan support, there is fierce opposition to the CDFI Fund within the Trump-Vance Administration.

~~91.~~95. In May 2025, the President's fiscal year 2026 Budget Request recommended eliminating CDFI Fund discretionary awards and preserving only enough funding to support oversight and closeout

[82] Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, 139 Stat. 9 (2025).
[83] Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, 140 Stat. 173, 442 (2026).
[84] Pub. L. No. 119-75, § 739, 140 Stat. 502.
[85] Continuing Appropriations and Extensions Act, 2027, Pub. L. No. 119-103, div. A, § 101, 140 Stat. 987 (2026).

of past awards, maintaining the CDFI certification process, and running the New Market Tax Credit and Bond Guarantee Programs.[86]

~~92.~~96. In conjunction with the announcement of the President's Budget, the White House issued a "fact sheet" titled "Cuts to Woke Programs." That fact sheet explained the desire to eliminate the CDFI Fund on the grounds that the CDFI awards were "abused to advance a partisan agenda" including building "a more equitable, resilient economy." The fact sheet also decried the CDFI Fund and its award recipients as promoting "critical race theory," "advanc[ing] racial justice," "forwarding gender extremism," and "irresponsibly dedicating funds to climate radicalism."[87]

~~93.~~97. In early October 2025, during a lapse in congressional appropriations to many federal agencies (but generally not the CDFI Fund), virtually all CDFI employees received reduction-in-force (RIF) notices stating that their positions were being abolished and that the purpose of the RIF was "to implement the abolishment of the Community Development Financial Institutions [sic] (CDFI) which is based on the Department of the Treasury determination that its programs, projects, and activities do not align with the President's priorities."[88]

~~94.~~98. When Congress passed a continuing resolution that November, it required the reinstatement of the CDFI Fund employees by November 17, 2025, along with other civil servants across the government.

~~95.~~99. In April 2026, the Office of Management and Budget transmitted to Congress the President's fiscal year 2027 budget, which once again recommended eliminating CDFI Fund discretionary awards.[89] The White House's accompanying "Cuts to Woke Programs" Fact Sheet asserted that "[t]he elimination of this fund would also disincentivize critical race theory[,]" and "prevent taxpayer dollars from

---

[86] *See* Ltr. from Russell Vought, Dir. of Off. Mgmt. & Budget, to Sen. Susan Collins, Chair, U.S. Senate, Comm. on Appropriations at 35 (May 2, 2025), https://perma.cc/ZQD4-PS4S ("the Budget recommends eliminating CDFI Fund discretionary awards").

[87] *See* Press Release, The White House, *Cuts to Woke Programs Fact Sheet* (May 2, 2025) https://perma.cc/X9W4-5N7P.

[88] *See* Katherine Hapggood, *White House eliminates entire Community Development Financial Institutions Fund staff*, PoliticoPro, (Oct. 10, 2025 at 6:33 PM EDT), https://perma.cc/YFJ4-LRHL.

[89] Off. of Mgmt. & Budget, *Budget of the U.S. Government, Fiscal Year 2027* at 53-54, https://perma.cc/978R-KGHQ.

forwarding gender extremism" and "climate radicalism[.]"[90] On April 15, 2026, Russell Vought testified before Congress that he believes that many CDFIs "continue to be woke."[91]

~~96.~~100. In April 2026, Secretary Bessent testified to Congress that he supported the Administration's proposed cuts to the CDFI Fund in the fiscal year 2027 budget. He testified that the CDFI Program had "lost its way" in pursuit of "a partisan agenda."[92]

**The Un-Awarded ~~Fiscal Year 2025~~ FY2025 CDFI ~~Appropriations~~Application Cycle**

~~97.~~101. ~~This year~~In 2025 and 2026, without explanation, the CDFI Fund ~~has~~ abandoned the orderly process for announcing awards well in advance of September 30, 2026, the date on which the funds for fiscal year 2025 awards would expire. Instead, in a haphazard and untimely manner, the CDFI Fund ~~has~~ repeatedly delayed the application process~~,~~ while refusing to announce awards ~~withholding funds to CDFIs nationwide~~.

~~98. The CDFI Fund initiates the award application process by publishing a Notice of Funds Availability (NOFA), which includes an application for prospective grantees to complete.~~

~~99.~~ On January 17, 2025, the CDFI Fund published a NOFA inviting Applications for Financial Assistance (FA) or Technical Assistance (TA) awards under the CDFI Program ~~fiscal year 2025~~FY2025 Funding Round.[93]

~~100.~~102. The deadline for CDFIs to submit applications for funding under the FA or TA programs was March 21, 2025.[94]

---

[90] Press Release, The White House, supra note 60 at 1.

[91] *The President's Fiscal Year 2027 Budget Request: Hearing Before the H. Budget Comm.* 119th Cong. (2026), at 1:18:16 (YouTube Apr. 15, 2026) https://www.youtube.com/watch?v=Gf-Q2vqxngg&t=1s (statement of Russell Vought, Dir. Off. of Mgmt. & Budget).

[92] Ebrima Santos Sanneh, *Bessent says CDFI Fund 'had lost its way'*, American Banker (Apr. 22, 2026 at 2:20 PM EDT), https://perma.cc/YT9G-AQWR.

[93] *Community Development Financial Institutions Fund, Notice of Funds Availability*, 90 Fed. Reg. 6051 (Jan. 17, 2025).

[94] *Id.*

~~101.~~103. The CDFI Fund stated ~~(and as of this filing, still states)~~ on its website that it anticipated awards from this funding round, which it expected to total approximately $320 million[95], would be announced in Fall of 2025.

~~102. The fiscal year 2025 Funding Round federal register notice estimated that it would award funding in the following amounts to the following components of the CDFI Program:~~

~~103. Base-FA Category I (Small and/or Emerging CDFI Assistance): $14.8 million~~

~~104. Base-FA: Category II/Core: $101.2 million~~

~~105. Healthy Food Financing Initiative-Financial Assistance (HFFI-FA): $24 million~~

~~106. Persistent Poverty Counties-Financial Assistance (PPC-FA): $21 million~~

~~107. Disability Funds-Financial Assistance (DF-FA): $20 million~~

~~108. Housing Production-Financial Assistance (HP-FA): $100 million[96]~~

~~109.~~104. Instead of announcing awards in Fall of 2025, on September 25, 2025, six months after the application deadline under the original NOFA, the CDFI Fund published amendments to the NOFA in the Federal Register~~,~~ and extended the application deadline until October 27, 2025.[97]

~~110.~~105. On October 10, 2025, the Administration terminated every employee at the CDFI Fund. Those employees were reinstated on November 17, and then only pursuant to a statutory command from Congress.

~~111.~~106. On March 6, 2026, the CDFI Fund again revised its application deadline for ~~fiscal year 2025~~FY2025 funding awards to April 10, 2026.[98]

~~112.~~107. ~~Following~~From the April 10, 2026, application deadline through August 14, when Plaintiffs initiated this suit, the CDFI Fund ~~has~~did not ~~announced~~announce or ~~issued~~issue any awards for the ~~fiscal~~

---

[95] The amount available in the NOFA exceeds the amount that Congress appropriated for the CDFI Fund because one of the programs announced in the NOFA, the Housing Production—Financial Assistance Award, is funded through interest and dividend payments and sale proceeds received under the Department of the Treasury's Emergency Capital Investment Program. *See id*. 90 Fed. Reg. at 6053.

~~[96] 90 Fed. Reg. at 6052.~~

[97] *Amendment of Notice of Funds Availability for Community Development Financial Institutions Program; Revised Application Submission Deadline*, 90 Fed. Reg. 46303 (Sept. 25, 2025).

[98] *See Amendment of Notice of Funds Availability for Community Development Financial Institutions Program; Revised Application Submission Deadline*, 91 Fed. Reg. 11595 (Mar. 10, 2026).

~~year 2025~~FY2025 Funding Round. ~~The CDFI Fund has not announced when it will take these steps, and it has given applicants no explanation for~~By the ~~delay. To date~~time Plaintiffs brought suit, award announcements ~~are~~were nearly a year behind the previously announced Fall 2025 award timeline on the CDFI Fund's website.

~~113. The CDFI Fund has taken no action to announce awards or release the fiscal year 2025 funding to CDFIs. As of today, nearly a year and a half after the fiscal year 2025 application process began, the CDFI Fund has failed to announce any awards or release any funds.~~

~~114. These fiscal year 2025 funds expire on September 30, 2026.~~

~~115.~~108. The CDFI Fund only released the applications for the Bank Enterprise Award Program, for which Congress appropriated $40 million, the Small Dollar Loan Program, for which Congress appropriated $9 million, and the Bond Guarantee Program, for which the Secretary may guarantee bonds up to an aggregate total of $500 million, on June 30, 2026.[99] Those applications opened just ninety-two days before the appropriations funding them were set to expire, and closed in July of 2026.

~~116.~~109. Although Congress appropriated $~~324 million for the CDFI Fund and its associated programs in 2025, OMB initially apportioned only the $35 million Congress allocated for administration of the Fund. But at the same time that OMB apportioned the $35 million, it refused to apportion remaining $~~289 million ~~that Congress appropriated~~ for the CDFI Fund's programs~~.~~ in 2025, OMB refused to apportion the funds. Instead, for ~~months~~approximately a year, it left those funds sitting in an account where the CDFI Fund could not access them or award them to CDFIs for distribution.

~~117.~~110. On April 8, 2026, shortly before OMB Director Russell Vought was scheduled to testify before Congress, OMB apportioned the $289 million in CDFI Program funds that it had previously refused to apportion. This apportionment took place over a year after the passage of the 2025 Continuing Resolution on March 15, 2025.

---

[99] *See Funding Opportunities: Small Dollar Loan Program: FY 2026 Funding Round*, 91 Fed. Reg. 39666 (June 30, 2026); *Funding Opportunities: Bank Enterprise Award Program (BEA) Program: FY 2026 Funding Round*, 91 Fed. Reg. 39682 (June 30, 2026); *Funding Opportunities: Bond Guarantee Program, FY 2026; Notice of Guarantee Availability*, 91 Fed. Reg. 39697 (June 30, 2026).

118.111. Even though the Antideficiency Act requires OMB to apportion appropriations to agencies not later than "30 days after the date of enactment of the law by which the appropriation is made available." 31 U.S.C. § 1513(b)(2)(B), OMB failed to apportion the CDFI Fund's fiscal year 2025FY2025 within 30 days of the passage of the 2025 Continuing Resolution Act.[100]

119.112. OMB's non-apportionment policy also violates the Antideficiency Act's provisions limiting when OMB may not apportion the full amounts appropriated, so as to establish a "reserve."[101]

120. However, in the months since OMB finally apportioned the fiscal year 2025 funds, Treasury has not obligated the funds. No awards have been made and those funds have not been distributed to awardees, despite the fact that they will expire on September 30, 2026.

121. OMB is required by law to post its apportionments to a publicly available database.[102] The database is available at https://apportionment-public.max.gov/, and a nonprofit organization has compiled the apportionments posted to that website in a more user-friendly searchable database at OpenOMB.org.

122. The April 8, 2026 apportionment is reflected in the OpenOMB.org database.[103]

123. When OMB apportioned the $289 million on April 8, 2026, it included a footnote to the apportionment. OMB considers that footnote to the apportioned amount, which begins with the letter A, to have legal effect, including under the Antideficiency Act.[104]

124. Specifically, the "A" footnote to the apportionment provides that Treasury must "provide notification to OMB three days in advance of public announcement or obligation of award amounts." The rationale for the footnote, provided by OMB, is that OMB requests additional information on programmatic spending for some or all of the apportioned funds.

---

[100] 31 U.S.C. § 1513(b)(2)(B).
[101] *Id.* § 1512(c).
[102] *See* Pub. L. No. 117-103, div. E, tit. II, § 204(b)-(c), 136 Stat. 49, 256-57 (2022); Pub. L. No. 117-328, div. E, tit. II., § 204, 136 Stat. 4459, 4667 (2022).
[103] OpenOMB, *TAFS: 020-1881 2025/2026 - Community Development Financial Institution Fund Program Account*, https://perma.cc/VT4X-C29Y.
[104] Off. of Mgmt. & Budget, *OMB Circular No. A-11, Preparation, Submission, and Execution of the Budget*, supra note 38.

125. OMB has, through its footnote to the appropriations, imposed an additional hurdle to Treasury's ability to obligate the funds, which may provide OMB another avenue by which to unlawfully delay, restrict, or withhold funding from award recipients.

**The Impounded Fiscal Year 2026 CDFI Appropriations**

126. OMB has prevented Treasury and the CDFI Fund from obligating other Congressionally appropriated funds, preventing the CDFI Fund and applicants from accessing or distributing these funds. These include another $324 million for fiscal year 2026 appropriations, which Congress intended to be available to the CDFI Fund and its programs.

113. OMB has refused to apportion the CDFI Fund's fiscal year 2026 funds within 30 days of the passage of the 2026 Appropriations Act in violation of the Antideficiency ActFollowing Plaintiffs' August 14 filing of their Complaint and Motion for a Preliminary Injunction or Section 705 Stay, Defendants opposed Plaintiffs' requested relief on the basis that it would be "unreasonable" and "impossible" for the CDFI Fund to obligate the awards "lawfully" before the funds expired on September 30.[105]

114. On September 22, two days before Plaintiffs' motion was set for oral argument, Defendants represented that they intended to obligate the funds the next day. On September 28, Defendants confirmed that the award funds had been obligated.[106]

127.1. .[107] OMB's withholding violates the Antideficiency Act's provisions limiting when OMB may not apportion for agency use the full amounts appropriated, so as to establish a "reserve."[108]

128. OMB has unlawfully impounded these funds, rendering them inaccessible to the CDFI Fund, despite the fact that Congress appropriated these funds to be spent on the CDFI Fund and its programs.

---

[105] Defs' Mem. in Opp'n to Pls.' Mot. for Prelim. Inj. & 705 Stay at 23, ECF No. 20.

[106] As of the date of this Second Amended Complaint, Plaintiffs are unaware of any assistance agreements being transmitted or finalized relating to the FY2025 awards. While those funds are obligated, they cannot be accessed by awardees unless and until assistance agreements are finalized.

[107] 31 U.S.C. § 1513(b)(2)(B). 31 U.S.C. § 1513(b)(2)(B). 31 U.S.C. § 1513(b)(2)(B). *See* Off. of Mgmt. & Budget, Apportionment of TAFS 020-1881 2026/2027, Community Development Financial Institutions Fund Program Account, Iteration No. 1 (approved Sep. 17, 2026) OpenOMB, https://perma.cc/R4PX-DBRR. (showing funds were "Apportioned in FY 2027").

[108] *Id*31 U.S.C. § 1512(c).

129. These funds have been unlawfully impounded by OMB. Unless apportioned and obligated, they will expire in September 2027.

130. OMB has also refused to apportion, in a manner that Treasury can access, funds that Congress appropriated to the CDFI Fund without restriction on what fiscal year those funds are spent ("no-year funds").[109] Those funds have been apportioned through a Category C apportionment, rendering them inaccessible to Treasury.

131. Defendants have not transmitted to Congress any special message proposing the rescission or deferral of these funds, and no rescission bill as to these funds is pending before Congress.

132. Defendants have offered no explanation, in the Federal Register or anywhere else, for the unreasonable delay in announcing awards on applications whose funding will expire within the next 45 days. Nor have Defendants offered any explanation for OMB's refusal to apportion the fiscal year 2026 funds so that Treasury can spend them or for apportioning the no-year funds into Category C where they are inaccessible to Treasury. Nor have Defendants offered any explanation in failing to announce a NOFA for fiscal year 2026 funds, which expire in just over a year.

**The Undecided and Lapsed Bond FY2025 Guarantee Program Applications**

133.115. Unlike the CDFI Fund's competitive award programs, its Bond Guarantee Program provides government guarantees for hundreds of millions of dollars in bonds that provide low-cost, long-term financing for CDFIs who successfully apply. The nature of the benefit from the government is not a grant payment, it is a 100% guarantee of the bonds by the Secretary of the Treasury.

134.116. As it does with its competitive award programs, the CDFI Fund initiates the application cycle for its Bond Guarantee Program each year by publishing a notice in the Federal Register—here, a Notice of Guarantee Authority (NOGA).

135.117. For the fiscal year 2025FY2025 guarantee authority, the CDFI Fund's application process appeared typical at first. The NOGA was published in the Federal Register in December 2024, with due

[109] *See* OpenOMB, *TAFS: 020-1881/X – Community Development Financial Institution Fund Program Account*, https://perma.cc/N62T-JV7J (showing OMB has apportioned CDFI Fund's no-year funds to an account that cannot be accessed until fiscal year 2027).

dates in February 2025. Community Development Financial Institutions Fund, Applications: Bond Guarantee Program, 89 Fed. Reg. 104290. (Dec. 20, 2024). Applicants, including a CAMEO member, submitted their materials and received review from the CDFI Fund and Treasury in order to verify that their applications met the statutory and regulatory requirements of the program. But even upon clearing that review, applications that Treasury had cleared were held by the Office of Management and Budget, despite OMB having no role under the Riegle Act or Treasury's implementing regulations in the application or approval process for Bond Guarantee Program applications.

~~136.~~118. OMB withheld its purportedly necessary approval from applications until the 2025 fiscal year ended on October 1, 2025. Once the fiscal year turned over, applicants were told that their applications under the 2025 NOGA could no longer be considered because the guarantee authority for that fiscal year had lapsed, and they would need to wait for the next fiscal year's NOGA to be issued before they could apply again.

~~137.~~119. After months of unexplained delay, the ~~fiscal year 2026~~FY2026 NOGA was issued on June 30, 2026—more than halfway through the fiscal year. Funding Opportunities: Bond Guarantee Program, FY 2026, Notice of Guarantee Availability, 91 Fed. Reg. 39697 (June 30, 2026). The 2026 NOGA provided an application window of approximately one week, closing on July 7 and 8. *Id.* Notably, the NOGA acknowledges that Bond Guarantee Program applicants are not compared against one another, they are evaluated only based on whether or not they fulfill the statutory and regulatory criteria defined for the program. As a result, the NOGA provides that "[i]f the CDFI Bond Guarantee Program receives applications requesting more than the amount of the Guarantee authority, then it reserves the right to reduce the award amount to applicants as necessary in order to maximize the utilization of the Guarantee authority." 91 Fed. Reg. at 39698.

~~138.~~120. Multiple applicants submitted applications in response to the 2026 NOGA, including a CAMEO member, which submitted its application on July 1, 2026. By August 6, that member was told that Treasury's credit review and due diligence checks were complete, and that Treasury had approved the proposed transaction under its policies, procedures, and applicable regulations. By mid-August, that

member was told that all underwriting and credit approvals had been completed and that the proposed transaction had been delivered for final clearance to OMB.

~~139.~~121. OMB then sat on the application through September 29, the date of ~~this~~Plaintiffs' First Amended Complaint and one day before the expiration of the ~~fiscal year 2026~~FY2026 guarantee authority Congress provided. Following Plaintiffs' filing of their First Amended Complaint and a motion for a temporary restraining order seeking to compel Defendants to exercise the Bond Guarantee Program's authority before the FY2025 authorization expired, the CDFI Fund attested on September 30 that it had exercised that authority just hours before its expiration.

**OMB's Continued Impoundment of FY2026 CDFI Fund Appropriations**

122. OMB's withholding of money from the CDFI Fund goes far beyond the FY2025 award cycle. Through a series of maneuvers, OMB has prevented Treasury and the CDFI Fund from accessing or distributing funds for the CDFI Fund's own operations and for its award programs. These include another $324 million for FY2026 appropriations, which will expire on September 30, 2027 if they go unobligated, as well as approximately half a billion dollars that are available for the Fund to spend with no specific expiration date.

123. Since Congress appropriated that money on February 3, 2026, OMB has refused to apportion the CDFI Fund's FY2026 operating and award funds in a manner that CDFI Fund can access. Treasury and CDFI Fund are required to have requested apportionment, but because those requests are nonpublic, it is unclear whether the request has been made and ignored by OMB, or whether Treasury and CDFI Fund did not make the request.

124. As of the date of this Second Amended Complaint, all of the available evidence indicates either that OMB has unlawfully impounded these funds, rendering them inaccessible to the CDFI Fund, despite the fact that Congress appropriated these funds to be spent on the CDFI Fund and its programs—or that Treasury and CDFI Fund have unlawfully refused to request their apportionment from OMB.

125. Under either scenario, the failure to request or failure to apportion violates the Antideficiency Act.[110]

---

[110] 31 U.S.C. § 1513(b).

126. Because Congress appropriated the money on February 3, 2026, the Antideficiency Act required Treasury and CDFI Fund to request apportionment by February 18, and required OMB to apportion the money for CDFI Fund's use by March 5, 2026.

127. OMB did not apportion the money until September 17, 2026.

128. When OMB did finally apportion the FY2026 programmatic funds, it did so by a Category C apportionment that prevents the CDFI Fund from accessing them.[111] OMB's withholding violates the Antideficiency Act's provisions limiting when OMB may not apportion for agency use the full amounts appropriated, so as to establish a "reserve."[112]

129. Once FY2026 turned over to FY2027, OMB's FY2026 Category C apportionment had no effect. But that did not render the funds available for Treasury and CDFI Fund to access or obligate. Rather, OMB has made no FY2027 apportionment for the FY2026 funds, which means that Treasury and CDFI Fund still cannot access them.

130. Because agency apportionment requests are nonpublic documents, it is not clear whether the lack of apportionment has occurred because Treasury and CDFI Fund failed to request one, or because they have and OMB has refused to make the apportionment.

131. Under the Antideficiency Act and OMB's own governing policies, in order to effectuate Congress's multi-year FY2026 appropriation, Treasury and CDFI Fund should have requested an apportionment applying to FY2027 by August 21, and OMB should have made the apportionment for FY2027 by September 10.[113] But no FY2027 apportionment of the FY2026 appropriated funds has been made.

132. Unless OMB apportions the funds in a manner the CDFI Fund can access, and CDFI Fund obligates them for the purposes Congress defined, they will expire on September 30, 2027.

---

[111] 31 U.S.C. § 1513(b)(2)(B). 31 U.S.C. § 1513(b)(2)(B). 31 U.S.C. § 1513(b)(2)(B). *See* Off. of Mgmt. & Budget, Apportionment of TAFS 020-1881 2026/2027, Community Development Financial Institutions Fund Program Account, Iteration No. 1 (approved Sep. 17, 2026) OpenOMB, https://perma.cc/R4PX-DBRR. (showing funds were "Apportioned in FY 2027").

[112] *Id*31 U.S.C. § 1512(c).

[113] 31 U.S.C. § 1513(b); Off. of Mgmt. & Budget, Exec. Off. of the President, OMB Circular No. A-11, *Preparation, Submission, and Execution of the Budget* § 120.40 at 120-21 (2026), https://perma.cc/XH2N-CMU6.

133. OMB is also withholding money Congress appropriated from the CDFI Fund under the 2026 Continuing Resolution. Since September 2, 2026, the federal government has been funded through a continuing resolution that automatically provides a prorated share of the previous appropriation's funding levels, indexed to the duration of the fiscal year the continuing resolution covers. That prorated amount of funding is automatically apportioned to federal agencies for their use during the time covered by the continuing resolution unless OMB takes specific action to override that apportionment.[114]

134. OMB has taken affirmative action to withhold the money automatically apportioned for the CDFI Fund's use under the continuing resolution, leaving it with only $200,000 in operating funds that will come in through fee collection and other self-generating means—not from a congressional appropriation. OMB has left the CDFI Fund no other accessible money. If OMB had not taken that affirmative action to interfere, automatic implementation of the continuing resolution would have apportioned roughly $6 million to the CDFI Fund for its use.

135. Finally, OMB is has also failed to apportion, in a manner that Treasury and the CDFI Fund can access to fund the CDFI Fund's programs, money in the CDFI Fund's accounts that are unrestricted as to what fiscal year those funds must be spent ("no-year funds").[115] Those funds have been apportioned through a Category C apportionment that renders them inaccessible to Treasury or the CDFI Fund. As of the time of this complaint, the available information is that OMB has deprived the CDFI Fund of more than $500 million of "no-year" CDFI Fund money by using Category C apportionments to keep them out of the CDFI Fund's hands.

136. Defendants have offered no explanation, in the Federal Register or anywhere else, for OMB's refusal to apportion the FY2026 funds so that Treasury can spend them or for apportioning the no-year funds through Category C, making them inaccessible to Treasury. Nor have Defendants offered any explanation for failing to announce NOFAs for FY2026 CDFI Fund award programs, though the funds expire in less than a year.

---

[114] Off. of Mgmt. & Budget, Exec. Off. of the President, OMB Bulletin No. 27-01, Apportionment of the Continuing Resolution(s) for Fiscal Year 2027 (Sep. 28, 2026), https://perma.cc/S6QB-6VSK.

[115] *See* OpenOMB, *TAFS: 020-1881/X – Community Development Financial Institution Fund Program Account*, https://perma.cc/N62T-JV7J (showing OMB has apportioned CDFI Fund's no-year funds to an account that cannot be accessed until fiscal year 2028).

## The Withheld FY2026 Application Cycle

137. As of the date of this Second Amended Complaint, CDFI Fund has not published in the Federal Register NOFAs for FY2026 awards for the CDFI Program, the Native American CDFI Assistance (NACA) Program, or the Small Dollar Loan Program, Bank Enterprise Award Program, or Capital Magnet Fund.[116] Nor has it published a NOGA for FY2027 for the Bond Guarantee Program.[117] .

138. Typically, the CDFI Fund has published NOFAs for awards early in the same year that Congress appropriates the money for those awards. For example, in the FY2020 funding round, Congress appropriated the funds on December 20, 2019 in the Consolidated Appropriations Act of 2020.[118] The CDFI Fund published NOFAs corresponding to the CDFI and NACA Programs on February 21, 2020.[119] And the CDFI Fund announced awards on September 24, 2020.[120]

139. The CDFI Fund adhered to similar timelines for award money appropriated for the FY2021 funding round (NOFA publication February 19, 2021; awards announced September 16 and December 8, 2021); the FY2022 funding round (NOFA publication February 11, 2022; awards announced September 26, 2022 and February 28, 2023); and the FY2024 funding round (NOFA published December 11, 2023, awards announced September 26 and November 21, 2024).[121]

140. The CDFI Fund's handling of the award money appropriated for FY2026 funding round so far stands in stark contrast to its prior history. Though the money was appropriated in February 2026, the

---

[116] In September of 2026, the CDFI Fund announced that it was making "FY2026" awards for the Small Dollar Loan Program and Bank Enterprise Award Program. But the June 2026 NOFAs for those funding rounds show that the funds being obligated during that funding round were appropriated in the Full-Year Continuing Appropriations and Extensions Act of 2025, Pub. L. No. 119-4. *See, e.g.*, 90 Fed. Reg. 39666 (June 30, 2026 Small Dollar Loan Program Notice of Funding Opportunity noting that the funds to be distributed are "based on FY 2025 appropriations" citing Pub. L. 119-4); Declaration of Alexandria Smith, ECF No. 20-1 (explaining that the June 2026 notices for the Bank Enterprise Award and Small Dollar Loan Programs facilitated the award of FY2025 funds).

[117] Unlike the CDFI Fund's discretionary awards, which are a year behind schedule, the Bond Guarantee Program's next NOGA will pertain to FY2027, not FY2026, because in FY2025 the Bond Guarantee Program's authority lapsed unused.

[118] Consolidated Appropriations Act, 2020, Pub. L. No. 116-93, 133 Stat. 2317, 2437 (2019).

[119] CDFI Program FY 2020 Notice of Funds Availability, 85 Fed. Reg. 10219 (Feb. 21, 2020); NACA Program FY 2020 Notice of Funds Availability, 85 Fed. Reg. 10240 (Feb. 21, 2020).

[120] Press Release, CDFI Fund, U.S. Treasury Awards $204.1 Million to Support Economic Growth in Low-Income, Distressed, and Native Communities (Sep. 24, 2020), https://perma.cc/JR46-LD52.

[121] FY2023 and FY2024 applications were combined because the relevant application form underwent the PRA review process in 2023.

CDFI Fund still had not announced awards for the FY*2025* round by the time the FY2026 award funds were appropriated—and took until September 22, 2026 to obligate the FY2025 funding round awards.

141. As of November 18, 2026, the date of this Second Amended Complaint, the CDFI Fund still has not published NOFAs to open the FY2026 funding round for any of its award programs. In prior years, the CDFI Fund would likely have published its NOFAs, accepted applications, processed applications, and announced at least some of the awards by this point in the year. Instead, the FY2026 funding round has not even started.

142. The CDFI Fund also has not published the FY2027 funding rounds for the Bond Guarantee Program. Accordingly, the funding rounds has not opened and no applications can be submitted by CDFIs seeking to fairly compete for that program.

143. Without publication in the Federal Register of NOFAs (or a NOGA) pertaining to each of the CDFI Fund's programs, it cannot open applications for the FY2026 funding or other supports that Congress tasked the Fund with delivering to CDFIs.

144. The CDFI Fund also cannot distribute FY2026 or FY2027 funds or other supports without soliciting and receiving applications using a Fund-provided form. Among the CDFI Fund's programs, its applications for the CDFI Program and the NACA Program expire within months, and the CDFI Fund has not obtained approved application forms to replace the expiring forms.

145. In addition, the CDFI Fund's form for CDFI Certification, which is necessary for a CDFI to participate in most of the Fund's programming, is also set to expire within months. The Fund has not obtained an approved replacement.

146. In addition, the CDFI Fund's form for Community Development Entity Certification, which is necessary to participate in the New Markets Tax Credit Program, is also set to expire within months. The Fund has not obtained an approved replacement.

147. Each updated application form must be approved through the process defined in the PRA. That process requires actions by both the CDFI Fund and the OMB Director, including publication of the proposed form by the CDFI Fund in the Federal Register followed by a 60-day comment period; consideration of comments; transmission to OMB and publication of a new notice in the Federal Register

followed by a 30-day comment period; and within 60 days of that publication, approval or denial of the form by the OMB Director. All told, the PRA process often takes around 120-180 days, with agencies often taking 30 days to process comments after the initial 60-day comment period before sending the proposed form to OMB.

148. CDFI Fund published a proposed form for CDFI Program Certification on September 30, 2026; and published proposed forms for the CDFI and NACA Program Applications and CDE certification on October 30, 2026. Under a 120-day timeline, unless disapproved by OMB, those forms would become available around January 28, 2027 and February 27, 2027, respectively.

149. This means that even under the most optimistic scenario, CDFI Fund's updated forms may not be available for use until approximately one year later than the CDFI Fund would historically have opened the funding round.

150. The most optimistic scenario is far from guaranteed. While the PRA defines timelines for comment periods that must be undertaken by CDFI Fund and OMB, it does not provide a timeline for CDFI Fund's consideration of comments following its 60-day comment period for each proposed form. Unreasonably delaying re-publication of the forms in the Federal Register following the comment period provides CDFI Fund or Treasury another avenue by which to unlawfully delay, restrict, or withhold funding or other supports from CDFIs.

151. OMB disapproval of a form under the PRA could provide another avenue for Defendants to delay, restrict, or withhold funding or other supports from CDFIs.

152. In 2026, even after publishing the relevant NOFAs and NOGA, and soliciting and receiving applications, OMB, Treasury, and CDFI Fund continued to withhold obligation of CDFI Fund awards and exercise of its other authorities in support of CDFIs before their expiration, only relenting when faced with emergency motions for relief in this litigation. Absent court intervention, Defendants will be left to continue their Impoundment Policy and withhold obligation of FY2026 awards and exercise of other authorities through their expiration on September 30, 2027.

### Impact on Plaintiffs and Their Communities

~~140.~~153. Defendants' unexplained departure from their prior policy of disbursing funds to CDFIs before those funds expire, withholding ~~fiscal year 2025~~FY2025 funds, and impounding and withholding the funds for fiscal years 2026 and beyond, has caused and continues to cause substantial disruption to CDFIs and the communities they serve.

#### *A. Inclusive Action for the City*

~~141.~~154. Inclusive Action was founded more than a decade ago to advocate for working people in Los Angeles County, California. Today, Inclusive Action is a CDFI serving micro- and small business owners.

~~142.~~155. Inclusive Action's mission is to champion working people, invest in entrepreneurs, and change systems to build an economy that works for all of us. It aims to provide underserved entrepreneurs with the capital they need to grow their business, enter and remain in the formal economy, and expand and stabilize their operations so that they can create local jobs and serve their communities. Some of Inclusive Action's small business customers are enterprises that need injections of capital in order to transition from cottage industry to the formal economy.

~~143.~~156. The entrepreneurs served by Inclusive Action are often trapped in debt cycles and unable to build wealth. Inclusive Action's lending exists to serve borrowers the mainstream credit market will not, including entrepreneurs whose preexisting assets, geographic location, credit history, legal or work history, or immigration or citizenship status fall outside the parameters conventional lenders serve. Their communities are targeted by predatory payday lenders, and they have extremely limited access to banks and traditional financial products. For those entrepreneurs, the realistic alternative to a CDFI loan is not a bank loan. It is a predatory loan at an exorbitant interest rate, subject to abusive collection practices—or no loan at all.

~~144.~~157. The capital Inclusive Action deploys has concrete, traceable effects on small businesses and the jobs they create. Its loans allow neighborhood restaurants to buy kitchen equipment; street vendors to obtain the permits they need to enter the formal economy; and local businesses to keep paying employees through unexpected closures caused by natural disasters, construction, and other

interruptions. For example, Inclusive Action loans are helping businesses that lost their entire physical footprint in the 2025 Eaton fire to reopen.

145.158. Since its founding, Inclusive Action has reached more than 9,400 small businesses with loans or grants, deployed more than $5 million in capital to small business owners through loans and more than $6 million in grants, and provided more than 6,700 hours of free business coaching to its customers and to members of the communities it serves.

146.159. Prior to the fiscal year 2025FY2025 award cycle, Inclusive Action received seven awards from the CDFI Fund, including Technical Assistance, Financial Assistance, Equitable Recovery Program, and Rapid Response Program awards. Each award has had a material impact on Inclusive Action's institutional stability and its capacity to extend low-cost credit to Los Angeles-area entrepreneurs.

147.160. The financial assistance Inclusive Action gets from Treasury's CDFI Fund directly furthers Inclusive Action's mission by increasing its loan fund by 10% annually, allowing it to serve more of its community and manage its institutional growth sustainably. Those awards help Inclusive Action keep its loans affordable at a time when the cost of capital has gone up in recent years as interest rates have increased—which is what permits Inclusive Action to extend low-interest loans to borrowers who would otherwise be driven to payday lenders and similar products. CDFI Fund awards have also funded Inclusive Action's cushion against loan losses and have supplied the loan capital for its consumer and small-business lending products. In addition, the CDFI Fund awards help fund Inclusive Action's operational and staffing costs.

148. For the CDFI Program's fiscal year 2025FY2025 cycle, Inclusive Action timely submitted an application following the Notice of Funding Availability openedpublished on January 16, 2025; applications were due March 21, 2025; and. By the government stated that it expected to announce awards by Fall 2025. Inclusive Action timely submitted its application for the 2025 Financial Assistance funding round by that deadline.

149. On September 24, 2025,time Inclusive Action received a notification from the CDFI Fund that the organization had advanced to Step 4 of the Financial Assistance evaluation process. Step 4 of the

evaluation process is the last remaining step before award amounts are determined and announced.[122] That notification also advised that, "to reflect the current Administration's priorities," the CDFI Fund was providing applicants that had advanced to Step 4 of the process the opportunity to reopen and update their applications to align with those priorities.

150. Following the CDFI Fund staff's termination by the Administration in October 2025, and their reinstatement by Congress in November 2025, that deadline to reopen and update applications was later extended to April 10, 2026, and Inclusive Action resubmitted by that deadline.

151. Since April 2026, Inclusive Action has heard nothing from the CDFI Fund—no status information and no award decision.

152.161. Inclusive Action's filed this suit, its 2025 application has nowhad been pending roughly seventeen months, more than double the time any prior Inclusive Action application to the CDFI Fund hashad taken to reach a decision. In past award cycles, Inclusive Action hashad not waited longer than approximately seven months from submission of its application to be notified of the CDFI Fund's award decision. Defendants offered Inclusive Action no explanation for the delay.

153. Nothing about the 2025 cycle resembles the CDFI Fund's prior practice, and Defendants have offered Inclusive Action no explanation for the delay.

162. This delay has harmed Inclusive Action. The 2025 Following the litigation of Plaintiffs' motions for preliminary relief in this action, and Defendants' announcement of awards, Inclusive Action learned that it had been selected for a FY2025 FA award.[123] Inclusive Action intends to submit an application for a FY2026 award from the funds set to expire September 30, 2027. But because the CDFI Fund has not published any NOFA and no application is available, Inclusive Action is faced with the prospect that the FY2026 funding round may not open and it may be deprived of the opportunity to fairly compete for a FY2026 award.

---

[122] *See Notice of Funds Availability*, 90 Fed. Reg. at 6069-70.

[123] Though the award has been announced, no Financial Assistance Agreement has been transmitted by the CDFI Fund as of the date of this Second Amended Complaint. As a result, Inclusive Action has not been able to access funds resulting from its award.

163. Defendants' failures to administer the CDFI Fund's programs have resulted in delays across the FY2025 and FY2026 funding cycles, and, each cycle, deep uncertainty over whether the programs will be administered and funded at all. These failures have imposed and continue to impose harm on Inclusive Action.

~~154.~~164. Each funding cycle, Inclusive Action has faced the serious possibility that Defendants will deprive it of the fair opportunity to compete for CDFI Fund awards. The stakes of the funding cycles are significant for Inclusive Action. For example, the 2025 Financial Assistance award Inclusive Action sought ~~represents~~represented approximately one fourth of the remaining capital it ~~needs~~needed to meet its current lending goals for 2026. That money ~~could~~was intended to support around 34 small businesses that depend on CDFIs for access to capital. Inclusive Action anticipates a FY2026 application, which it intends to submit if Defendants permit applications, would account for a similar share of the capital it needs. Losing the opportunity to fairly compete for a monetary award, let alone one of such significance, injures Inclusive Action.

165. If the CDFI Fund does not announce awards before the funding for those awards expires on September 30, 2027, Inclusive Action will permanently lose the opportunity to fairly compete for FY2026 awards because the funds Congress appropriated for those awards will become permanently unavailable. And as a result, Inclusive Action's clients will never see a penny of the FY2026 award funding that Congress appropriated. Without an award, Inclusive Action will be able to serve fewer small businesses and entrepreneurs because it will need to scale back its lending program for the calendar year 2028, missing its targets for the number of small businesses Inclusive Action has planned to serve with loans and grants. Inclusive Action will also have to scale back its technical assistance educational offerings, including the free business coaching it provides to clients and members of the community—services that are critical to minimizing its clients' default rates and promoting their business success.[124]

---

[124] Indeed, promoting its clients' business success supports Inclusive Action's stability and viability, as successful clients are more likely to timely repay their loans. Conversely, being forced to curtail its educational offerings may increase Inclusive Action's own institutional risk and harm its mission by increasing its clients' risk of delinquency or default.

And Inclusive Action may need to reduce staffing, which would have a sustained impact on its operations.

166. Every month the application sits undecidedLosing the fair opportunity to compete for CDFI Fund awards also damages Inclusive Action's relationships with, and ability to raise capital from, non-government funders. Even if it receives financial support from the CDFI Fund, Inclusive Action relies upon access to capital from non-government funders for two reasons: first, because like the overwhelming majority of CDFIs it requires multiple sources of capital to operate; and second, because CDFI Fund awards require recipients to match the Fund's award with non-government funds.

155.167. Defendants' implementation of their Impoundment Policy also causes Plaintiffs ongoing harm each day that Defendants sabotage, delay, and withhold the CDFI Fund's programming and administration of that programming. Inclusive Action is also injured by the uncertainty surrounding the availability and timing of FY2026 Financial Assistance awards, an extension of the uncertainty it has faced since 2025. Every month of uncertainty over the status of Inclusive Action's application, and its future ability to submit an application and fairly compete for an award, is a month in which Inclusive Action cannot commit that capital, cannot plan its loan book against it, and cannot extend credit it would otherwise extend. The uncertainty also makes it more difficult for Inclusive Action to raise funds from non-governmental sources, as those sources look to the CDFI Fund's support of the CDFI industry and Inclusive Action specifically as indicators of stability and safe investment.

156.168. Defendants' conductThe uncertainty has alreadyalso damaged Inclusive Action's ability to raise moneyfunds from alternative, non-governmental, sources. Because CDFI Fund awards increase Inclusive Action's institutional stability and capacity, they make Inclusive Action a more attractive investment for major financial institutions, philanthropies, and private lenders. Defendants' unpredictable treatment of the CDFI Fund's awards has harmed and is harming Inclusive Action because it chills investors who view the CDFI industry as potentially unstable, given the uncertainty of federal funding. This has harmed Inclusive Action's ability to secure investment from non-federal sources, such as private lenders and philanthropic organizations.

157. The CDFI Fund's delay and failure to announce awards for the fiscal year 2025 funding round also harms Inclusive Action's ability to fairly compete for funding from the CDFI Fund. The inability to compete for fiscal year 2025 funds will harm Inclusive Action's ability to carry out its mission of serving small businesses and entrepreneurs. And the loss of the ability to meaningfully compete for CDFI Fund money, even for the 2025 cycle alone, increases the perceived risk that Inclusive Action presents to private investors, impairing its ability to attract outside investment. Accordingly, Inclusive Action is harmed by the denial of the opportunity to compete for a pool of funds for which they are able and willing to compete.

158.1. If the CDFI Fund does not announce Financial Assistance awards before the funding for those awards expires on September 30, 2026, Inclusive Action will permanently lose the opportunity to fairly compete for fiscal year 2025 awards because the funds Inclusive Action applied for in March 2025 will become permanently unavailable. And as a result, Inclusive Action's clients will never see a penny of the fiscal year 2025 award funding that Congress appropriated. Without a fiscal year 2025 award, Inclusive Action will be able serve fewer small businesses and entrepreneurs because it will need to scale back its lending program for the calendar year 2027, missing its targets for the number of small businesses Inclusive Action has planned to serve with loans and grants. Ultimately, theseInclusive Action will also have to scale back its technical assistance educational offerings, including the free business coaching it provides to clients and members of the community—services that are critical to minimizing its clients' default rates and promoting their business success.[125] And Inclusive Action may need to reduce staffing, which would have a sustained impact on its operations.

159.169. These harms will be acutely felt by the small business owners that Inclusive Action serves. The entrepreneurs who needed a permit, a piece of kitchen equipment, or a payroll bridge will be forced to go without or turn to a predatory lender instead of working with Inclusive Action's mission-based lending program. And when Inclusive Action cancels or curtails its educational programming,

[125] Indeed, promoting its clients' business success supports Inclusive Action's stability and viability, as successful clients are more likely to timely repay their loans. Conversely, being forced to curtail its educational offerings may increase Inclusive Action's own institutional risk and harm its mission by increasing its clients' risk of delinquency or default.

entrepreneurs will go without vital financial education they need to help their businesses in real time—a harm that cannot be remedied by a later payment even if funding is obligated in future fiscal years.

***B. CAMEO Network and its Members***

~~160.~~170. The California Association for Micro Enterprise Opportunity began in the early 1990s when four women from across California joined together to create business development programs to serve low-income women entrepreneurs. Three decades later, CAMEO Network is now an organization of more than 400 members nationwide dedicated to furthering business development across the nation with small and micro-business financing such as loans and credit, technical assistance, and business management training. CAMEO Network's members include small businesses, the organizations and institutions that serve them, policymakers, public agencies, and other non-traditional community-based partners that serve entrepreneurs as stakeholders in entrepreneurial ecosystems. Its members include 57 Community Development Financial Institutions (CDFIs). One of those CDFI members is Inclusive Action for the City in Los Angeles, California.

~~161.~~171. CAMEO Network's dues-paying members are located throughout California, and in Nevada, Arizona, Colorado, Michigan, Alabama, South Carolina, Florida, Virginia, Pennsylvania, and Maryland. Annually, CAMEO members serve about 200,000 very small businesses with training and access to capital.

~~162.~~172. CAMEO's members, including Inclusive Action and others, include CDFIs who have been harmed by the CDFI Fund's delay and withholding of not only ~~fiscal year 2025~~FY2025 and FY2026 award funds, but also of the instability and chaos caused by Defendants' actions. CAMEO counts among its membership CDFIs that have applied for the CDFI Program Financial Assistance and Technical Assistance, the Small Dollar Loan Program, the Bank Enterprise Award Program, and the Bond Guarantee Program—all of which ~~have failed to announce awards for fiscal year 2025 funds~~were upended by Defendants' actions for the FY2025 cycle, and none of which have announced applications for the FY2026 cycle.

~~163.~~173. CAMEO's main purpose is ~~in~~ promoting and protecting the interests of its members, who are being harmed by Defendants' conduct. CAMEO's members are harmed by the inability to fairly

compete for ~~fiscal year 2025 funding awards.~~FY2025 funding awards. Defendants' implementation of their Impoundment Policy also causes CAMEO's members ongoing harm each day that Defendants sabotage, delay, and withhold the CDFI Fund's programming and administration of that programming—an extension of the uncertainty they have faced since 2025. They are harmed by the uncertainty plaguing the CDFI industry and disrupting and disincentivizing private investment. And they will be harmed by permanently losing access to these funding opportunities.

~~164.~~174. CAMEO members, including Inclusive Action and others, ~~have~~ applied for ~~fiscal year 2025~~FY2025 CDFI Fund awards~~, but have still not received notification that~~ and would apply for FY2026 awards ~~have been issued and have yet to see any money flow~~if Defendants made applications available. CAMEO members have experienced the deep uncertainty over whether the programs will be administered and funded at all arising from ~~the CDFI Fund.~~Defendants' actions, including OMB's failure to apportion FY2026 funds and no-year funds to accounts the CDFI Fund can access and Defendants' failure to open and announce the FY2026 funding cycle. Those members ~~have been irreparably~~were and are harmed by the effective denial of their ability to compete fairly for the FY2026 awards and the uncertainty Defendants' withholding of the funds ~~has already~~ created and ~~the effective denial of their ability to fairly compete for the fiscal year 2025 awards~~creates, and will be further ~~irreparably~~ harmed if the ~~fiscal year 2025~~FY2026 funds become permanently unavailable.

~~165.~~ For Clearinghouse CDFI, CAMEO's member that has applied in 2025 and 2026 for the Bond Guarantee Program only to see the application sit undecided as the fiscal year comes to a close, the repeated running out of the clock has caused significant harm. Each year, Clearinghouse has had to deal with months of uncertainty, after having been led to believe the application was being evaluated consistent with law and regulation, only to have the application sit without explanation for a decision from OMB that is never made. In 2025, Clearinghouse awaited a decision on its application for months, only to have to turn to the capital market for funds instead when the Bond Guarantee Program simply let its application become moot at the end of the fiscal year. The capital that CDFIs can access through the Bond Guarantee Program is provided at much lower rates than the capital market provides, which is one of the key benefits of the program. Having been denied the opportunity to fairly compete for those funds,

after months of uncertainty, Clearinghouse had to turn to much more expensive sources of capital instead. This delay, uncertainty, and pivot decreased Clearinghouse's ability to extend its own financing to projects deserving of funds, including affordable housing projects and small business loans in both urban and rural areas. CAMEO members, including Inclusive Action and others, also have been harmed by the delayed announcement of the fiscal year 2026 funding cycle, and OMB's failure to apportion fiscal year 2026 funds and no-year funds to accounts that the CDFI Fund can use to support the important work that CAMEO's members do.

175.

176. Though Clearinghouse's FY2026 Bond Guarantee Program application was approved hours before the expiration of the CDFI Fund's authority on September 30, 2026—on information and belief, because of the emergency relief sought through this litigation—the delay and uncertainty of the program's administration caused by Defendants' Impoundment Policy harmed Clearinghouse as well. The uncertainty surrounding the Bond Guarantee Program and Clearinghouse's application status impeded Clearinghouse's ability to plan its financial outlook and thus its programmatic activities, ultimately harming the people and communities Clearinghouse serves. The uncertainty also places strain on Clearinghouse's relationships with nongovernmental funders. If Defendants succeed in replicating their treatment of the FY2025 Bond Guarantee Program authority for the FY2027 application cycle, Clearinghouse will lose a second year of the fair opportunity to compete for the Bond Guarantee Program, which has already had a significant impact on Clearinghouse's performance, financial resilience, and financial outlook. If Defendants again fail to administer the Bond Guarantee Program before the FY2027 authority lapses on September 30, Clearinghouse will suffer further harm.

166.177. Defendants' actions are also harming CAMEO itself. CAMEO also offers training, consulting, access to capital, and affordable back-office services to help emerging and established CDFIs and technical assistance providers that provide business coaching to entrepreneurs. CAMEO's programs help advise its members on applying for funding from the CDFI Fund. A significant portion of CAMEO's work involves counseling their members through these training programs and resources.

~~167.~~178. CAMEO created and operates the National CDFI Academy, which provides ongoing education and skill development to microlenders' staff and board members. This educational programming helps identify and provide microlending best practices and technical assistance courses for business coaching organizations.

~~168.~~179. In addition to providing financial and technical resources to its members, CAMEO Network builds community among small business stakeholders, bringing members together to elevate best practices, develop relationships, and share information and support.

~~169.~~180. Faced with the uncertainty and instability that has characterized OMB's and Treasury's treatment of the CDFI Fund since 2025, CAMEO's members have turned to CAMEO to help them decipher what is happening in the CDFI Fund's programs that affect them. The uncertainty at the federal level has taken a toll on CDFIs and, for some, has wreaked havoc on their financial stability and ability to operate.

~~170.~~181. CAMEO has diverted significant resources to trying to figure out exactly what is happening with the CDFI Fund, the status of Notices of Funding Availability tied to each CDFI program for two consecutive fiscal years, and how the applications submitted by member CDFIs will be handled, in order to counsel their members effectively.

~~171.~~182. For example, CAMEO has spent significant resources with respect to both its staff and paid consultants to track what is going on with the funds Congress appropriated for the CDFI Fund to distribute to receiving CDFIs, and, given the lack of transparency about the administration of the CDFI Fund, any information that can be gleaned from private conversations between government officials and CDFI industry stakeholders.

~~172.~~183. In order to make sense of the government's actions with respect to the CDFI Fund, CAMEO has had to change the scope of work it contracted a paid consultant to execute, shifting the consultant's time away from facilitating congressional relationship building in order to educate legislators on the needs of small businesses and the financial institutions that serve them. In place of that work, CAMEO's consultant spends their time tracking what little information is publicly available about the

administration's handling of the CDFI Fund and working sources to understand what is happening to the government's CDFI programs.

173.184. In order to ensure it is tracking and responding to its members' needs, CAMEO has also conducted numerous leadership polls of its membership and provided regular updates specific to the evolving status of the CDFI Fund.

174.185. CAMEO has also had to divert staff and leadership time to responding to the ripple effects of the government's unstable administration of its CDFI programs on non-governmental financial supporters of CDFIs. The federal government's unstable handling of the CDFI Fund has generated concern and anxiety among non-governmental CDFI funders, many of whom are seeking clarity and seriously considering limiting or ending their investments in the industry.

175.186. If the fiscal year 2025FY2026 CDFI Fund award money expires before Treasury obligates the funds to CDFIs, some of CAMEO's CDFI members will likely scale back their participation and utilization of CAMEO's membership programming. For example, if no fiscal year 2025 funding flows to CDFIs, CAMEO expects that some of its CDFI members would fail to renew their membership dues or choose to pay for fewer National CDFI Academy course offerings. CAMEO has already seenDuring the uncertainty and instability of the FY2025 funding cycle, CAMEO experienced double-digit declines in both the number of organizations and the number of attendees in one of its signature membership events for 2026 as compared to previous years when CDFI Fund money flowed without obstruction.

176. For Clearinghouse CDFI, CAMEO's member that has applied in 2025 and 2026 for the Bond Guarantee Program only to see the application sit undecided as the fiscal year comes to a close, the repeated running out of the clock has caused significant harm. Each year, Clearinghouse has had to deal with months of uncertainty, after having been led to believe the application was being evaluated consistent with law and regulation, only to have the application sit without explanation for a decision from OMB that is never made. In 2025, Clearinghouse awaited a decision on its application for months, only to have to turn to the capital market for funds instead when the Bond Guarantee Program simply let its application become moot at the end of the fiscal year. The capital that CDFIs can access through the Bond Guarantee Program is provided at much lower rates than the capital market provides, which is one

of the key benefits of the program. Having been denied the opportunity to fairly compete for those funds, after months of uncertainty, Clearinghouse had to turn to much more expensive sources of capital instead. This delay, uncertainty, and pivot decreased Clearinghouse's ability to extend its own financing to projects deserving of funds, including affordable housing projects and small business loans in both urban and rural areas. The compounded loss of two years of a fair opportunity to compete for the Bond Guarantee Program has had a significant impact on Clearinghouse's performance, financial resilience, and financial outlook. If Defendants again fail to act on Clearinghouse's 2026 application and the Bond Guarantee Program authority lapses on September 30, Clearinghouse will suffer further harm.

### *C. The Communities Plaintiffs Serve*

177.187. CDFIs serve communities that the conventional banking system has largely passed over. Viable businesses, run by capable people, need capital and investment to succeed and thrive. But many of these entrepreneurs get turned down by traditional financial institutions because they lack collateral, a long credit history, or family wealth to put up as a down payment—not because their business does not work or is unworthy of investment.

178.188. The work of CDFIs reaches rural towns without a bank branch for miles, urban neighborhoods scarred by decades of redlining, tribal lands, immigrant communities, and small business owners whose creditworthiness and entrepreneurial spirit cannot be captured by an automated underwriting score.

179.189. CDFIs finance affordable housing, childcare centers, health clinics, grocery stores, and the small enterprises that anchor local economies and employ neighbors. Just as importantly, they pair capital with relationships — technical assistance, financial coaching, and patient underwriting that reflects genuine knowledge of the borrower and the place where the borrower operates. That combination allows CDFIs to take on risk that conventional lenders will not, and to build lasting wealth and resilience in communities where the absence of accessible capital has been a persistent barrier to opportunity.

180.190. For a small business owner in one of these places, the practical choice is rarely between a CDFI loan and a bank loan. It is between a CDFI loan and a predatory lender—often demanding interest

rates in the triple digits. Those products do not fund growth; they consume it, and they frequently push an otherwise viable business into a cycle of refinancing that ends in closure.

181.191. If the CDFI Fund continues to delay, withhold, and impound funding for the CDFI Fund's crucial programs, those harms will be felt not just by the CDFIs, but also by the communities they serve and the small businesses and entrepreneurs who will increasingly be forced to seek capital from much higher risk sources — or forego their dream of starting or growing a business at all.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the APA 706(2) — Arbitrary and Capricious
***Against all Defendants***

182.192. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

183.193. A reviewing court must "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

184.194. Defendants' actions, evince their refusal and intent to refuse to spend the money or exercise the authorities Congress appropriated and assigned for the CDFI Fund and its programs. Defendants' Impoundment Policy has motivated the actions they have undertaken to prevent the CDFI Fund from implementing its statutory duties since the Trump-Vance Administration took office: in first proposing elimination of the CDFI Fund's discretionary award program entirely in the President's budget; terminating all CDFI Fund staff (who were only reinstated pursuant to a subsequent congressional mandate); delaying the apportionment of the fiscal year 2025 CDFI Funds until less than six months before those funds are set to expireFY2025 CDFI Fund moneys; failing to obligate or spend the fiscal year 2025 CDFI FundsFY2025 CDFI Funds until emergency relief was sought from this Court; fiercely opposing Plaintiffs' requested relief seeking the obligation of the FY2025 funds and exercise of bond guarantee authority before they expired; refusing to request the FY2026 programmatic funds' apportionment or refusing to apportion the fiscal year 2026 FY2026 programmatic funds; and apportioning in a way Treasury and CDFI Fund can access; failing to publish NOFA documents necessary to open FY2026 funding round; failing to publish NOGA documents necessary to open FY2027 funding round; failing to prepare and approve application forms necessary for CDFIs to submit

funding applications; refusing to apportion the no-year CDFI funds into Category C suchin a way Treasury and the CDFI Fund can access for the CDFI Fund's programs; and affirmatively withholding FY2026 operating funds intended for the CDFI Fund under the 2026 Continuing Resolution. Each of these actions is independently arbitrary and capricious. Together, these actions evince Defendants' refusal and intent to refuse to spend the money or exercise the authorities that Treasury cannot access them; evince Defendants' refusal and intent to refuse to spend the money that Congress appropriatedCongress provided for the CDFI Fund and its programs.

185.195. In adopting and implementing the Impoundment Policy, Defendants are now attemptingseek to accomplish by unlawful means what they could not accomplish by lawful channelslegislation: the dismantling and defundingelimination of the CDFI Fund, its discretionary award programs, and the Bond Guarantee Program. AccordinglyBy continuing to delay and withhold apportionment of operating and award funds, form approvals under the process outlined in the Paperwork Reduction Act, the NOFA and NOGA publication necessary to open the current funding round, and administration of the CDFI Fund's programming, Defendants have adopted a policy to withhold, delay, impound, and otherwise not authorize, obligate, or spend for the purposes set by Congress the amounts appropriated for the CDFI Fund's programs ("the Impoundment Policy") before thosecontinue to pursue their Impoundment Policy for the appropriations and authorizationsauthorities Congress intends the CDFI Fund to spend and exercise before they expire on September 30, 2026 (for fiscal year 2025 funds and fiscal year 2026 Bond Guarantee Program authority) and September 30, 2027 (for fiscal year 2026 funds)..

186.196. Defendants' adoption of the Impoundment Policy is final agency action because it (1) marks the consummation of the agencies' decisionmaking process and (2) affects "rights or obligations" or creates "legal consequences[.]" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). And because Defendants' new policy constitutes "final agency action for which there is no other adequate remedy in a court," it is subject to judicial review under the APA. 5 U.S.C. § 704.

187. Defendants are implementing their Impoundment Policy through a series of actions, including: OMB's delayed or withheld apportionment of the CDFI Fund's appropriations, apportioning funds tin

~~ways that Treasury cannot access (by abusing "Category C" apportionments); Treasury's refusal to obligate those funds it is able to access; Treasury's delay in publishing notices of funding availability for several CDFI Fund programs, which are a necessary condition for the CDFI Fund to solicit applications for, and then make, awards; and the purported review authority OMB has sought to impose on the fiscal year 2025 funds through its use of the "A" footnote, which adds an additional step before Treasury may make awards from the CDFI Fund even after OMB apportioned that money to an account Treasury can access.~~

~~188. Each of these decisions also constitutes final agency action.~~

~~189.~~197. The effect of Defendants' Impoundment Policy is final because the appropriations and authorities will expire~~, either in~~ on September ~~2026 (for fiscal year 2025 funds) or in September~~30, 2027 ~~(for fiscal year 2026 funds).~~. Once the appropriations expire without having been spent, the money is permanently unavailable and cannot be recovered, whether by Defendants or by entities that should have received the funds through awards.

198. Each of the decisions Defendants have made to implement their Impoundment Policy also constitutes final agency action. For example, OMB's decision to apportion the no-year funds through a Category C apportionment that Treasury and CDFI Fund cannot access reflects the consummation of OMB's apportionment decisionmaking and has the legal effect of preventing the CDFI Fund from accessing over $500 million dollars.

~~190.~~199. A decision is arbitrary and capricious where Defendants "failed to consider an important aspect of the problem, offered an explanation for [their] decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Assoc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Defendants' decision is arbitrary and capricious for each of the following independently sufficient reasons:

~~191.~~200. First, Defendants considered factors that Congress did not permit them to consider. For example, Congress's mandatory appropriation of CDFI Fund money does not permit Defendants to consider whether they can refuse to spend the money that Congress directed be spent through the CDFI

Fund because they believe the CDFI Program is "woke" or otherwise inconsistent with the Administration's policy goals. Nor does the Antideficiency Act allow consideration of these factors in requiring Treasury and CDFI Fund to request, and OMB to apportion congressional appropriations no later than 30 days after the money has been appropriated or 20 days before the beginning of the fiscal year for which the appropriation is available. Defendants also are not permitted to consider whether obligating the CDFI Fund moneys and exercising its bond guarantee authority aligns with the President's proposed budget where that budget was not enacted into law by Congress.

~~192.~~201. Second, Defendants have failed to reasonably explain their decision, including under what authority Defendants believe they can refuse to spend Congress's appropriation and exercise congressionally assigned authorities after Congress explicitly rejected the President's proposal to eliminate the CDFI ~~Program~~Fund's programs.

~~193.~~202. Third, Defendants failed to consider the serious reliance interests implicated by the CDFI ~~Programs~~Fund's programs, including the interests of CDFIs themselves as well as the people, organizations, and communities that depend on those funds for loans, mortgages, financial services, educational programming, and other important functions.

~~194.~~203. Fourth, Defendants have failed to consider multiple important aspects of the problem. For example, there is no evidence that Defendants considered the detrimental impact of not obligating funds or exercising authorities, including the lack of access to capital and other financial services to small businesses and low-income rural and urban communities across the country. There is also no evidence that Defendants considered the increased reliance on predatory lenders that will result if CDFIs are unable to supply financial services and loans to entrepreneurs, homeowners, and others in underserved populations.

~~195.~~204. Fifth, there is no evidence that Defendants considered reasonable alternatives to impounding, withholding, or otherwise refusing to spend congressionally mandated funding for the CDFI Fund.

~~196.~~205. For each of these reasons, Defendants' conduct is arbitrary and capricious in violation of the APA.

**COUNT II**

**Violation of the APA 706(2) — Contrary to Law and In Excess of Statutory Authority**

***Against all Defendants***

~~197.~~206. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

~~198.~~207. A reviewing court must "hold unlawful and set aside agency action" that is "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C).

208. Pursuant to their Impoundment Policy, ~~Defendants have so far withheld, delayed,~~ Defendants' policy is to withhold, delay, or otherwise ~~failed~~fail to spend for the purposes set by Congress the amounts appropriated for the CDFI Fund for ~~fiscal year 2025~~FY2026, which are set to expire on September 30, ~~2026~~2027, as well as ~~fiscal year 2026 funds and~~ no-year funds. Defendants' policy is also to avoid announcing awardees under the Bond Guarantee Program, the authority for which also expires on September 30, 2027. In the FY2025 award cycle, Defendants also withheld, delayed, and failed to spend the amounts Congress appropriated for FY2025, and failed to announce awardees under the Bond Guarantee Program, ~~the authority for which is set to expire on September 30, 2026.~~ before Plaintiffs' lawsuit and emergency motions for preliminary relief compelled Defendants to act. Nonetheless, Defendants continue to withhold, delay, or otherwise fail to implement the CDFI Fund's programs for the FY2026 funding cycle.

~~199.~~209. Defendants' actions are contrary to law or in excess of statutory authority for four independent reasons~~: they contravene the Riegle Act, they contravene Congress's commands in the 2024 Appropriations Act, the 2025 Continuing Resolution, and the 2026 Appropriations Act; they contravene the 2026 Appropriations Act's specific prohibition on the executive branch seeking to unilaterally eliminate programs established and funded by Congress; and OMB's actions violate the Antideficiency Act~~.

210. ~~*First*~~*First*, pursuant to the Impoundment Policy, either Defendants Treasury and CDFI Fund have refused to request the apportionment of, or Defendant OMB has refused to apportion, by the deadlines set by Congress and for the purposes set by Congress, amounts that Congress appropriated to

fund the CDFI Fund and its programs for FY2026. Moreover, OMB has apportioned no-year funds in a Category C apportionment that Treasury cannot access, much less obligate or spend.

211. The Antideficiency Act requires OMB to "apportion in writing an appropriation available to an executive agency[,]" pursuant to an agency's request, 20 days prior to the start of the fiscal year for which the appropriations were provided or 30 days after the date of enactment of the appropriations act, whichever is later. 31 U.S.C. § 1513(b)(1)–(2). Congress appropriated funds for the CDFI Fund to spend in FY2026 on February 3, 2026. Under the Antideficiency Act, Treasury and the CDFI Fund were required to request an apportionment of those funds by February 18, 2026, and OMB was required to provide that apportionment, by March 5, 2026. But between February 3, 2026 and October 1, 2026 when the fiscal year turned over, OMB never apportioned those funds to an account that Treasury could access in FY2026—when it finally made an apportionment on September 17, 2026, OMB refused to apportion the money such that Treasury and CDFI Fund could access it. Instead, it issued a Category C apportionment that prohibited Treasury and CDFI Fund from accessing the money in FY2026.

212. Then, even though the fiscal year turned over to FY2027 on October 1, 2026, OMB has not apportioned the FY2026 funds at all—either because Treasury and CDFI Fund failed to request the apportionment, or because they made the request and OMB has refused to apportion the money.

~~200.~~213. *Second*, other than through the processes laid out in the ICA, which Defendants have not followed here, Defendants do not have authority to impound funds. Defendants' policy ~~violates~~first violated the 2024 Appropriations Act~~, the~~ and 2025 Continuing Resolution, and continues to violate the 2026 Appropriations Act, because those laws require Defendants to apportion and obligate money appropriated to the CDFI Fund in the amounts specified, by the dates specified, and for the purposes specified.

214. ~~*Second*~~*Third*, Defendants' failure to apportion and obligate the CDFI Fund money also violates the 2026 Appropriations Act and 2026 Continuing Resolution for an independent reason. Congress has included specific language in ~~that~~Appropriations Acts, including the 2026 Appropriations Act, prohibiting the President and his agents from attempting to unilaterally eliminate programs established and funded by Congress: "None of the funds made available in this or any other appropriations Act may

be used to increase, eliminate, or reduce funding for a program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act, or unless such change is made pursuant to the reprogramming or transfer provisions of this or any other appropriations Act."[126] The 2026 Continuing Resolution includes language imposing those same "conditions provided" in the 2026 Appropriations Act on the money appropriated by the Continuing Resolution.

201.215. Defendants' actions amount to an attempt to unilaterally implement the President's budgetary goal of dismantling and defunding the CDFI Fund, or at a minimum, reduce its funding. Either way, Defendants' actions under the Impoundment Policy with respect to the funds Congress appropriated under the 2024 Appropriations Act, the 2025 Continuing Resolution, and the 2026 Appropriations Act, and 2026 Continuing Resolution contravene the 2026 Appropriations Act and 2026 Continuing Resolution by attempting to advance the President's budgetary goals through unilateral means.

202. *Third*, pursuant to the Impoundment Policy, Defendant OMB has also refused to apportion, by the deadlines set by Congress and for the purposes set by Congress, amounts that Congress appropriated to fund the CDFI Fund and its programs for fiscal years 2026, and OMB has apportioned no-year funds in a Category C apportionment that Treasury cannot access, much less obligate or spend.

203. The Antideficiency Act requires OMB to make apportionments in writing to an executive agency either twenty days prior to the start of the fiscal year for which the appropriations were provided or thirty days after the date of enactment of the appropriations act, whichever is later. 31 U.S.C. § 1513(b)(2). Congress appropriated funds for the CDFI Fund to spend in fiscal year 2026 on February 3, 2026. Under the Antideficiency Act, OMB was required to apportion those funds by March 5, 2026. More than five months after that deadline, OMB has yet to apportion those funds to an account that Treasury can access.

204.216. For all of these reasons, Defendants' conduct is contrary to law in violation of the APA.

**COUNT III**

**Violation of the APA 5 U.S.C. § 706(1) — Agency Action Unlawfully Withheld or Unreasonably**

[126] Pub. L. No. 119-75, § 739, 140 Stat. 502.

**Delayed**
***Against all Defendants***

~~205.~~217. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

~~206.~~218. A reviewing court must "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

219. ~~The~~ Since the Trump-Vance Administration took office, Defendants have sabotaged the administration of the CDFI Fund's programs due to their policy disagreements with the programs' existence. Defendants' Impoundment Policy sought to delay the obligation of FY2025 award funds and exercise of other authorities until those funds and authorities expired on September 30, 2026. While motions for emergency relief in this litigation prompted a temporary reprieve, Defendants' adherence to the Impoundment Policy continues in their withholding and delay of award and other programs.

~~207.~~220. In early 2025, the CDFI Fund stated that it would announce ~~fiscal year 2025~~FY2025 awards in the fall of 2025. ~~Those~~ By August of 2026, those awards ~~have~~ still had not been announced~~, nearly a year later than promised. And as a result, the fiscal year 2025 funds appropriated for those awards have not been obligated or spent. The funds will expire within~~ and Plaintiffs saw little choice but to initiate this suit and seek obligation of the funds approximately six weeks ~~absent judicial intervention. The CDFI Fund has likewise~~before the funds and other authorities Congress delineated were set to expire. Defendants vigorously opposed obligating the funds, claiming that it was "unreasonable" and "impossible" for them to do "lawfully." Then, days before the expiration of those funds and authorities, Defendants took the action they had insisted they could not and should not~~ announced awardees under the Bond Guarantee Program. The fiscal year 2026 authority to guarantee bonds under that program will expire on September 30, 2026.~~ .

~~208.~~221. The 2024 Appropriations Act, ~~and the~~ 2025 Continuing Resolution, 2026 Appropriations Act, and 2026 Continuing Resolution require Defendants to obligate ~~fiscal year 2025~~FY2026 appropriated CDFI Fund money and exercise bond guarantee authority before the funds and authority expire on September 30, ~~2026. The 2024 Appropriations Act and the 2025 Continuing Resolution~~ 2027. The Acts thus impose a non-discretionary duty on OMB to apportion~~,~~; and Treasury and the CDFI Fund

to obligate and, spend, and exercise; appropriated CDFI Fund money and bond guarantee authority in the amounts specified, and for the purposes specified, prior to the expiration of those funds. and authorities.

209.222. In addition, the Antideficiency Act requires Treasury and CDFI Fund to request apportionment, and requires OMB to make apportionments in writing to an executive agency either thirtytwenty days prior to the start of the fiscal year for which the appropriations were provided or thirty days after the date of enactment of the appropriations act, whichever is later. 31 U.S.C. § 1513(b).

210. Defendants have not complied with their duties. Instead, Defendants have withheld and delayed appropriated monies from the CDFI Fund and its programs, prevented obligation of, and failed to obligate, those appropriated monies to assist people, small businesses, and communities as Congress intended.

211.223. OMB unlawfully withheld and delayed apportioning the CDFI Fund's fiscal year 2025Either Treasury and CDFI Fund have unlawfully withheld and delayed requesting apportionment, or OMB has unlawfully withheld and delayed apportioning the CDFI Fund's FY2026 discretionary award funds, though they were appropriated on February 3, 2026 and the Antideficiency Act requires their apportionment to an account Treasury and CDFI Fund can access by March 5, 2026 for use in FY2026 and by September 10, 2026 for use in FY2027. OMB has also taken affirmative action to decrease the amount in operating money the CDFI Fund was entitled to receive and would have received automatically under the 2026 Continuing Resolution, starving the CDFI Fund of approximately $6 million in operating money and limiting the Fund to $200,000 instead. This withholding is only the latest in a recurring pattern: OMB unlawfully withheld and delayed apportioning the CDFI Fund's FY2025 discretionary award money until April 8, 2026—over a year after Congress passed the 2025 Continuing Resolution on March 15, 2025, and long after the statutory deadline imposed by the Antideficiency Act.

212. OMB's imposition of a requirement that the CDFI Fund notify OMB three days in advance of obligating award amounts adds an additional step, affording OMB further, unauthorized control over expenditure of funds and further opportunity to delay or prevent Treasury's obligation of the funds before the end of the fiscal year.

213. And OMB continues not to apportion fiscal year 2026 programmatic funds, despite that appropriation having been made on February 3, 2026. Under the Antideficiency Act, OMB was required to apportion those funds by March 5, 2026.

224. Defendants have also failed or refused to publish the NOFA and NOGA documents necessary to open the FY2026 funding round; failed or refused to finalize timely updated application and certification forms necessary for CDFIs to seek the Fund's financial assistance; and prevented obligation of, and failed to obligate, the FY2026 appropriated monies to assist people, small businesses, and communities as Congress intended.

214.225. OMB likewise continueswithheld and might continue to withhold approval on Bond Guarantee Program applications, despite having no statutory or regulatory authority to do so.

215. Defendants' actions have thus amounted to a withholding of the funds and have caused an unreasonable delay in obligating the fiscal year 2025 funds that Congress appropriated before the funds expire on September 30, 2026. Further, OMB has refused to apportion the fiscal year 2026 programmatic funds the Antideficiency Act mandated that OMB apportion more than five months ago.

216. The September 30, 2026 expiration of the fiscal year 2025 funds and the Bond Guarantee Program authority is fast approaching, and the CDFI Fund has not taken action to ensure that the funding for these crucial programs will flow in time. The effect of continued inaction is irreparable because the appropriation and authorization will lapse permanently and the funds will never be recovered.

217.226. Defendants have unreasonably withheld and unreasonably delayed apportioning, obligating, and spending appropriated CDFI Fund funds, or exercising authorities, as directed by Congress in violation of the APA.

## COUNT IV
### Violation of Separation of Powers and Take Care Clause
### *Against all Defendants*

218.227. Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

219.228. The Constitution exclusively grants the power of the purse to Congress. *See* U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause); U.S. Const. art. I, § 8, cl. 1 (Spending Clause). The President lacks authority to enact, amend, or repeal statutes, *Clinton v. City of New York*, 524 U.S. 417, 438 (1998),

and, as the head of the Executive Branch, must "take care that the laws be faithfully executed." U.S. Const. art. II, § 3.

~~220.~~229. Consistent with these separation-~~-~~of-~~-~~powers principles, the Executive Branch has no unilateral authority to eliminate, modify, or disregard congressional appropriations and statutory programs.

~~221.~~230. By flouting Congress's statutory directives to spend appropriated CDFI Fund money through the CDFI Fund's administration and competitive award programs, Defendants have acted contrary to separation-~~-~~of-~~-~~powers principles and the Take Care Clause.

**COUNT V**
***Ultra Vires* Action (In the Alternative)**
***Against all Defendants***

~~222.~~231. The paragraphs above are incorporated and reasserted as if fully set forth here.

~~223.~~232. *Ultra vires* review is appropriate "when an agency has taken action entirely in excess of its delegated powers and contrary to a specific prohibition in a statute." *Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025) (citations and internal quotation marks omitted).

~~224.~~233. Defendants' impoundment of CDFI Fund funds is contrary to specific prohibitions in the 2024 Appropriations Act, the 2025 Continuing Resolution, ~~and~~ the 2026 Appropriations ~~Act's~~Act, and the 2026 Continuing Resolution's statutory mandates that the CDFI Fund obligate no less than the amounts specified by Congress, by the dates specified, and for the purposes specified.

~~225. Defendants' failure to announce awards under the Bond Guarantee Program is contrary to the Riegle Act and the 2026 Appropriations Act, which mandate that the Secretary approve qualified applications and guarantee bonds.~~

~~226.~~234. The 2024 Appropriations Act provides that "*not less than*" $188 million "is available" for Financial Assistance and Technical Assistance awards, along with specific amounts for the other CDFI Fund programs. Pub. L. 118-47, 138 Stat. 460 (emphasis added).

~~227.~~235. The 2025 Continuing Resolution held those amounts steady,[127] and under the same conditions as the 2024 appropriation,[128] prohibiting the executive branch from making available through the CDFI Fund any amount less than the funding levels that Congress specified, by the dates specified, and for the purposes specified.

~~228.~~236. The 2026 Appropriations Act held the CDFI Fund spending level steady once again,[129] and prohibited OMB and Treasury from using any of the "funds made available in this or any other appropriations Act" to "increase, eliminate, or reduce funding for a program, project, or activity as proposed in the President's budget request for fiscal year until such proposed change is subsequently enacted in an appropriation Act[,]".[130]

237. The 2026 Continuing Resolution provided continued funding for the CDFI Fund and its operations "at a rate for operations as provided in the applicable appropriations Acts for fiscal year 2026" and "under the authority and conditions provided in such Acts[.]"[131]

238. Nonetheless, either Treasury and CDFI Fund have failed to request, or OMB has refused to apportion, the funds that Congress appropriated for discretionary awards, and that expire on September 30, 2027. OMB has also deliberately overridden the automatic, prorated apportionment of operating costs the CDFI Fund should have received under the September 2026 Continuing Resolution in order to fund its own administration.

~~229.~~239. Defendants' actions in delaying, withholding, refusing to obligate, and impounding the CDFI Fund funds have violated these specific statutory requirements and prohibitions, and are entirely in excess for their delegated powers.

~~230.~~240. If relief is not available on Plaintiff's APA and constitutional claims, the Court should declare unlawful and enjoin Defendants' *ultra vires* actions.

## COUNT VI
## Mandamus Relief (In the Alternative)

---

[127] Pub. L. No. 119-3, § 1101(a)(5), 139 Stat. 8.
[128] *Id*. at § 1105.
[129] Pub. L. No. 119-75, 140 Stat. 173.
[130] Pub. L. No. 119-75, § 739, 140 Stat. 502.
[131] Pub. L. No. 119-103, div. A, § 101, 140 Stat. at 987.

***Against all Defendants***

231.241. The paragraphs above are incorporated and reasserted as if fully set forth here.

232.242. Mandamus relief is appropriate where "(1) the plaintiff's claim is clear and certain; (2) the [defendant's] duty is ministerial and so plainly prescribed as to be free from doubt; and (3) no other adequate remedy is available." *R.T. Vanderbilt Co. v. Babbitt*, 113 F.3d 1061, 1065 n. 5 (9th Cir.1997).

233.243. By delaying, withholding, refusing to obligate, and impounding money appropriated by Congress to the CDFI Fund, Defendants have violated their clear legal duty to apportion for the CDFI Fund's use, and obligate, CDFI Fund funds in the amounts specified, by the dates specified, and for the purposes specified in the 2024 Appropriations Act, the 2025 Continuing Resolution, and the 2026 Appropriations Act, and the 2026 Continuing Resolution.

~~234. By delaying, withholding, and refusing to act on applications for the Bond Guarantee Program by September 30, 2026, Defendants have violated their clear legal duty to carry out the Riegle Act.~~

235.244. If relief is not available under Plaintiffs' APA, constitutional, and *ultra vires* claims, the Court should grant mandamus relief.

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that this Court:

a. Declare that Defendants' Impoundment Policy, and their resulting failure to apportion, obligate, and award the funds Congress appropriated to the CDFI Fund for fiscal years 2025, 2026, and no-year funds, along with their refusal or failure to guarantee bonds pursuant to eligible applications made to the Bond Guarantee Program, is contrary to law, exceeds statutory authority, arbitrary and capricious, and constitutes agency action unlawfully withheld and unreasonably delayed;

b. Preliminarily and permanently enjoin Defendants from withholding those funds and withholding guarantee authority,; and order Defendants to take all steps necessary to guarantee bonds; and apportion, obligate, and award the competitive award funds in the amounts, for the purposes, and by the dates Congress specified — including by ~~obligating awards in the fiscal year 2025 funding round before September 30, 2026, and by~~ opening the

fiscal year 2026 funding round forthwith and making funding awards in due course~~;~~, and obligating awards in the fiscal year 2026 funding round before September 30, 2027.

c. Stay the effective date of Defendants' challenged actions, including the Impoundment Policy, under 5 U.S.C. § 705, or, in the alternative, postpone the expiration of the affected appropriations to the extent permitted by 5 U.S.C. § 705, 31 U.S.C. § 1502(b), and this Court's equitable authority pending this Court's review;

d. Retain jurisdiction to monitor Defendants' compliance, and require Defendants to file periodic status reports identifying the funds apportioned, obligated, and awarded;

e. Award Plaintiffs their costs, reasonable attorneys' fees, and other disbursements deemed appropriate; and

f. Grant such other relief as the Court deems necessary, just, and proper.

Date: ~~September 29~~November 18, 2026

~~*/s/ Daniel "Sparky" Abraham*~~
Daniel "Sparky" Abraham (SBN 299193)
**JUBILEE LEGAL**
300 E. Esplanade Dr., 9th Floor
Oxnard, CA 93036
(805) 946-0386
sparky@jubilee.legal

Respectfully submitted,

*/s/ Andrea J. Matthews*
Andrea J. Matthews (pro hac vice)
Anna L. Deffebach (pro hac vice)
~~Johanna M. Hickman (pro hac vice)~~
Steven Y. Bressler (pro hac vice)
Elena Goldstein (pro hac vice)
**DEMOCRACY FORWARD FOUNDATION**
P.O. Box 34553
Washington, DC 20043
(202) 304-3457 (Matthews)
amatthews@democracyforward.org
adeffebach@democracyforward.org
~~hhickman@democracyforward.org~~
~~consultantkmiller@democracyforward.org~~
sbressler@democracyforward.org
egoldstein@democracyforward.org

*Counsel for Plaintiffs*